Tanya L. Greene (Cal. Bar No. 267975)
  tgreene@mcguirewoods.com
Nicholas J. Hoffman (Cal. Bar No. 284472)
  nhoffman@mcguirewoods.com
McGUIREWOODS LLP
355 South Grand Ave., Suite 4200
Los Angeles, CA 90071-3103
Telephone: (213) 627-2268
Facsimile: (213) 627-2579

Lucy Jewett Wheatley (*Pro Hac Vice* Application forthcoming)
  lwheatley@mcguirewoods.com
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4320
Facsimile: (804) 698-2017

Attorneys for Plaintiffs Vans, Inc. and VF Outdoor, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANS, INC.; and VF OUTDOOR, LLC,<br><br>              Plaintiffs,<br><br>       vs.<br><br>WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADEMARK INFRINGEMENT (15 U.S.C. § 1114);**<br>**(2) UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a));**<br>**(3) CONTRIBUTORY TRADEMARK INFRINGEMENT;**<br>**(4) STATE UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200); AND**<br>**(5) COMMON LAW UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Vans, Inc. and VF Outdoor, LLC (collectively, "Vans") bring this Complaint against Defendants Walmart, Inc. ("Walmart"), The Doll Maker, LLC ("Doll Maker"), and Trendy Trading, LLC ("Trendy Trading"), and allege as follows:

## INTRODUCTION

1.      Vans is a world-famous footwear and apparel company that was founded in Southern California.  Operating on a "shoestring" budget, in 1966 a group of friends and partners, including brothers Paul Van Doren and Jim Van Doren, founded The Van Doren Rubber Company to manufacture shoes and sell them directly to the public.  In the 55 years since, Vans has become an iconic brand, known for its original, authentic, and distinctive shoes that embody Southern California counterculture.

2.      Vans' core product lines include its OLD SKOOL shoes, SK8-HI shoes, and Checkerboard Slip-On shoes.  Since first creating these shoes over 40 years ago, Vans has worked tirelessly to develop these shoe lines into their now-iconic status through the investment of enormous amounts of time, effort, and resources.



*Old Skool*                          *Sk8-Hi*                          *Checkerboard Slip-On*

3.      Despite early years of uncertainty, Vans' efforts paid off.  Over four decades later, these shoes are now some of the most popular footwear in the world. Vans sells millions of shoes within these shoe lines each year.  To consumers, the OLD SKOOL, SK8-HI, and Checkerboard Slip-On shoes are instantly recognizable and associated with Vans and its considerable goodwill.  Seeing Vans' distinctive trademarks and trade dress lets the consumer know that the shoe comes from Vans and instantly conveys Vans' reputation for authenticity, quality, and creative expression.

4.     Defendant Walmart is well aware of Vans' trademarks and trade dress rights, including their tremendous value.   On information and belief, Walmart's customers have long requested that Walmart begin selling Vans footwear.   In response, Walmart has been forced to explain that it is not an authorized retailer of Vans brand shoes, as depicted below:



5.     At all relevant times, Walmart was further aware of Vans' intellectual property rights since Vans has previously sent Walmart takedown requests and enforcement actions in relation to Vans' rights.

6.     In spite of, or perhaps due to, its knowledge of Vans' rights and the value of the Vans trademarks and trade dress, Walmart recently embarked on an escalating campaign to knock off virtually all of Vans' bestselling shoes. On information and belief, Walmart started shamelessly selling copycat shoes in a direct effort to confuse consumers, unlawfully siphon sales from Vans, and intentionally damage Vans' valuable intellectual property rights.

7.     Walmart's copying of Vans' shoes is not subtle or inadvertent; rather, Walmart started selling **over twenty** blatant knockoff versions of Vans shoes, while willfully infringing Vans' trademark and trade dress rights.   Walmart sells and promotes such knockoff shoes through Walmart's own in-house labels, including "Time and Tru," "Wonder Nation," and "No Boundaries."   For comparison, some of Vans' and Walmart's respective products are depicted below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| VANS SHOE | KNOCKOFF SOLD BY WALMART |
|---|---|
| *Vans Old Skool– Women's* | *"Time and Tru" Women's Shoe* |
| *Vans Old Skool – Women's* | *"Time and Tru" Women's Shoe* |
| *Vans Old Skool - Boys'* | *"Wonder Nation" Boys' Shoe* |
| *Vans Old Skool - Boys'* | *"Wonder Nation" Boys' Shoe* |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




*Vans Old Skool - Rainbow Checkerboard*

*"Wonder Nation" Girls' Shoe*




*Vans Sk8-Hi 38 DX*

*"Wonder Nation" Boys' Shoe*




*Vans Sk8-Hi 38 DX*

*"Wonder Nation" Boys' Shoe*

*Vans Sk8-Hi*

*"Wonder Nation" Boys' Shoe*

*Vans Old Skool*

*"Wonder Nation" Girls' Shoe*

*Vans' Baby/Toddler Old Skool*

*"Wonder Nation" Toddler Shoe*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Vans Old Skool*

*"No Boundaries" Men's and Women's Shoe*

*Vans Old Skool*

*"No Boundaries" Men's Shoe*

*Vans Old Skool*

*"No Boundaries" Men's Shoe*



Vans Old Skool Pro

"No Boundaries" Men's Shoe

Vans Old Skool – Woodland Camo

"No Boundaries" Men's Shoe

Vans Sk8-Hi

"No Boundaries" Men's Shoe

*Vans Sk8-Hi*


*"No Boundaries" Men's Shoe*


*Vans Sk8-Hi 38 DX*


*"No Boundaries" Men's Shoe*


*Vans Sk8-Hi*


*"No Boundaries" Men's Shoe*

8.     Walmart sells all of the above copycat shoes, along with additional colorways of the same designs, both in its retail stores across the United States and through its online website (https://www.walmart.com/) ("Walmart Website").

9. In addition to selling infringing shoes under its own Walmart brands, on the Walmart Website, Walmart also sells infringing shoes manufactured by third parties, as shown below:

| VANS SHOE | KNOCKOFF SOLD BY WALMART |
|---|---|
|  *Vans Checkerboard Slip-On* |  *"Doll Maker" Slip-On Shoe* |
|  *Vans Old Skool* |  *"Doll Maker" Skate Shoe* |
|  *Vans Sk8-Mid Checkerboard - Toddler* |  *"WISPR" Toddler Shoes* |

10. Walmart has therefore flooded the market with cheap, low-quality, and confusingly similar shoes that harm Vans' goodwill and reputation (collectively, the "Infringing Footwear").

11.     Earlier this year, Vans placed Walmart on unequivocal notice of its infringement.   In March 2021, Vans' discovered Walmart's misappropriation in connection with just one of these shoes, Walmart's "Time and Tru" Women's Shoe, and immediately reached out to Walmart to address the matter.  In response to Vans' cease and desist letter, Walmart refused to address any of Vans' concerns and defiantly continued selling the copycat shoes up to the present.  Worse yet, in the months after receiving Vans' letter, Walmart introduced an avalanche of additional knockoff shoes, as seen in the above photographs.

12.     Walmart's continued use of Vans' intellectual property—and in fact, further encroachment on Vans' rights after receiving Vans' letter—confirms that Walmart is a willful infringer, and that it will not cease infringing unless ordered to do so.  Vans has been left with no choice but to file this lawsuit to stop Walmart's infringement and to recover damages for Walmart's unlawful activities.

## THE PARTIES

13.     Plaintiff Vans, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 1588 South Coast Drive, Costa Mesa, California 92626.

14.     Plaintiff VF Outdoor, LLC is a limited liability company organized under the laws of Delaware, having its principal place of business at 1551 Wewatta Street, Denver, Colorado, 80202.

15.     Upon information and belief, Defendant Walmart Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 702 SW 8th Street, Bentonville, Arkansas, 72716.

16.     Upon information and belief, Defendant The Doll Maker, LLC is a limited liability company organized under the laws of the State of California, having its principal place of business at 1018 S. Lawson St., City of Industry, California, 91748.

17.     Upon information and belief, Defendant Trendy Trading, LLC is a

limited liability company organized under the laws of the State of California, having its principal place of business at 5199 G Street, Chino, California, 91710.

18.     Defendants Walmart, Doll Maker, and Trendy Trading are referred to herein collectively as the "Defendants."

## JURISDICTION AND VENUE

19.     This is a civil action seeking disgorgement of profits, punitive damages, and injunctive relief under federal and California law based upon Defendants' willful acts of trademark and trade dress infringement, false designation of origin, and unfair competition.

20.     This Court has original jurisdiction over this action pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. § 1331 (Federal Question Jurisdiction), and 28 U.S.C. § 1338(b) (Trademark and Unfair Competition).

21.     This Court has jurisdiction over the pendant state law claim pursuant to 28 U.S.C. § 1367(a) (Supplemental Jurisdiction) because such claim is based upon the same or substantially the same conduct by Defendants.

22.     This Court has personal jurisdiction over Walmart because it is engaged in substantial and regular business in the State of California and in the Central District of California, including by selling its goods through retail stores located in the Central District of California.  Additionally, Walmart's acts have caused injury to Vans within the State of California and the Central District of California.

23.     This Court has personal jurisdiction over Doll Maker and Trendy Trading because they are organized in the State of California and maintain a principal place of business in California.  Doll Maker and Trendy Trading are also engaged in substantial and regular business in the State of California and in the Central District of California.  And the actions of Doll Maker and Trendy Trading caused injury to Vans within the State of California and the Central District of California.

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this judicial district for venue purposes, and

because a substantial part of the events giving rise to the claims asserted in this Complaint occurred within this judicial district.

## FACTUAL BACKGROUND

## I.   VANS AND ITS BUSINESS

25.   Vans is an industry-leading shoe and apparel company, which is known for its original, authentic, and distinctive footwear and apparel that embody Southern California counterculture.

26.   In March 1966, brothers Paul Van Doren and James Van Doren, along with friends and business partners Gordon C. Lee and Serge Delia, founded Vans under the name "The Van Doren Rubber Company."  Their goal was to manufacture distinctive shoes and sell them directly to the public.  To start out, they built a factory in Anaheim, California and a retail store that was a mere 400 square feet.

27.   Vans eventually grew into one of the most popular and well-known footwear companies in the United States.  Vans' iconic trademarks and distinctive trade dresses have been consistently used for decades and instantly convey Vans' reputation for authenticity, quality, and creative expression.  Throughout the lifetime of the company, billions of shoes with Vans' distinctive trademarks and trade dress rights have been sold in the United States.

28.   Vans' products have amassed significant goodwill and are continuing to grow in popularity.  Over the past half century, Vans' shoes have been worn and popularized by a wide variety of athletes, musicians, artists, and other celebrities, from skateboarding legends such as Stacy Peralta, Tony Alva, and Jerry Valdez in the 1970s to individuals such as Kanye West, Common, Rihanna, Justin Bieber, Frank Ocean, Pharrell, A$AP Rocky, Harry Styles, Kylie Jenner, and Russell Westbrook in the present day.  For example, a recent article in *Esquire* recognized Vans' significant

popularity among celebrities while including the below photo collage:[1]



SHUTTERSTOCK, SPLASH

29.    Vans' shoes are now some of the most popular shoes in the United States. For the past several years, an independent third-party survey called "*Taking Stock with Teens*" has consistently found that Vans is the No. 2 overall favorite footwear brand among U.S. teens.[2]  According to the survey, Vans trails only Nike in popularity among U.S. teens.[3]   These rankings have been recognized in publications such as *CNBC*, *Vogue*, *Bloomberg*, *Forbes*, *Footwear News*, and *Business Insider*, to name a few.

30.    Due to high demand for its shoes, Vans distributes its iconic footwear through a vast network of distribution channels, including major department stores

[1] https://www.esquire.com/style/mens-fashion/a13446025/vans-shoes/

[2] Piper Sandler Investment Research, *Taking Stock With Teens Survey* - Fall 2020, http://www.pipersandler.com/private/pdf/TSWTs_Fall_2020_Full_Report.pdf

[3] https://www.businessinsider.com/vans-shoes-popular-with-teens-2018-7

and retailers such as Nordstrom, Journeys, Tillys, Urban Outfitters, PacSun, and Famous Footwear; sporting goods and outdoor retailers like Foot Locker and Dick's Sporting Goods; online retail outlets like Zappos.com; through Vans' own retail stores, including the 450+ Vans retail stores throughout the United States; and via online sales through Vans' own website (https://www.vans.com/).  Vans' products are sold throughout the United States and across the world.

31.   In addition to its popularity among consumers, Vans has earned substantial recognition and praise within the footwear industry.  By way of example only, Vans won the prestigious "Brand of the Year" award in 2014 from *Footwear News*, which hosts an annual ceremony often referred to as "The Shoe Oscars."  In giving Vans the award, *Footwear News* recognized that Vans has "a lot of experience influencing youth culture with its iconic products and marketing"[4] and that "Vans has rolled far beyond its skater roots to achieve superstar status — a textbook case of taking your authenticity to the masses."[5]  *Footwear News* also previously named Vans as the footwear industry's "Marketer of the Year" in 1998, "Company of the Year" in 2000, and "Brand of the Year" in 2006.[6]

32.   Vans' widespread popularity is reflected in its sales and revenue.   In November 2011, Vans surpassed $1 billion in annual global sales for the first time in its history, while becoming the largest single action sports brand in the world and the first company rooted in skateboarding to achieve this level of success.  By 2014, Vans' annual global sales surpassed $2 billion.

33.   Vans' enduring success has been driven by factors such as its focus on just a few iconic shoe lines, its reputation for creating lasting and durable footwear

---

[4] https://footwearnews.com/2014/focus/athletic-outdoor/fnaa-2014-brand-of-the-year-vans-319/

[5] https://footwearnews.com/2014/focus/opinion-analysis/fnaa-winners-2014-2591/

[6] https://footwearnews.com/2020/influencers/power-players/footwear-news-achievement-awards-fnaa-past-winners-1203069635/

without sacrificing style, and its longstanding and consistent use of its trademarks and trade dress.  In particular, Vans' consistent use of its distinctive trademarks and trade dress described herein—rights that Vans has built up methodically for nearly half a century—drives much of the company's popularity and success.

## II.   VANS' SIDE STRIPE TRADEMARK

34.   One of Vans' most valuable trademarks is its now-iconic "jazz stripe," which adorns the side panel of many Vans shoes (the "Side Stripe Mark").



35.   Vans first placed the Side Stripe Mark on its shoes over 40 years ago. The Side Stripe Mark started out as a doodle drawn by Vans founder Paul Van Doren. Since then, the Side Stripe Mark has become an unmistakable—and instantly recognizable—hallmark of the Vans brand.

36.   Since at least as early as the 1970s, Vans has continuously manufactured, sold, and promoted footwear using the Side Stripe Mark.  During its four-plus decades of continuous use, Vans has utilized the Side Stripe Mark across multiple Vans shoe lines and in countless color combinations.

37.     The Side Stripe Mark serves no function other than as a signifier of the Vans brand; it is an inherently distinctive symbol that Vans intended from the outset to be used as a trademark designating a single source, namely, Vans.  Examples of Vans footwear bearing the Side Stripe Mark are depicted below:



*Vans OLD SKOOL*                                   *Vans SK8-HI*

          

*Vans UltraRange Exo*                              *Vans Sk8-Mid*

          

*Vans MTE (Mountain Edition) Boot*        *Vans Snowboard Boot*

38.     In the United States alone, Vans has sold hundreds of millions of shoes bearing the Side Stripe Mark.  Vans' U.S. sales of footwear bearing the Side Stripe

1 | Mark have accounted for tens of billions of dollars in revenue.

2 |       39.    Vans has devoted significant resources over more than 40 years to
3 | advertising and promoting its products bearing the Side Stripe Mark.  Over this period,
4 | Vans has spent many millions of dollars advertising the Side Stripe Mark, including
5 | in print publications, television and Internet advertising, signage, in-store displays,
6 | and social media, among other advertising mediums.  Vans' advertisements and
7 | marketing efforts have reached billions of individual consumers during that time.

8 |       40.    Vans also promotes products bearing the Side Stripe Mark by sponsoring
9 | athletes.  As one example, skateboarding legend Tony Hawk has a partnership with
10 | Vans and can often be seen wearing Vans shoes with the Side Stripe Mark.  A
11 | representative photograph of Tony Hawk wearing shoes with the Side Stripe Mark is
12 | reproduced below:



41.     Over the past several decades, Vans further promoted the Side Stripe Mark by sponsoring events.  For example, in 1996, Vans started sponsoring (and later purchased) the Vans Warped Tour, which went on to become the longest running concert series in the United States.  The Vans Warped Tour operated annually every year until 2019 and played a major part in the rise of genres such as pop-punk, emo, and hardcore punk.  Vans' sponsorship and ownership of the Vans Warped Tour not only provided a forum for Vans to promote its products bearing the Side Stripe Mark, but also helped Vans forge close relationships with musical artists who then prominently wore Vans shoes during their performances.  Blink-182's Mark Hoppus, for example, wore Vans shoes bearing the Side Stripe Mark during multiple now-famous performances at the Vans Warped Tour and at other concerts throughout the past three decades.  A representative image from a Blink-182 performance in the 1990s is depicted below:



42.     As a result of Vans' promotional and sales efforts over the past four-plus decades, the Side Stripe Mark is one of the most recognizable, iconic, and valuable trademarks in the world.  Due to Vans' efforts, consumers readily identify products bearing the Side Stripe Mark as being high quality merchandise emanating from,

sponsored by, or approved by Vans.

43.    In addition to common law rights, Vans has registered the Side Stripe Mark on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services.  For use of the Side Stripe Mark on footwear, Vans owns all right, title, and interest in the following U.S. Trademark Registrations:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 2,177,772 | August 4, 1998 | *Class 25*: Footwear |
|  | 2,170,961 | July 7, 1998 | *Class 25*: Footwear |
|  | 2,172,482 | July 14, 1998 | *Class 25*: Footwear |

44.    A copy of the Certificates of Registration for Vans' above marks are attached as **Exhibit 1** (Reg. No. 2,177,772) and **Exhibit 2 (**Reg. No. 2,170,961), and **Exhibit 3 (**Reg. No. 2,172,482).  All of these registrations are valid and subsisting on the Principal Register, and have been since their respective registration dates.

45.    The above registrations relating to the Side Stripe Mark are incontestable.  As such, each registration is conclusive evidence of the validity of the mark, Vans' ownership of the mark, and Vans' exclusive right to use the mark in connection with shoes in the United States.

46.    Vans has further strengthened the Side Stripe Mark by using it to promote Vans' other apparel and products, including by placing it on T-shirts, sweatshirts, pants, shorts, jackets, and hats, among other products.  Vans owns additional U.S. Trademark Registrations, some of which are incontestable, for use of

the Side Stripe Mark with other products and services. Such U.S. Trademark Registrations, which cover a wide range of goods and services, include U.S. Reg. Nos. 4,442,122 (issued December 3, 2013), 2,206,796 (issued December 1, 1998), and 6,062,935 (issued May 26, 2020).  Copies of the Certificates of Registration for each of these marks are attached collectively as **Exhibit 4**.

47.     As a result of Vans' efforts, the public recognizes and understands that the Side Stripe Mark distinguishes and identifies Vans' products.  As just an example, third party publications and media reports routinely refer to: Vans' "iconic side stripe, which has become a hallmark design characteristic for the brand";[7] the "now-iconic side stripe";[8] and Vans' "famous side stripe detail."[9]

48.     Accordingly, thanks to Vans' dedication to providing high quality, original, and authentic footwear and apparel using the Side Stripe Mark, as well its extensive marketing and years of hard work, Vans has built up and now owns extremely valuable goodwill that is symbolized by that mark.  Consumers recognize the Side Stripe Mark as a source identifier that is uniquely associated with Vans and genuine Vans brand products.

## III.    VANS' OLD SKOOL TRADE DRESS

49.     Also central to this lawsuit is Vans' OLD SKOOL shoe. The OLD SKOOL shoe is an iconic low-top skate shoe that Vans first introduced to the market in the 1970s.  Debuting under the name "Style 36," the OLD SKOOL shoe was one of the first Vans shoes to feature the Side Stripe Mark and later became one of Vans' bestselling shoes of all time.

---

[7] https://www.wmagazine.com/story/old-skool-vans-popular-sneaker-trend-2018

[8] https://www.yahoo.com/entertainment/basically-every-celeb-hollywood-owns-110512940.html

[9] https://www.gq.com/gallery/most-famous-white-canvas-sneakers

50.     Vans' "OLD SKOOL Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching, including where the eyestay meets the vamp; and (6) the placement and proportion of these elements in relation to one another.



*Vans OLD SKOOL*

51.     Since first introducing the OLD SKOOL in the 1970s, Vans has continuously manufactured, sold, and promoted shoes bearing the OLD SKOOL Trade Dress.

52.     The combination of elements comprising the OLD SKOOL Trade Dress serves no function other than as a signifier of the Vans brand.  The OLD SKOOL Trade Dress is not essential to the use or purpose of the shoe, it does not reduce the cost or improve performance of the shoe, and its use by Vans does not put competitors at any significant non-reputation-related disadvantage.  Competitors have available a multitude of alternative shoe designs they could use.

53.     In the 1970s, the OLD SKOOL shoe was originally released in three colorways, including an enduring royal blue version worn notably by Stacy Peralta. Since then, Vans has introduced the OLD SKOOL shoe in additional colorways that

still have the unmistakable "look and feel" of the OLD SKOOL Trade Dress.  The consistent overall look of such OLD SKOOL colorways immediately lets consumers know that the shoe comes from Vans, and that such product comes with Vans' reputation for authenticity, quality, and creative expression.  A small fraction of the colorways that bear the OLD SKOOL Trade Dress are depicted below:



54.    Since first introducing the OLD SKOOL shoe, Vans has manufactured, sold, and promoted well over 1,000 colorways within the OLD SKOOL shoe line.  Some of Vans' OLD SKOOL colorways come in the form of collaborations with other designers, companies, or celebrities.  For example, Vans has released OLD SKOOL

colorways through high profile collaborations with Marc Jacobs, Tyler the Creator/Golf Wang, Supreme, Stussy, Kenzo, JJJJound, Taka Hayashi, The North Face, and Disney. These collaborations and limited-run releases have given Vans' OLD SKOOL shoes a coveted level of prestige and helped further increase popularity of the shoes with new generations and demographics.

55.   Vans also offers consumers the opportunity to become their own collaborators through "Vans Customs," a platform on Vans' website (https://www.vans.com/customs). Through this platform, consumers can design their own colorway while utilizing the OLD SKOOL Trade Dress.



*Vans Customs platform*

56.   Vans launched Vans Customs on its website in 2004, but in fact Vans has been selling customized OLD SKOOL shoes since its early days, well before the advent of the Internet. Through customization, Vans has allowed consumers to create new colorways of the OLD SKOOL shoe, with numerous color and material options, while at the same time strictly maintaining the OLD SKOOL Trade Dress and ensuring the high quality that consumers have come to expect from Vans products.

57.   Due to Vans' significant investments and efforts, in the United States

alone, Vans has sold hundreds of millions of shoes that incorporate the OLD SKOOL Trade Dress.  Vans' U.S. sales of footwear bearing the OLD SKOOL Trade Dress have generated several billions of dollars in revenue.

58.    Over the years, Vans has spent millions of dollars promoting the OLD SKOOL Trade Dress.  Vans advertises and promotes footwear bearing the OLD SKOOL Trade Dress through a wide variety of traditional and non-traditional means, including print, television, and internet advertising, event sponsorship, and athlete endorsement, to name a few.

59.    An advertisement published in 1994 for Vans shoes bearing the OLD SKOOL Trade Dress is attached as **Exhibit 5** and reproduced below:



60.     Over 40 years since the introduction of the OLD SKOOL shoe, the OLD SKOOL Trade Dress remains immensely popular and continues to grow in popularity. A 2018 article in *W Magazine* named the OLD SKOOL as the "most popular shoe of the summer."[10]   Meanwhile, *GQ* remarked that the OLD SKOOL shoe had become "the go-to shoe for members of every fashion tribe."[11]   And an article in *Business Insider* observed that the OLD SKOOL shoe was "blowing up the fashion world" and had "surpassed its humble roots to become an icon in its own right."[12]   Copies of these articles and others are attached collectively as **Exhibit 6**.

61.     The OLD SKOOL shoe is one of the most sought-after sneakers in the world.   In 2017, Online fashion sales website Lyst found that the OLD SKOOL shoe was the No. 4 most searched sneaker in the world.[13]   Meanwhile, according to a 2019 research study by SEMrush, the Vans OLD SKOOL shoe was the No. 3 most popular sneaker search on Google in the United States within the previous 12 months.[14]

62.     Over the years, shoes bearing Vans' OLD SKOOL Trade Dress have been worn and popularized by countless athletes, pop stars, rappers, artists, and other influential celebrities, including Frank Ocean, Justin Bieber, Kanye, A$AP Rocky, Tyler the Creator, Russell Westbrook, Julia Roberts, Paul Walker, Gwen Stefani, Miguel, Olivia Wilde, Kylie Jenner, and Kristen Stewart.

63.     In addition, Vans' OLD SKOOL Trade Dress has appeared in a variety of television shows and movies.   By way of example only, Vin Diesel wore OLD

---

[10] https://www.wmagazine.com/story/old-skool-vans-popular-sneaker-trend-2018

[11] https://www.gq.com/story/how-vans-got-everyone-wearing-vans-again

[12] https://www.businessinsider.com/vans-old-skool-is-blowing-up-the-fashion-world-2017-3

[13] https://www.bizjournals.com/portland/news/2017/12/08/a-new-battleground-for-nike-and-adidas-the-10-most.html

[14] https://footwearnews.com/2019/focus/athletic-outdoor/top-10-most-searched-sneakers-air-max-97-1202770252/

SKOOL shoes as Xander Cage in the 2002 film *xXx*, as depicted below:



64.     The OLD SKOOL Trade Dress has also appeared in television shows such as *Friends*, *Modern Family*, *Animal Kingdom*, and *Ted Lasso*, and appeared on the feet of rapper Mac Miller in his music video "Good News," G-Eazy in his music video "Power," and Machine Gun Kelly in his music video "Bloody Valentine."  In short, the OLD SKOOL Trade Dress has become an iconic part of popular culture, which has driven increased demand for OLD SKOOL shoes and further strengthened the OLD SKOOL Trade Dress.

65.     The combination of elements comprising the OLD SKOOL Trade Dress is distinctive, and the public recognizes and understands that the OLD SKOOL Trade Dress distinguishes and identifies genuine Vans brand shoes.  As a result of Vans' extensive use of the OLD SKOOL Trade Dress, Vans has built up and now owns extremely valuable goodwill that is embodied by the OLD SKOOL Trade Dress.

## IV.   VANS' OLD SKOOL TODDLER TRADE DRESS

66.     In addition to the OLD SKOOL Trade Dress described above, Vans owns the rights to the "OLD SKOOL Toddler Trade Dress," which consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a

three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching; and (6) the placement and proportion of these elements in relation to one another.



*Vans OLD SKOOL Toddler*

67.    Vans sells toddler-sized shoes in certain styles.  Vans' OLD SKOOL toddler shoes incorporate many of the same features and elements as Vans' regular OLD SKOOL shoes.  However, the OLD SKOOL toddler shoes are smaller in size and incorporate hook-and-loop straps instead of laces.  As a result, Vans' OLD SKOOL toddler shoes have a slightly different stitching and design pattern.

68.    Nonetheless, Vans' OLD SKOOL Toddler Trade Dress benefits from the immense goodwill it gains from the OLD SKOOL Trade Dress, due to its common distinctive elements.

69.    Vans' OLD SKOOL Toddler Trade Dress has also acquired secondary meaning individually through use and recognition in the marketplace.  Vans first started selling OLD SKOOL shoes for toddlers, while incorporating the OLD SKOOL Toddler Trade Dress, in the 1990s.  Since then, Vans has continuously manufactured, sold, and promoted shoes bearing the OLD SKOOL Toddler Trade Dress.

70.    The combination of elements comprising the OLD SKOOL Toddler Trade Dress is nonfunctional, since the claimed trade dress is not essential to the use or purpose of the shoe and there is a plethora of alternative design options available

to Vans' competitors for a toddler's strapped sneaker.

71.     Accordingly, Vans' OLD SKOOL Toddler Trade Dress, both individually and due to its familial relationship to the OLD SKOOL Trade Dress, has significant goodwill and conveys that the shoes originate from Vans.

## V.     VANS' SK8-HI TRADE DRESS

72.     Another legendary Vans shoe is the SK8-HI, which Vans also introduced in the 1970s.  Originally launched under the name "Style 38," the SK8-HI debuted just one year after the OLD SKOOL shoe.  Inspired by the already popular OLD SKOOL shoe, the SK8-HI shoe was an instant hit with consumers and has remained a staple of Vans' footwear offerings for over 40 years.

73.     Although inspired by Vans' OLD SKOOL shoe, the SK8-HI shoe has a high-top design.  Vans' "SK8-HI Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) a ribbed collar formation that encircles the uppermost part of the shoe; (6) visible stitching, including separating the individual ankle collar corrugations; and (7) the placement and proportion of these elements in relation to one another.



*Vans SK8-HI*

74.     Since first introducing the SK8-HI in the 1970s, Vans has continuously manufactured, sold, and promoted shoes bearing the SK8-HI Trade Dress.

75.     The combination of elements comprising the SK8-HI Trade Dress is nonfunctional, in that it is not essential to the use or purpose of the shoe, it does not reduce the cost or improve the performance of the shoe, and its use by Vans does not put competitors at any significant non-reputation-related disadvantage.   Vans' competitors have available a nearly infinite number of alternative designs they could use for a high-top sneaker.

76.     Like the OLD SKOOL shoe, Vans has introduced the SK8-HI shoe in numerous colorways that still have the unmistakable look and feel of the SK8-HI Trade Dress.  The consistent overall look of such SK8-HI colorways immediately lets consumers know that the shoe comes from Vans and that such product comes with Vans' reputation for authenticity, quality, and creative expression.  For reference, a small fraction of Vans' colorways that bear the SK8-HI Trade Dress are depicted below:

 

 

77.     The SK8-HI shoe has been the subject of numerous high-profile collaborations with designers, companies, and celebrities, including Marc Jacobs, Tyler the Creator/Golf Wang, Supreme, Stussy, Kenzo, The North Face, and Disney. These collaborations and limited-run releases have increased the prestige of SK8-HI shoes and broadened their appeal.

   

*Disney X Vans SK8-HI*                                  *Supreme X Vans SK8-HI*

78.     Vans also offers consumers the opportunity to design their own unique SK8-HI colorways through "Vans Customs."   Through customization, Vans has allowed consumers to create new colorways of the SK8-HI shoe, while strictly maintaining the SK8-HI Trade Dress and ensuring that the quality of the customized designs meets Vans' rigorous standards, as depicted below.



-30-

COMPLAINT

79.     Due to Vans' significant investments and efforts, Vans has sold tens of millions of shoes that incorporate the SK8-HI Trade Dress in the United States alone. Vans' sales of footwear bearing the SK8-HI Trade Dress have generated billions of dollars in revenue.

80.     Vans has spent millions of dollars promoting the SK8-HI Trade Dress. Vans advertises and promotes shoes bearing the SK8-HI Trade Dress through a wide variety of traditional and non-traditional means, including print, television, and internet advertising, event sponsorship, and athlete endorsement.   An early advertisement for the SK8-HI shoe is attached as **Exhibit 7** and reproduced below:



81.    Like the OLD SKOOL, the SK8-HI shoe remains immensely popular and has been continuing to grow in popularity over 40 years after its introduction. For example, in a 2017 article, *GQ* lauded Vans' SK8-HI shoes as "instantly noticeable," "one of the more perfect sneakers ever created," and a shoe that "has been around for so long that it transcends the hamster wheel of the sneaker game, meaning they'll look cool today, tomorrow, and basically forever."[15]  Copies of this article and other articles about the SK8-HI are attached collectively as **Exhibit 8**.

82.    Over the years, shoes bearing Vans' SK8-HI Trade Dress have been worn and popularized by countless athletes, musicians, artists, and scores of other influential celebrities.  Such individuals include everyone from skateboarder Steve Caballero in Vans' earlier days (pictured below) to individuals such as Justin Bieber, Kanye, Zac Efron, David Beckham, Chris Brown, Chloe Grace Moretz, Alessandra Ambrosio, and Kylie Jenner in more recent years.



*Skate legend Steve Caballero wearing the SK8-HI in 1985*

---

[15] https://www.gq.com/story/best-black-sneakers-high-tops

83.    Vans' SK8-HI Trade Dress has also appeared in movies, television shows, and music videos.  As one example, singer Chris Brown danced in SK8-HI shoes in the 2015 music video for his song "Anyway," as depicted below:



84.    The combination of elements comprising the SK8-HI Trade Dress is distinctive, and the public recognizes and understands that the SK8-HI Trade Dress distinguishes and identifies genuine Vans brand shoes.  Due to Vans' longstanding use of the SK8-HI Trade Dress for over 40 years, as well as Vans' extensive promotional efforts, Vans has developed and now owns significant goodwill embodied by the SK8-HI Trade Dress.

## VI.    VANS' SK8-MID TODDLER TRADE DRESS

85.    Vans also owns the rights to the "SK8-MID Toddler Trade Dress," which consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) a ribbed collar formation that encircles the

uppermost part of the shoe; (6) visible stitching, including separating the individual ankle collar corrugations; and (7) the placement and proportion of these elements in relation to one another.



*Vans SK8-MID Toddler*

86.     Vans' SK8-MID toddler shoes incorporate many of the same features and elements as Vans' SK8-HI shoes.  However, the SK8-MID toddler shoes are smaller in size, are slightly lower on the ankle, and incorporate hook-and-loop straps instead of laces.  As a result, Vans' SK8-MID toddler shoes have a slightly different stitching and design pattern.

87.     Nonetheless, Vans' SK8-MID Toddler Trade Dress benefits from the immense goodwill it gains from the SK8-HI Trade Dress, due to its common distinctive elements.

88.     Vans' SK8-MID Toddler Trade Dress has also acquired secondary meaning individually through use and recognition in the marketplace.  Since at least 2015, Vans has been selling SK8-MID shoes for toddlers, while incorporating the SK8-MID Toddler Trade Dress.  Since then, Vans has continuously manufactured, sold, and promoted shoes bearing the SK8-MID Toddler Trade Dress.

89.     The combination of elements comprising the SK8-MID Toddler Trade Dress is also nonfunctional, in that the claimed trade dress is not essential to the use or purpose of the shoe, and there are countless alternative design options available to

Vans' competitors for a toddler's mid or high-top shoe.

90. For these reasons, Vans' SK8-MID Toddler Trade Dress, both individually and through its familial relationship to the SK8-HI Trade Dress, has significant goodwill and conveys that SK8-MID toddler shoes originate from Vans.

## VII.   VANS' CHECKERBOARD SLIP-ON SHOES

91. Another iconic Vans shoe is the Vans' Checkerboard Slip-On, a twin-gore slip-on with distinctive checkerboard patterns.  Vans first launched "Style 98," its slip-on silhouette, in 1977.  Shortly thereafter, Vans started manufacturing its Checkerboard Slip-On shoe line, which incorporated checkerboard patterns on the slip-on silhouette.  The shoes became instantly popular in Southern California.





*Vans Checkerboard Slip-On shoes*

92.   For over 40 years, Vans has now continuously manufactured, sold, and promoted its Checkerboard Slip-On shoes.   The below photograph depicts the manufacturing and production of Vans' Checkerboard Slip-On shoes in the earlier days of the company:



Carlos Bravo applies side laminates to 'Off the Wall' shoes.

Brian Smith/The Register

93.   In 1982, Vans' Checkerboard Slip-On shoes exploded in popularity when they appeared in the movie "*Fast Times at Ridgemont High*."  Actor Sean Penn wore Checkerboard Slip-Ons while playing the loveable part of Jeff Spicoli.  After Sean Penn hand-selected the shoes for his character, Penn's Spicoli immortalized the

Checkerboard Slip-On in multiple scenes, including a scene where Spicoli famously unboxes the shoe from a Vans "Off the Wall" box:



94.    Requests for Vans' Checkerboard Slip-On shoes skyrocketed as soon as audiences saw the unboxing scene in the movie's trailer.  When "*Fast Times at Ridgemont High*" premiered, the Checkerboard Slip-On gained international attention and appeal, which only increased further when the shoes were then featured prominently on the cover of the film's soundtrack:



95.     Since their introduction, Vans has spent millions of dollars promoting its Checkerboard Slip-On shoes and their distinctive look.    Representative print advertisements that display the Checkerboard Slip-On shoes are attached as **Exhibit 9** and included below:





96.     Vans' promotional efforts, along with the originality of the design and Vans' consistent enforcement of its intellectual property rights in the shoe, have made the Checkerboard Slip-Ons a best-seller.  Vans has sold many millions of pairs of the shoe in the United States.  Vans' sales of the Checkerboard Slip-Ons have generated billions of dollars in revenue.

97.     When Vans co-founder Paul Van Doren recently passed away, *The Los*

*Angeles Times* remarked that Vans' Checkerboard Slip-On shoe "almost singlehandedly – make that singlefootedly – set the company on its way to becoming a multibillion-dollar action sports brand, and it's as instantly identifiable a piece of branding as Nike's swoosh."[16]

98.    Decades after its introduction, the Checkerboard Slip-On shoe line remains immensely popular.  In 2011, actress Kristen Stewart literally cemented Vans' Checkerboard Slip-On shoes into pop culture history when she famously wore a pair to her Hollywood Walk of Fame ceremony:[17]



---

[16] https://www.latimes.com/lifestyle/story/2021-05-11/look-back-vans-signature-styles-epic-collaborations

[17] https://www.thecut.com/2011/11/kristen_stewart_wore_checkered.html

99.    In 2016, singer Frank Ocean grabbed headlines when he wore a pair of the shoes to the White House for President Obama's state dinner:[18]



100.    Vans' Checkerboard Slip-Ons have similarly been worn and popularized in recent years by other celebrities, including Justin Bieber, Ty Dolla $ign, Russell Westbrook, Jennifer Lawrence, Gwen Stefani, Ryan Reynolds, Jared Leto, Kylie Jenner, and Kourtney Kardashian.

101.    The fame and popularity of Vans' Checkerboard Slip-Ons are further evidenced by third party publications and media coverage, in which the shoe is routinely referred to as a "cultural icon,"[19] "iconic,"[20] and "an iconic symbol in

---

[18] https://www.sneakerfreaker.com/news/frank-ocean-wore-vans-slip-ons-to-a-whitehouse-state-dinner

[19] https://www.esquire.com/style/mens-fashion/a19841930/vans-checkerboard-slip-on-endorsement/

[20] https://www.forbes.com/sites/abrambrown/2015/11/23/how-vans-shoes-became-

footwear."[21]

102. Vans has taken proactive steps to protect its valuable trade dress and trademark rights associated with its Checkerboard Slip-On shoes. Vans owns all right, title, and interest in multiple federal trademark registrations issued by the United States Patent and Trademark Office, including:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 1,583,727 | February 20, 1990 | *Class 25*: Shoes |
|  | 5,070,471 | November 1, 2016 | *Class 25*: Footwear, namely, twin-gore slip-on shoes. |
|  | 5,070,470 | November 1, 2016 | *Class 25*: Footwear, namely, twin-gore slip-on shoes. |

103. A copy of the Certificates of Registration for Vans' above marks are attached as **Exhibit 10** (Reg. No. 1,583,727), **Exhibit 11 (**Reg. No. 5,070,471), and **Exhibit 12 (**Reg. No. 5,070,470).

104. All of Vans' above registrations relating to its Checkerboard Slip-Ons are valid and subsisting on the Principal Register, and have been since their respective registration dates.

105. Vans' earliest federal trademark registration, Reg. No. 1,583,727, issued

a-quiet-fashion-juggernaut/?sh=1debd583994a

[21] https://www.drifthouse.com/blogs/drift-house-blog-spot/the-birth-of-and-icon-the-vans-checkerboard-slip-o/

by the United States Patent and Trademark Office on February 20, 1990 (with a first use in commerce date of June 1982), is incontestable. As such, this registration is conclusive evidence of the validity of the mark, Vans' ownership of the mark, and Vans' exclusive right to use the mark in connection with shoes in the United States.

106. Similarly, Vans' two subsequent federal trademark registrations, Reg. Nos. 5,070,471 and 5,070,470, which were issued by the United States Patent and Trademark Office on November 1, 2016 (with a first use in commerce date of June 1982), are also incontestable. As such, Reg. Nos. 5,070,471 and 5,070,470 are also conclusive evidence of the validity of the marks, Vans' ownership of the marks, and Vans' exclusive right to use the marks in connection with twin-gore slip-on shoes in the United States.

107. Vans also owns common law trade dress rights associated with its Checkerboard Slip-On shoes. As applicable in this lawsuit, Vans' "Checkerboard Slip-On Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) checkerboard pattern on the upper portion of a twin-gore slip-on shoe, including on the vamp; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; and (5) the placement and proportion of these elements in relation to one another.

108. Vans' Checkerboard Slip-On Trade Dress is non-functional. The design features embodied by the Checkerboard Slip-On Trade Dress are not essential to the function or purpose of the shoe, they do not reduce the cost or improve the performance of the shoe, and their use by Vans does not put competitors at any significant non-reputation-related disadvantage. In other words, the design features of the Checkerboard Slip-On Trade Dress are not a competitive necessity; rather, such design features serve no purpose other than as an identifier of source.

109. As used in this Complaint, Vans' three federal trademark registrations

relating to its Checkerboard Slip-Ons (Reg. Nos. 1,583,727, 5,070,471 and 5,070,470) and Vans' common law rights in the Checkerboard Slip-On Trade Dress are collectively referred to as the "Checkerboard Slip-On Marks."

110.   In recognition of the distinctiveness and source-identifying nature of Vans' Checkerboard Slip-On Marks, third party publications and news reports acknowledge that the checkerboard design on a twin-gore slip-on shoe is "instantly identifiable" as coming from Vans,[22] and that such Marks are an "unmistakable" piece of branding "as identifiable as the Louis Vuitton monogram print."[23]

111.   Thanks to Vans' dedication to providing high quality and highly original shoes using the Checkerboard Slip-On Marks, as well Vans' extensive marketing and years of hard work, Vans' trademarks and trade dress associated with its Checkerboard Slip-On shoes have been an instantly recognizable source-identifier for decades.

112.   Vans has further strengthened the Checkerboard Slip-On Marks by applying distinctive checkerboard trademarks and trade dress to Vans' other apparel and products, including on sandals, socks, T-shirts, sweatshirts, pants, shorts, jackets, and hats, among other products.   Vans owns a host of additional U.S. Trademark Registrations for use of checkerboard in connection with other Vans branded products.   Such registrations include U.S. Reg. Nos. 4,792,837 (issued August 18, 2015), 5,888,832 (issued October 22, 2019), 6,031,142 (issued April 7, 2020), 6,168,135 (issued October 6, 2020), 6,230,277 (issued December 22, 2020), 6,248,317 (issued January 19, 2021), and 6,451,276 (issued August 17, 2021).   Copies of the Certificates of Registration for each of these marks are attached collectively as **Exhibit 13**.

---

[22] https://www.latimes.com/lifestyle/story/2021-05-11/look-back-vans-signature-styles-epic-collaborations

[23] https://stockx.com/news/checkered-vans-a-brief-history/

113.  Accordingly, Vans' Checkerboard Slip-On Marks embody substantial consumer goodwill that drive not just sales of Vans' Checkerboard Slip-On shoes, but also sales of related products, such as Vans' other shoes and apparel.

## VIII.  VANS' ADDITIONAL U.S. TRADEMARK REGISTRATIONS

114.  In addition to Vans' trademarks and trade dress rights identified above, Vans owns further U.S. Trademark Registrations pertinent to this action.  Namely, Vans owns all right, title, and interest in the three additional U.S. Trademark Registrations identified below:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 5,320,384 | October 31, 2017 | *Class 25*: Footwear |
|  | 6,451,279 | August 17, 2021 | *Class 25*: Footwear |
|  | 6,436,779 | August 3, 2021 | *Class 25*: Footwear |

115.  Copies of the Certificates of Registration for these marks are attached as **Exhibit 14** (Reg. No. 5,320,384), **Exhibit 15 (**Reg. No. 6,451,279), and **Exhibit 16 (**Reg. No. 6,436,779).  These trademark registrations are valid and subsisting on the Principal Register and have been since their respective registration dates.

116.   First, U.S. Trademark Reg. Nos. 5,320,384 covers a mark that consists of a distinctive stitching pattern on a sneaker, including "two parallel stitched lines set across the top of a shoe toe vamp running from midsole to midsole with a slight curve set into the space between the two eye stays; and two identical parallel curved stitched lines on both sides of the shoe running from center of the midsole to the side of the toe vamp parallel stitched lines, and both curved lines form an angle approximately below the first eyelet on each side of the shoe."  The mark is depicted by the bold dotted lines below (the fine broken lines are not part of the mark):



*U.S. Reg. No. 5,320,384*

117.   This distinctive stitching design, which includes two parallel stitched lines that cut all the way across the shoe's upper (and that are set far back on the toe vamp near the bottom of the laces), is unique to Vans and embodies significant goodwill.  The mark is also nonfunctional, in that it is not essential to the use or purpose of the shoe and there are countless alternative design options available to Vans' competitors for stitching on a sneaker.

118.   Vans has continuously manufactured, sold, and promoted footwear that included this mark since at least 1977.  During that time, Vans has engaged in extensive promotion of footwear that included the stitching pattern embodied in this mark.  For these reasons, the mark covered by U.S. Reg. No. 5,320,384 has attained secondary meaning among consumers, and consumers associate such stitching

1  pattern, including the pattern of two stitched lines running all the way across the toe

2  vamp, uniquely with Vans.

3      119.  Next, U.S. Trademark Reg. Nos. 6,451,279 covers a "checkerboard

4  pattern applied to the side panels" of a low top sneaker.  Since at least as early as

5  1980, Vans has been applying checkerboard pattern on the side panels of low top

6  sneakers, including the OLD SKOOL shoe.  One example of Vans' use of this mark

7  is included below:



120.  One of Vans' most popular products that bears this mark is the OLD

SKOOL Rainbow Checkerboard shoe, as depicted below:



21      121.  For the past four-plus decades, Vans has continuously manufactured,

22  sold, and promoted footwear that included this mark.  Vans has also engaged in

23  extensive promotion of shoes bearing this mark, including through print, television,

24  and internet advertising.

25      122.  Through its widespread use and promotion, Vans has achieved

26  secondary meaning for this mark.  The mark covered by Reg. No. 6,451,279 is non-

27  functional, in that it serves no purpose other than an assurance that Vans is the source

28  of the product.

123.   Finally, U.S. Trademark Reg. No. 6,436,779 covers a "checkerboard pattern applied to the side panels" of a high-top sneaker.  Since at least as early as 1980, Vans has been applying checkerboard pattern on the side panels of high-top sneakers, including SK8-HI shoes (and later the SK8-MID in toddler sizes).  Several examples of Vans' uses of Reg. Nos. 6,436,779 are depicted below:



124.   For decades, Vans has continuously manufactured, sold, and promoted footwear that included this mark.  Vans has also engaged in extensive promotion of shoes bearing this mark, including through print, television, and internet advertising.

125.   The mark covered by Reg. No. 6,436,779 is non-functional, in that it serves no purpose other than an assurance that Vans is the source of the product.

126.   Accordingly, through its widespread use and promotion, Vans has achieved significant secondary meaning for this mark.

## IX.   VANS MAINTAINS STRICT CONTROL OVER AND VIGOROUSLY DEFENDS ITS TRADEMARKS AND TRADE DRESS RIGHTS

127.   Vans maintains strict quality control standards for its footwear.  Vans goes to great lengths to ensure that its genuine Vans products are designed for durability and comfort, and that they are inspected and approved by Vans prior to distribution and sale.  Due to these efforts by Vans, consumers and potential purchasers have come to expect high quality goods from Vans and such trust is reinforced when they see high quality Vans shoes in public.

128.   Vans not only strictly monitors the quality of the products that it sells, but also carefully determines where the products are released, when the products are released, and how the products are released.

129.   Vans also devotes significant time and resources to stopping infringement of its valuable trademarks and trade dress rights.  Vans' enforcement actions are varied and multifaceted, ranging from attempts to reach an informal resolution to full-scale litigation.  Vans has spent millions of dollars defending its valuable intellectual property rights, including those rights at issue in this lawsuit.

## X.   DEFENDANTS AND THEIR UNLAWFUL USE OF VANS' INTELLECTUAL PROPERTY

130.   In contrast to Vans, Defendants sought to skip the significant investments required to develop original, authentic, and high-quality shoes, and instead chose to free ride off Vans' reputation and popularity.  Defendants did so by starting to sell copycat versions of Vans' shoes, aimed at overlapping consumers, while willfully infringing Vans' trademarks and trade dress rights.

### *Walmart's Scheme to Copy Vans' Shoes Through its In-House Labels*

131.   Walmart is a multinational retail chain.  It distributes a wide variety of products both through its massive network of retail stores and through the Walmart Website (https://www.walmart.com/).

132.   In 2018, Walmart announced a strategy to develop new in-house fashion labels so that it could start selling more "on-trend styles" of clothing and shoes.[24]  On information and belief, Walmart developed this strategy since "selling private label brands is more profitable for Walmart than name brands."[25]  With its announcement, Walmart launched four new in-house clothing labels, including "Time and Tru" for women and "Wonder Nation" for children.

133.   As part of the same strategy, in Fall 2019, Walmart announced the creation of another in-house label, "No Boundaries" for men.[26]

134.   On information and belief, at all times relevant to this Complaint, the Time and Tru, No Boundaries, and Wonder Nation brands were wholly owned, operated, and controlled by Walmart.

135.   As recognized by one retail industry insider, up to 2018, Walmart had "not had any real success as the lead in fashion."[27]  Despite many years of attempts, "Walmart ha[d] long struggled to find a meaningful fashion niche in apparel beyond basic, commodity goods like t-shirts, jeans and socks."[28]  Indeed, Walmart's many failures to develop successful, fashionable clothing lines had been previously described as Walmart's "perennial Achilles heel."[29]  On information and belief, Walmart sought to turn around these disappointing results through its Time and Tru,

---

[24] https://footwearnews.com/2018/shop/shoes/walmart-fashion-brands-wonder-nation-kids-time-and-tru-terra-sky-509103/

[25] https://www.cnn.com/2020/09/21/business/walmart-private-label-clothing/index.html

[26] https://hypebeast.com/2019/8/no-boundaries-walmart-fall-lookbook

[27] https://www.usatoday.com/story/money/2018/02/27/walmart-doubles-down-fashion/374511002/

[28] https://www.forbes.com/sites/barbarathau/2018/02/28/walmarts-new-private-fashion-brands-signal-courtship-of-its-more-affluent-tech-grocery-shoppers/

[29] https://www.forbes.com/2010/06/10/wal-mart-fashion-retail-markets-retailwire-braintrust.html

---

COMPLAINT

No Boundaries, and Wonder Nation brands.

136.   On information and belief, as part of its initial footwear offerings through its Wonder Nation brand, Walmart sold the below sneakers, which looked very different than its current Vans knockoffs:



Wonder Nation Cap-Toe Sneaker, $9.87; walmart.com

137.   On information and belief, Walmart's initial offerings through its new in-house brands failed to meet Walmart's expectations for profitability and failed to meet consumers' expectations in terms of style and originality.

138.   On information and belief, within the past few years, Walmart was aware of the tremendous success that Vans had achieved with its OLD SKOOL and SK8-HI shoes and made the conscious decision to trade off the goodwill of—and piggyback on—Vans' iconic shoes.

139.   Instead of innovating and competing fairly, Walmart chose to take unlawful shortcuts by designing, producing, importing, marketing, distributing, offering for sale, and selling an entire slate of Vans knockoffs.   Examples of Walmart's Infringing Footwear are depicted below, along with information about Vans' asserted trademarks and/or trade dress rights that each violates:

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Time and Tru" Women's Shoe* | X | X | | | X | |
|  *"Time and Tru" Women's Shoe* | X | X | | | X | |

---

[30] Includes U.S. Trademark Registration Nos. 2,177,772, 2,170,961, and 2,172,482, and common law rights.

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Boys' Shoe* | X | X | | | X | |
|  *"Wonder Nation" Boys' Shoe* | X | X | | | X | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Girls' Shoe* | X | X | | | X | X |
|  *"Wonder Nation" Childrens' Shoe* | X | X | | | X | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Boys' Shoe* | X | X | | | X | |
|  *"Wonder Nation" Girls' Shoe* | X | X | | | X | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Boys' Shoe* | X | | | X | | |
|  *"Wonder Nation" Boys' Shoe* | X | | | X | | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Boys' Shoe* | X | | | X | | |
|  *"Wonder Nation" Toddler Shoe* | X | | X | | | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"Wonder Nation" Toddler Shoe* | X | | X | | | |
|  *"Wonder Nation" Toddler Shoe* | X | | X | | | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|   *"No Boundaries" Men's and Women's Shoe* | X | X | | | X | |
|   *"No Boundaries" Men's Shoe* | X | X | | | X | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"No Boundaries" Men's Shoe* | X | X | | | X | |
|  *"No Boundaries" Men's Shoe* | X | X | | | X | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"No Boundaries" Men's Shoe* | X | X | | | X | |
|  *"No Boundaries" Men's Shoe* | X | | | X | | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"No Boundaries" Men's Shoe* | X | | | X | | |
|  *"No Boundaries" Men's Shoe* | X | | | X | | |

| WALMART INFRINGING FOOTWEAR | SIDE STRIPE Mark[30] | OLD SKOOL Trade Dress | OLD SKOOL Toddler Trade Dress | SK8-HI Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | U.S. Trademark Reg. No. 6,451,279 (Checker Side Panel on Low Top) |
|---|---|---|---|---|---|---|
|  *"No Boundaries" Men's Shoe* | X | | | X | | |

140.   The scope of Walmart's infringement cannot be overstated.  Over the course of several months, Walmart first introduced the "Time and Tru" Women's shoe and then gradually introduced **over twenty** additional knockoffs in a concerted, systematic, and escalating campaign to rip off Vans' shoes in broad-brush fashion.

141.   On information and belief, Walmart has truly flooded the market with its cheap, poorly made, and confusingly similar knockoff shoes.  Walmart sells the infringing shoes in its thousands of retail stores across the United States and through its online website (https://www.walmart.com/).  Walmart sells the shoes for prices between $9.97 and $18.64, before tax.  Printouts of Walmart's website pages for some of the above infringing shoes are attached collectively as **Exhibit 17**.  A representative

image of these infringing shoes displayed in Walmart's retail stores is attached as **Exhibit 18**.

142.   On information and belief, Walmart also previously sold additional colorways of the same designs.  For example, earlier this year, a consumer posted the below colorway of Walmart's OLD SKOOL knockoff on TikTok (with an appropriate caption), even though the colorway does not currently appear for sale by Walmart:



143.   Walmart adopted its infringing shoe designs well after Vans acquired the trademarks and trade dress rights asserted herein, and long after Vans established itself as one of the most popular footwear companies in the world.

1   ***Walmart's Intentional Copying of Vans' Trademarks and Trade Dress Rights***

2       144.   There is nothing coincidental about Walmart's infringing shoes.   On

3   information and belief, Walmart's infringing shoe designs are calculated and

4   intentional knockoffs of Vans' footwear products, designed to intentionally confuse

5   consumers as to their source by mimicking the Vans' trade dress.

6       145.   For example, each of the infringing shoes sold by Walmart's in-house

7   labels incorporates a mark on the shoe upper that is confusingly similar to Vans' Side

8   Stripe Mark.   Notably, Walmart applies its imitation side stripe mark across all of its

9   knockoff OLD SKOOL and SK8-HI shoes, *i.e.,* in the same way that Vans' uses the

10  actual Side Stripe Mark on its genuine versions of OLD SKOOL and SK8-HI shoes.

11      146.   On its infringing shoes, Walmart blatantly copies at least two-thirds of

12  the Side Stripe Mark, as well as the exact sizing and placement of the Mark on the

13  shoe upper.   A comparison between Vans' U.S. Trademark Registration No.

14  2,177,772 and Walmart's confusingly similar mark is included below:

15

16       

17

18

19

20

21      *Reg. No. 2,177,772*               *Walmart Time and Tru*

22

23      147.   Starting at the back of the shoe, the Walmart side stripe is angled and

24  "cut off" by the semi-circular heel cap (inner red circle); the side stripe then curves

25  up following the shoe collar and proceeds in a straight direction down the eyestay

26  reinforcement (outer oval) at which point the Side Stripe Mark curves up and

27  Walmart's stripe angles downward.   In addition, Walmart's side stripe mark is

28  substantially the same width and size as Vans' Side Stripe Mark.

148.   As shown in the above comparison, Walmart's side stripe is confusingly similar to Vans' Side Stripe Mark even when compared side by side.   When encountered at separate times, as most consumers will do in the marketplace or in the post-sale context, the parties' respective designs are even more confusing.

149.   Second, Walmart's infringing shoes deliberately incorporate the distinctive features of the OLD SKOOL Trade Dress, SK8-HI Trade Dress, and OLD SKOOL Toddler Trade Dress.

150.   Through its in-house labels, Walmart started selling over a dozen knockoff versions of Vans' OLD SKOOL shoes.   Walmart's various low-top shoes imitate every element of the OLD SKOOL Trade Dress, as illustrated below:



*Vans Old Skool*                    *Walmart's Infringing*
                                    *"No Boundaries" Shoe*

| Vans' OLD SKOOL Trade Dress | Walmart's Infringing Footwear |
|---|---|
| Side Stripe Mark on the shoe upper | Yes – use of confusingly similar mark |
| Rubberized sidewall with a consistent height around the perimeter of the shoe | Yes |
| Uppermost portion of sidewall having a three-tiered or grooved appearance | Yes |
| Textured toe box outer around the front of the sidewall | Yes |
| Visible stitching, including where the eyestay meets the vamp | Yes |
| Relative placement and proportion of elements | Yes |

151.   Walmart's knockoff versions of Vans' OLD SKOOL shoes go even further by also infringing upon U.S. Trademark Reg. No. 5,320,384, which covers Vans' distinctive stitching pattern on a low-top sneaker:





*Reg. No. 5320384*

*Close-up of Toe Cap*
*On "Time and Tru" Shoe*

152.   In addition to copying Vans' OLD SKOOL Trade Dress and the mark embodied in Reg. No. 5320384, Walmart copies additional features of the OLD SKOOL shoe, including the exact color schemes used by Vans, the overall shape of the shoes, and the silhouette of the shoe.   Walmart's copying of these additional features further confirms Walmart's intent to copy Vans' products and trade on Vans' reputation, increasing the likelihood consumers will be confused.

153.   As one example, Walmart has intentionally replicated the color scheme of the Rainbow Checkerboard OLD SKOOL:





*Vans Old Skool - Rainbow Checkerboard*

*"Wonder Nation" Girls' Shoe*

154.  With regard to its high-top shoes, Walmart's knockoff shoes similarly imitate every element of the SK8-HI Trade Dress, as shown below:

 

*Vans SK8-HI*              *Walmart's Infringing*
                          *"No Boundaries" Shoe*

| Vans' SK8-HI Trade Dress | Walmart's Infringing Footwear |
| --- | --- |
| Side Stripe Mark on the shoe upper | Yes – use of confusingly similar mark |
| Rubberized sidewall with a consistent height around the perimeter of the shoe | Yes |
| Uppermost portion of sidewall having a three-tiered or grooved appearance | Yes |
| Textured toe box outer around the front of the sidewall | Yes |
| Ribbed collar formation that encircles the uppermost part of the shoe | Yes |
| Visible stitching, including separating the individual ankle collar corrugations | Yes |
| Relative placement and proportion of elements | Yes |

155.  Beyond these elements, Walmart also copies the exact color schemes used by Vans for its SK8-HI shoes, the overall shape of the shoes, and the silhouette. Walmart's copying of these features further demonstrates Walmart's intent to copy

Vans' SK8-HI shoes and increases the likelihood consumers will be confused.  For reference, another comparison between Vans' SK8-HI shoes and one of Walmart's knockoff versions is depicted below:

| VANS SK8-HI | WALMART "WONDER NATION" |
|---|---|
|  | |

156.   For its toddler sized shoes, Walmart likewise imitates every element of the OLD SKOOL Toddler Trade Dress:

   

*Vans OLD SKOOL Toddler*          *Walmart's "Wonder Nation" Shoe*

| Vans OLD SKOOL Toddler Trade Dress | Walmart's Infringing Footwear |
|---|---|
| Side Stripe Mark on the shoe upper | Yes – use of confusingly similar mark |
| Rubberized sidewall with a consistent height around the perimeter of the shoe | Yes |
| Uppermost portion of sidewall having a three-tiered or grooved appearance | Yes |
| Textured toe box outer around the front of the sidewall | Yes |
| Visible stitching | Yes |
| Relative placement and proportion of elements | Yes |

157.   Walmart also copies additional features of Vans' OLD SKOOL Toddler shoes beyond these elements.  For example, Walmart copies specific color schemes used by Vans, the overall shape of the shoes, and the silhouette.  Once again, Walmart's copying of these features further demonstrates Walmart's deliberate intent to copy Vans' OLD SKOOL Toddler shoes and trade on Vans' reputation, increasing the likelihood that consumers will be confused.

| VANS OLD SKOOL (TODDLER/BABY) | WALMART "WONDER NATION" (TODDLER/BABY) |
|---|---|
|  | |

158.   Due to Walmart's extensive copying and misappropriation, Walmart's Infringing Footwear falsely suggests and is likely to cause the mistaken impression that Vans is the source of such infringing shoes, that Vans is owned by or controlled

by Walmart, that Vans has approved the Infringing Footwear, that Vans has licensed its intellectual property rights for use by Walmart, and/or that Walmart is otherwise affiliated with or connected with Vans or Vans' products.

### *Walmart's Additional Attempts to Associate Its Products with Vans*

159.   Beyond mimicking the design of Vans' shoes, Walmart takes additional, affirmative steps to try to associate itself and its infringing shoes with Vans.  As an example, Walmart intentionally markets all of its infringing shoes as either "Skate" or "Retro" sneakers in an attempt to suggest a connection with Vans' products, which found fame in the 1970s in the skateboarding community of Southern California.

160.   On its website, Walmart also purports to sell genuine Vans products alongside its infringing knockoff shoes in a misleading manner.  As a result, a search for "skate shoes" on Walmart's website can lead the consumer to search results such as the following, which may lead consumers to believe falsely that Walmart's infringing Wonder Nation shoe is another colorway of the SK8-HI shoe next to it:



161.   On information and belief, Walmart also uses Google AdWords and other advertising methods in connection with the Infringing Footwear to deceive consumers into believing they are purchasing a product made by, sponsored by, approved by, or otherwise associated with Vans.  For instance, searching for the words "walmart" and "vans" on Google can lead to deceptive search results that include Walmart's Infringing Footwear rather than genuine Vans:



162.   Unfortunately, Walmart's deceptive marketing tactics do not stop there. Walmart also enlists endorsers and influencers to promote its products, including its subject infringing shoes, via other websites or social media platforms.  Walmart does so through its "Walmart.com Affiliates Program."   On information and belief, Walmart's "affiliates" receive compensation in the form of monetary payment for reviewing and publicizing Walmart's products, including the subject infringing shoes. On information and belief, Walmart is well aware that many of its affiliates promote

and endorse Walmart's Infringing Footwear by (1) openly referring to Vans while promoting them, (2) explicitly selling them as "Van dupes" or "Vans knockoffs," and/or (3) intentionally trying to divert potential customers away from Vans by suggesting that the prestige of Vans' shoes can be acquired without paying Vans' normal prices.   Representative examples of these deceptive tactics by Walmart's affiliates are attached collectively as **Exhibit 19** and some are reproduced below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26



27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT





1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

COMPLAINT



163. Indeed, even Walmart's account for its Walmart Supercenter in Georgetown, Delaware (Walmart Store 2791) openly sells the Infringing Footwear by invoking the Vans brand:



*Walmart Causes Actual Confusion in the Marketplace*

164.  Consumers have already been confused and deceived into believing that Walmart's infringing shoes are made by, sponsored by, connected to, licensed by, or otherwise associated with Vans.  Representative examples of actual confusion are attached as **Exhibit 20** and reproduced below:





165.   Unless stopped, Walmart's Infringing Footwear will continue to cause confusion in the marketplace, including but not limited to initial interest confusion, confusion at the point of purchase, post-sale confusion, and confusion in the secondary market.

166.   On information and belief, Walmart's actions alleged herein are intended to cause actual confusion, mistake, and deception as to the source of Walmart's Infringing Footwear.

### *Walmart's Infringing Footwear Are Cheap and Low Quality*

167.   Post-sale confusion involving Walmart's Infringing Footwear is likely to harm Vans' reputation since Walmart's shoes are cheaply made and inferior quality compared to genuine Vans shoes.  Despite how closely they mimic the look of Vans' shoes, Walmart's infringing shoes fail to mimic the high quality or durability of genuine Vans shoes.  As an example, rather than having actual rubber foxing above the midsole, some of Walmart's knockoffs appear to have poorly applied dark paint and glue instead, as seen on the Walmart shoes below:



168.   Representative examples of consumer complaints about the poor quality of Walmart's infringing shoes are attached as **Exhibit 21** and reproduced below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

★★★☆☆ **Verified Purchaser**                                    7/25/2021

The souls at the bottom are very thin they do not last long I had mine for a week and minds are already coming A part

Yolanda

★☆☆☆☆ **Verified Purchaser**                                    6/28/2021

Very disappointed

Not the quality I've come to expect from Time and Tru. Very shoddy workmanship. Like pieces glued together. Won't buy shoes online anymore. Didn't look like picture.

Joann

★☆☆☆☆ **Verified Purchaser**                                    2/25/2021

they broke in two weeks, very poor

patricia



169.   In short, Walmart's Infringing Footwear are cheaply made and considerably lower quality than Vans' genuine shoes.

170.   Consumers and prospective purchasers are likely to attribute the inferior quality of Walmart's Infringing Footwear to Vans, thereby damaging Vans' reputation and making such consumers less likely to purchase genuine Vans shoes.

### *Walmart's Infringing Advertisements*

171.   Walmart has also unlawfully used Vans' trademarks and trade dress rights in advertisements for the Infringing Footwear and other products, including on Walmart's website and in print advertisements.

172.   Walmart uses the Infringing Footwear to sell Walmart's other shoes and apparel, while creating the impression of a false connection, approval, or sponsorship by Vans.  This Complaint therefore also seeks damages for Walmart's infringing uses of Vans' trademarks and trade dress to sell its other products.   Representative

examples of such actions by Walmart are included below:









***Walmart Ignores Vans' Objections to Walmart's Unlawful Conduct***

173.   In or around March 2021, Vans discovered that Walmart was selling just one of the infringing shoes, Walmart's Time and Tru women's shoe.

174.   Upon learning about Walmart's sales of the Time and Tru shoe, Vans' in-house counsel organized a telephone call with Walmart's counsel and then also sent Walmart a follow up cease and desist letter demanding that Walmart discontinue use of the infringing shoe design.

175.   In response to Vans' correspondence, Walmart refused to address any of Vans' concerns and defiantly continued selling the copycat shoe up to the present. Indeed, rather than addressing Vans' concerns, Walmart turned around and introduced over twenty more knockoff shoes.  Walmart's continued usage of Vans' intellectual property and further encroachment on Vans' rights—after being placed on unequivocal notice of its infringement—confirms Walmart's willful infringement and bad faith intent to profit from Vans' goodwill.

***Defendants' Other Infringing Shoes and Unlawful Acts***

176.   Vans also brings this lawsuit in connection with three additional infringing shoes, which are designed, manufactured, imported, distributed, offered for sale, and/or sold by Defendants Walmart, Doll Maker, and Trendy Trading.  The additional infringing shoes are pictured below, along with information about Vans' asserted trademarks and/or trade dress rights that each shoe infringes:

| KNOCKOFF SOLD BY WALMART | Checkerboard Slip-On Marks[31] | Side Stripe Mark[32] | OLD SKOOL Trade Dress | U.S. Trademark Reg. No. 5,320,384 (Stitching Mark) | SK8-MID Toddler Trade Dress | Trademark Reg. No. 6,436,779 (checker panel on high-top) |
|---|---|---|---|---|---|---|
|  *"Doll Maker" Slip-On Shoe* | X | | | | | |
|  *"Doll Maker" Skate Shoe* | | X | X | X | | |

[31] Includes U.S. Trademark Registration Nos. 1,583,727, 5,070,471 and 5,070,470, and common law rights.

[32] Includes U.S. Trademark Registration Nos. 2,177,772, 2,170,961, and 2,172,482, and common law rights.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
|  *"WISPR" Toddler Shoes* | | | X | | | X | X |

177.   On information and belief, Defendant Doll Maker designs, manufactures, distributes, and sells the above Doll Maker branded shoes.  On further information and belief, Doll Maker sells or has sold the shoes through Walmart as well as other retailers.

178.   On information and belief, Defendant Trendy Trading sources, imports, markets, promotes, distributes, and sells the above Doll Maker branded shoes.  On further information and belief, Trendy Trading sells or has sold the shoes through Walmart as well as other retailers.

179.   Against Doll Maker and Trendy Trading, this lawsuit seeks to stop all such infringing sales of these shoes in the United States, regardless of point of purchase, and to recover damages for all such sales.  In other words, this lawsuit also concerns any sales of the Infringing Footwear by Doll Maker and Trendy Trading through retailers or other means besides Walmart.

180.   Walmart promotes, offers to sell, and sells each of the above infringing shoes on the Walmart Website (https://www.walmart.com/).   Screenshots of Walmart's website pages for the above infringing shoes are attached collectively as **Exhibit 22**.

181.   On information and belief, the infringing Doll Maker checkerboard slip-on is one of the bestselling shoes on the Walmart Website, as indicated in the below photograph:



182.   As seen in the above photograph, Walmart deceptively and confusingly promotes, offers to sell, and sells the checkerboard slip-on knockoff as a "Skate Sneaker," alongside Walmart's other knockoff Vans shoes.   This tactic further increases the likelihood of confusion as to the source of the products.

183.   On information and belief, Defendants intentionally promote, offer to sell, and sell the additional infringing shoes despite knowing that they incorporate Vans' trademarks and mimic the Vans trade dress.

184.   With regard to Defendants' checkerboard slip-on knockoff, Defendants' version incorporates Vans' valuable trademark and trade dress rights that are embodied in U.S. Trademark Registration Nos. 1,583,727, 5,070,471 and 5,070,470, and the Checkerboard Slip-On Trade Dress.   Defendants' infringing version of the

checkerboard slip-on is confusingly similar to multiple versions of Vans' iconic Checkerboard Slip-On shoes, as depicted below:

| VANS SHOE | DEFENDANTS' KNOCKOFF |
|---|---|
|  *Vans Checkerboard Slip-Ons* | *"Doll Maker" Slip-On Shoe* |

185.   Defendants' knockoff version incorporates all of the elements of Vans' Checkerboard Slip-On Trade Dress, including a checkerboard pattern on the upper portion of a twin-gore slip-on shoe, a rubberized sidewall with a consistent height around the perimeter of the shoe; the uppermost portion of the sidewall having a three-tiered or grooved appearance; and a textured toe box outer around the front of the sidewall.

186.   Beyond these elements, Defendants' infringing version also copies additional features such as the most popular color scheme of Vans' Checkerboard Slip-Ons, the black piping at the top of the toe vamp, the shape, and the silhouette.

Defendants' inclusion of these features demonstrates their deliberate intent to copy Vans' Checkerboard Slip-On Trade Dress and trade on Vans' reputation, and also increases the likelihood that consumers will be confused.

187.   The "Doll Maker" Skate Shoe that is promoted, offered for sale, and sold by Defendants similarly incorporates Vans' valuable trademark and trade dress rights, as depicted below:

| **VANS SHOE** | **DEFENDANTS' KNOCKOFF** |
|---|---|
| *Vans Old Skool* | *"Doll Maker" Skate Shoe* |

188.   Notably, in addition to infringing upon the Side Stripe Mark and OLD SKOOL Trade Dress, Defendants' above infringing shoe directly copies the highly unique stitching pattern embodied in U.S. Trademark Reg. No. 5,320,384:



189.   Defendants' knockoff shoe also incorporates additional features such as Vans' color scheme, shape, and silhouette, thereby further increasing the likelihood of confusion.

190.   Finally, Walmart also promotes, offers for sale, and sells the below infringing version of Vans' SK8-MID toddler shoe on its website:

| VANS SHOE | KNOCKOFF SOLD BY WALMART |
|---|---|
|  *Vans Sk8-Mid Checkerboard - Toddler* |  *"WISPR" Toddler Shoes* |

191.   The above infringing shoe directly copies and infringes Vans' SK8-MID Trade Dress, Side Stripe Mark, and U.S. Trademark Reg. No. 6,436,779 (checkerboard panel on high-top sneaker).

192.   With regard to sales of these additional infringing shoes through Walmart's website, Vans is informed and believes that (1) Walmart actively induces and encourages such unlawful sales through Walmart's own rampant infringement of Vans' intellectual property rights, (2) Walmart knowingly allows third parties to infringe Vans' rights in relation to the above shoes, (3) Walmart employs willful blindness to allow infringing goods to remain on the Walmart website, (4) Walmart fails to employ industry-standard methods to prevent sales of infringing goods, and (5) Walmart actively contributes to infringing sales by deceptively displaying third-party infringing shoes next to both Walmart's in-house products and real Vans shoes,

1    without adequate labeling to inform purchasers as to the provenance of the shoes.

2        193.   On information and belief, Walmart knew about Vans' asserted
3    trademarks and trade dress rights at all times relevant to this action.   On further
4    information and belief, Walmart knew that third parties were selling the above
5    additional infringing shoes, and that such shoes infringed Vans' asserted rights.

6        194.   Counterfeiting and trademark infringement are rampant on Walmart's
7    marketplace.   Numerous third parties and media outlets have reported on the fact that
8    Walmart fails to properly monitor and distinguish third party sellers on Walmart's
9    website.   For example, a December 2019 press release by *The Counterfeit Report*
10   reported on the facts that: (1) Walmart's push to capture a portion of the e-commerce
11   market led to an influx of counterfeit products on its website, (2) Walmart allows
12   counterfeit items to deceptively appear right next to authentic products, and (3) *The*
13   *Counterfeit Report* had specifically identified counterfeit Vans goods on Walmart's
14   website.   This press release is attached as **Exhibit 23** and a portion is reproduced
15   below:

16
17   **Press Release**
18
     **Walmart Holiday Shoppers May Receive Counterfeit and Fraudulent Products**

     Walmart.com not safe for holiday shoppers.

19   **December 11, 2019, Los Angeles, CA –** Holiday shoppers expect Walmart to provide authentic and safe products
20   when they shop on Walmart's website -- but that confidence is misplaced. Walmart's push to capture a portion of the
     exploding e-commerce marketplace exposes a seedy and dishonest practice -- the sale of counterfeit, fraudulent, and
     replica products.
21
     Walmart is both a <u>direct retailer</u> of counterfeits, and has opened its website, Walmart.com, to global third-party sellers
22   who can list just about anything they want, including counterfeit, fake and replica products.

23   Counterfeit items appear right alongside authentic products, creating the illusion they are from Walmart, or have
     Walmart's endorsement. Deceived consumers spend good money for bad products, while Walmart takes a transaction
     fee for each item sold.

24       195.   Based on its actions, Walmart materially assisted and contributed to its
25   third-party sellers' efforts to promote, offer for sale, and sell the above additional
26   infringing shoes in the United States, which is causing and is likely to continue to
27   cause confusion, mistake, or deception among the public as to the origin, source,
28   sponsorship, approval or affiliation of the additional infringing shoes.

## XI.    INJURIES TO VANS AND THE PUBLIC

196.    Without permission, authorization, or consent from Vans, Defendants have infringed Vans' trademarks and trade dress rights by designing, making, using, promoting, advertising, selling, and/or offering to sell goods using marks that are confusingly similar to Vans' trademarks and trade dress rights.

197.    The Infringing Footwear produced, distributed, marketed, promoted, offered for sale, and sold by Defendants are not made by Vans.  Nor are Defendants' products associated, affiliated, or connected with Vans, or licensed, authorized, sponsored, endorsed, or approved by Vans in any way.

198.    The likelihood of confusion, mistake, and deception engendered by Defendants' infringement of Vans' trademarks and trade dress is causing irreparable harm to the goodwill symbolized by the marks and the reputation for originality, authenticity, and quality that they embody.

199.    Defendants' activities are likely to cause confusion before, during, and after the time of purchase because purchasers, prospective purchasers, and others viewing Defendants' Infringing Footwear at the point of sale or post-purchase are likely—due to Defendants' use of confusingly similar imitations of Vans' trademarks and trade dress—to mistakenly attribute the Infringing Footwear to Vans.  By causing a likelihood of confusion, mistake, and deception, Defendants are inflicting irreparable harm on Vans and damaging its reputation.

200.    On information and belief, Defendants continue to sell the Infringing Footwear to this day, in overlapping channels of trade, to overlapping target consumers.

201.    On information and belief, Defendants knowingly, willfully, intentionally, and maliciously adopted and used confusingly similar imitations of Vans' trademarks and trade dresses.

202.    On information and belief, Defendants deliberately intended to trade off the popular and positive goodwill associated with Vans and its trademarks and trade

dress rights by using features on the Infringing Footwear that are nearly identical to or that include a confusingly similar combination of elements as Vans' trademarks and trade dress rights.

203.   Defendants knew or should have known of Vans' prior rights in its asserted trademarks and trade dresses before using their imitation marks, and thus Defendants have acted willfully with respect to Vans' trademarks and trade dress rights.

204.   Vans has no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement**
**15 U.S.C. § 1114**
**(Against All Defendants)**

205.   Vans repeats and incorporates by reference the allegations in the preceding paragraphs.

206.   Defendants have knowingly used and continue to use in commerce, without Vans' permission or authorization, Vans' asserted trademarks and trade dress rights, and/or confusingly similar marks, in connection with products that Defendants design, manufacture, import, distribute, promote, advertise, offer for sale, and/or sell in the United States, including the Infringing Footwear.

207.   Defendants' use of Vans' trademarks and trade dress rights has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are produced or distributed by Vans, or are associated or connected with Vans, or have the sponsorship, endorsement, or approval of Vans.

208.   Defendants' Infringing Footwear are confusingly similar to Vans' federally registered marks in violation of 15 U.S.C. § 1114.  Defendants' activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury

to Vans' goodwill and reputation as embodied in the Vans' marks, for which Vans has no adequate remedy at law.

209.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Vans' marks to Vans' great and irreparable harm.

210.   Defendants caused and are likely to continue causing substantial injury to the public and to Vans, and Vans is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**SECOND CLAIM FOR RELIEF**
**Federal Unfair Competition and False Designation of Origin**
**15 U.S.C. § 1125(a)**
**(Against All Defendants)**

211.   Vans repeats and incorporates by reference the allegations in the preceding paragraphs.

212.   Based on extensive marketing, promotion, and use, Vans' asserted trademarks and trade dresses have acquired distinctiveness and enjoy secondary meaning among consumers, instantly identifying Vans as the source of the products with which they are used.

213.   Defendants have knowingly used and continue to use in commerce, without Vans' permission or authorization, Vans' asserted trademarks and trade dress rights, and/or confusingly similar marks, in connection with products that Defendants design, manufacture, import, distribute, promote, advertise, offer for sale, and/or sell in the United States, including the Infringing Footwear.

214.   Defendants' use of Vans' trademarks and trade dress rights has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are produced or distributed by Vans, or are affiliated, connected, or associated with Vans, or have the sponsorship,

endorsement, or approval of Vans.

215.   Defendants have made false representations, false descriptions, and false designations of, on, or in connection with its goods in violation of 15 U.S.C. § 1125(a).  Defendants' activities have caused and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Vans' goodwill and reputation as embodied in the marks, for which Vans has no adequate remedy at law.

216.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Vans' marks to the great and irreparable injury of Vans.

217.   Defendants' conduct has caused, and is likely to continue causing, substantial injury to the public and to Vans.  Vans is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1125(a), 1116, and 1117.

**THIRD CLAIM FOR RELIEF**
**Contributory Trademark Infringement, Unfair Competition, and**
**False Designation of Origin**
**15 U.S.C. §§ 1114 and 1125(a)**
**(Against Walmart)**

218.   Vans repeats and incorporates by reference the allegations in the preceding paragraphs.

219.   Defendant Walmart has knowingly and materially contributed to the use in commerce, without Vans' permission or authorization, of Vans' asserted trademarks and trade dress rights, and/or confusingly similar marks, in connection with products that third parties design, manufacture, import, distribute, promote, advertise, offer for sale, and/or sell in the United States, including with respect to shoes manufactured or distributed by Defendants Doll Maker and Trendy Trading.

220.   Defendant Walmart's contributory infringement has caused and is likely

to cause confusion, deception, and mistake by creating the false and misleading impression that third parties' goods are produced or distributed by Vans, or are associated or connected with Vans, or have the sponsorship, endorsement, or approval of Vans.

221. Defendant Walmart has also knowingly and materially contributed to third parties, including Defendants Doll Maker and Trendy Trading, and others, making false representations, false descriptions, and false designations of, on, or in connection with goods.

222. Defendant Walmart's activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Vans' goodwill and reputation as embodied in the Vans' marks, for which Vans has no adequate remedy at law.

223. Defendant Walmart's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Vans' marks to Vans' great and irreparable harm.

224. Defendant Walmart caused and is likely to continue causing substantial injury to the public and to Vans, and Vans is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, 1117, and 1125(a).

**FOURTH CLAIM FOR RELIEF**
**State Unfair Competition Under Cal. Bus. & Prof. § 17200, *et seq*.**
**(Against All Defendants)**

225. Vans repeats and incorporates by reference the allegations in the preceding paragraphs.

226. By reason of the foregoing, Defendants have been, and are, engaged in unlawful, unfair and/or fraudulent business practices in violation of California Business & Professions Code § 17200, *et seq*.

227. Defendants have intentionally traded upon and unfairly benefited from

1  Vans' valuable goodwill, reputation, and substantial marketing and promotion, and
2  have been unjustly enriched thereby.

3      228.   Defendants have misappropriated for themselves the commercial value
4  of Vans' trademarks and trade dress rights and have harmed the value of Vans'
5  goodwill in these marks.

6      229.   Defendants' acts greatly and irreparably damage Vans and will continue
7  to so damage Vans unless restrained by this Court; wherefore, Vans is without an
8  adequate remedy at law.   Accordingly, Vans is entitled to, among other things,
9  restitution in an amount to be determined at trial, and an order enjoining and
10  restraining Defendants from advertising and selling their Infringing Footwear.

11
12                    **FIFTH CLAIM FOR RELIEF**
                 **Common Law Trademark Infringement**
13                      **and Unfair Competition**
                       **(Against All Defendants)**
14

15      230.   Vans repeats and incorporates by reference the allegations in the
16  preceding paragraphs.

17      231.   Vans is the owner of all rights and title to, and has valid and protectable
18  prior rights in, the asserted trademarks and trade dress rights.

19      232.   Vans engages in the sale and distribution of footwear and apparel,
20  employing the asserted trademarks and trade dress rights in the State of California and
21  has done so since long before Defendants began their infringing use of Vans' marks
22  as alleged herein.

23      233.   Vans' trademarks and trade dress rights are inherently distinctive.   In
24  addition, based on extensive marketing, promotion, and use, Vans' marks have
25  acquired distinctiveness and enjoy secondary meaning among consumers, instantly
26  identifying Vans as the source of the products with which they are used.

27      234.   Defendants have reproduced, copied, and imitated Vans' trademarks and
28  trade dress rights in connection with advertising, promoting, and selling footwear

bearing infringing marks, in competition with Vans and without Vans' consent.

235.   Defendants' use of confusingly similar imitations of Vans' trademarks and trade dress rights has caused and is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Defendants' goods are produced or distributed by Vans, or are affiliated, connected, or associated with Vans, or have the sponsorship, endorsement, or approval of Vans.

236.   Upon information and belief, Defendants' acts of common law trademark infringement and unfair competition have been done willfully and deliberately, and Defendants have profited and been unjustly enriched by sales that Defendants would not otherwise have made if not for its unlawful conduct.

237.   Defendants' willful and deliberate acts described herein have caused injury and damages to Vans, and have caused irreparable injury to Vans' goodwill and reputation and, unless enjoined, will cause further irreparable injury, whereby Vans has no adequate remedy at law.  Vans, therefore, is entitled to injunctive relief.

238.   Vans is also entitled to its actual damages, Defendants' profits, and an award of costs and attorneys' fees.

239.   Additionally, because Defendants' misconduct as alleged herein has been willful, malicious, and wanton, Vans is entitled to an award of punitive damages under California law in an amount sufficient to punish Defendants and deter such misconduct in the future.

## PRAYER FOR RELIEF

Vans respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

1.   Defendants and all of their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through or under authority from Defendants, or in concert or participation with Defendants, and each of them, be enjoined from:

a.  advertising, marketing, promoting, offering for sale, distributing, or selling the Infringing Footwear;

b.  using Walmart's side stripe mark or any mark confusingly similar thereto on or in connection with any of Walmart's goods or services;

c.  using Vans' Side Stripe Mark, OLD SKOOL Trade Dress, SK8-HI Trade Dress, OLD SKOOL Toddler Trade Dress, SK8-MID Toddler Trade Dress, Checkerboard Slip-On Marks, or any of Vans' registered trademarks, or any other copy, reproduction, colorable imitation, or simulation of Vans' marks on or in connection with Defendant's goods or services;

d.  using any trademark, name, logo, design, or source designation of any kind on or in connection with Defendants' goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to any of Vans' trademarks, trade dresses, names, or logos;

e.  using any trademark, name, logo, design, or source designation of any kind on or in connection with Defendants' goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Vans, or are sponsored or authorized by Vans, or are in any way connected or related to Vans; and

f.  passing off, palming off, or assisting in passing off or palming off Walmart's goods as those of Vans, or otherwise continuing any and all acts of unfair competition as alleged in this Complaint.

2.  Defendants be ordered to cease offering for sale, marketing, promoting, and selling and to recall all Infringing Footwear, or any other goods bearing Defendants' confusingly similar imitation marks that are in

Defendants' possession or have been shipped by Defendants or under their authority, to any store, affiliate, subsidiary, business, wholesaler, distributor, retailer, or marketer, and also to deliver to each such entity a copy of this Court's order as it relates to said injunctive relief against Defendants;

3.   Defendants be ordered to deliver up for impoundment and for destruction, all Infringing Footwear, bags, boxes, labels, tags, signs, packages, receptacles, advertising, sample books, promotional materials, stationery, or other materials in the possession, custody or under the control of Walmart that are found to adopt, infringe, or misappropriate Vans' trademarks or that otherwise unfairly compete with Vans and its products;

4.   Defendants be compelled to account to Vans for any and all profits derived by Defendants from the sale or distribution of the Infringing Footwear;

5.   Defendants be compelled to account for any and all profits derived by Defendants from the sale or distribution of other products while using Vans' trademarks or trade dress rights, and/or confusingly similar marks, to advertise such products;

6.   Vans be awarded all damages caused by the acts forming the basis of this Complaint;

7.   Based on Defendants' knowing and intentional use of a confusingly similar imitation of Vans' trademarks and trade dress rights, the damages awarded be trebled and the award of Defendants' profits be enhanced as provided for by 15 U.S.C. § 1117(a);

8.   Defendants be required to pay to Vans the costs and reasonable attorneys' fees incurred by Vans in this action pursuant to 15 U.S.C. § 1117(a) and California state law;

9. Based on Defendants' willful and deliberate infringement of Vans' trademarks and trade dress rights, and to deter such conduct in the future, Vans be awarded punitive damages;

10. Vans be awarded restitution for Defendants' unjust enrichment;

11. Vans be awarded prejudgment and post-judgment interest on all monetary awards; and

12. Vans be granted such other and further relief as the Court may deem just.

## JURY DEMAND

Vans hereby demands a trial by jury on all claims and issues so triable.

DATED: November 15, 2021          MCGUIREWOODS LLP


By:

*/s/ Nicholas J. Hoffman*
Tanya L. Greene
Nicholas J. Hoffman
Attorneys for Plaintiffs Vans, Inc. and VF
Outdoor, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on **November 15, 2021**, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and service via transmittal of a Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **November 15, 2021**, at Los Angeles, California.


*/s/ Nicholas J. Hoffman*
Nicholas J. Hoffman
McGuireWoods LLP