Tanya L. Greene (Cal. Bar No. 267975)
  tgreene@mcguirewoods.com
Nicholas J. Hoffman (Cal. Bar No. 284472)
  nhoffman@mcguirewoods.com
McGUIREWOODS LLP
355 South Grand Ave., Suite 4200
Los Angeles, CA  90071-3103
Telephone: (213) 627-2268
Facsimile: (213) 627-2579

Lucy Jewett Wheatley (admitted *Pro Hac Vice*)
  lwheatley@mcguirewoods.com
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4320
Facsimile: (804) 698-2017

Attorneys for Plaintiffs Vans, Inc. and VF Outdoor, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANS, INC.; and VF OUTDOOR, LLC,<br><br>        Plaintiffs,<br><br>        vs.<br><br>WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC,<br><br>        Defendants. | Case No. 8:21-cv-01876 -DOC-KES<br><br>Hon David O. Carter<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   January 31, 2022<br>Time:   8:30 a.m.<br>Court:  9D<br><br>Complaint Filed:       11/15/2021 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................... 1

        A.      Vans and its Intellectual Property Rights............................... 1

                1.      Vans' Side Stripe Trademark ........................................ 2

                2.      Vans' OLD SKOOL Trade Dress.................................. 3

                3.      Vans' OLD SKOOL Toddler Trade Dress .................. 5

                4.      Vans' SK8-HI Trade Dress........................................... 6

                5.      Vans' SK8-MID Trade Dress ....................................... 8

                6.      Vans' Checkerboard Slip-On Marks and Trade Dress ............... 9

                7.      Vans' Additional U.S. Trademark Registrations...................... 10

        B.      Defendants and Their Unlawful Use of Vans' Intellectual
                Property ...................................................................................... 11

III.    LEGAL STANDARD ............................................................................. 13

IV.     ARGUMENT .......................................................................................... 14

        A.      Vans is Likely to Succeed on the Merits of its Claims......................... 14

                1.      Vans Owns Valid Trademark and Trade Dress Rights. ........... 14

                2.      Defendants' Infringing Shoes Are Likely to Cause
                        Confusion.................................................................... 16

                        a.      Vans' Marks and Trade Dress Rights Are Strong.......... 16

                        b.      Defendants Sell Identical Goods to Overlapping
                                Consumers ........................................................ 17

                        c.      Defendants Use Confusingly Similar Imitations of
                                Vans' Trademarks and Trade Dress Rights ................. 18

                        d.      There is Evidence of Actual Confusion .......................... 19

                        e.      Consumers are Unlikely to Exercise Significant
                                Care................................................................... 20

                        f.      Defendants Have Intentionally and Willfully Copied... 200

                        g.      Likelihood of Expansion of the Product Lines ............. 211

        B.      Vans Will Suffer Irreparable Harm Without an Injunction ................. 22

i
MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

C.  The Ongoing Injury to Vans Outweighs Any Harm to Defendants ........................................................................... 244

D.  A Preliminary Injunction will Serve the Public Interest ..................... 25

V.  **CONCLUSION** .......................................................................... **255**

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adidas America, Inc. v. Skechers USA, Inc.*,
   890 F.3d 747 (9th Cir. 2018) .................................................14, 15, 18, 19, 23, 24

*adidas-Am., Inc. v. Payless ShoeSource, Inc. ("Payless")*,
   546 F. Supp. 2d 1029 (D. Or. 2008) .......................................................15, 18, 21

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................................14

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) .........................................................14, 15, 17, 18, 22

*Anheuser-Busch, Inc. v. The Customer Co., Inc.*,
   947 F. Supp. 422 (N.D. Cal. 1996) ....................................................................18

*Branding v. By Lee Tillett, Inc.*,
   940 F.Supp.2d 1178 (C.D. Cal. 2013) ..........................................................21, 24

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999) .............................................................14, 17, 21, 22

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) ............................................................................17

*Clicks Billiards Inc. v. Sixshooters Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ............................................................................19

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280 (9th Cir. 1992) ......................................................................18, 20

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ............................................................................20

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ..............................................................................16

*Golden Door, Inc. v. Odisho*,
   646 F.2d 347 (9th Cir. 1987) ..............................................................................17

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................. 17, 18

*Hand v. Nail Harmony, Inc. v. ABC Nail & Spa Prods.*,
  2016 WL 3545524 (C.D. Cal. June 28, 2016) (Carter, J.) ......................... 24, 25

*Inc. v. Tres Hermanos*,
  993 F. Supp. 1277 (C.D. Cal. 1997) ............................................................. 17

*K–Swiss, Inc. v. USA AISIQI Shoes, Inc.*,
  291 F.Supp.2d 1116 (C.D.Cal.2003) ............................................................. 20

*Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store,
  Inc.*,
  735 F.3d 735, 108 U.S.P.Q.2d 1630 (7th Cir. 2013) ..................................... 25

*Kreation Juicery, Inc. v. Shekarchi*,
  2014 WL 7564679 (C.D. Cal. Sept. 17, 2014) .............................................. 22

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
  799 F. Supp. 980 (D. Ariz. 1992) ................................................................. 16

*M'Otto Enter., Inc. v. Redsand, Inc.*,
  831 F. Supp. 1491 (W.D. Wash. 1993) ............................................... 20, 22, 25

*Moroccanoil, Inc. v. Moroccan Gold*,
  590 F. Supp. 2d 1271 (C.D. Cal. 2008) ......................................................... 26

*MySpace v. Wallace*,
  498 F. Supp. 2d 1293 (C.D. Cal. 2007) ......................................................... 24

*Ocean Garden, Inc. v. Marktrade Co., Inc.*,
  953 F.2d 500 (9th Cir. 1991) ......................................................................... 25

*Official Airline Guides v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) ........................................................................... 21

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
  469 U.S. 189 (1985) ....................................................................................... 15

*Payless Shoesource, Inc. v. Reebok Intern. Ltd.*,
  998 F.2d 985, 27 U.S.P.Q.2d 1516 (Fed. Cir. 1993) ..................................... 23

iv

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ................................................................. 19, 22

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995) ....................................................................................... 16

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
    875 F.3d 426 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1984 (2018) ................. 21

*Transgo, Inc., v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985) ................................................................. 15, 16

*UGG Holdings, Inc. v. Severn*,
    2005 WL 5887187 (C.D. Cal. Feb. 23, 2005) ................................................ 22

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) .......................................................................................... 14

**Federal Statutes**

15 U.S.C. § 1114(1) ............................................................................................. 14

15 U.S.C. § 1115(b) ............................................................................................. 15

15 U.S.C. §§ 1116, 1125(a) ................................................................................. 14

15 U.S.C. § 1116(a) ............................................................................................. 22

Lanham Act §§ 8 and 15 ................................................................................. 3, 10

**Rules**

Fed. R. Civ. P. 65(a) ............................................................................................. 1

**Other Authorities**

1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition § 8:2 (4th ed. 2000) ................................................................ 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants Walmart, Inc. ("Walmart"), The Doll Maker, LLC ("Doll Maker"), and Trendy Trading, LLC ("Trendy Trading") (collectively, "Defendants") are flooding the market with cheap, copycat versions of some of the most iconic shoes sold by Plaintiffs Vans, Inc. and VF Outdoor, LLC (collectively "Vans").  Since a picture is often worth a thousand words, visual comparisons of some of the parties' shoes are attached as **Exhibits 15 and 16** to the Declaration of Kia Wimmer.

Perhaps even more troubling than Defendants' blatant infringement of Vans' trademark and trade dress rights, Defendants' unlawful activities have been escalating steeply over the past few months.  Within the past few months alone, Walmart introduced over a dozen new colorways of its knockoff shoes.  Indeed, even *after* Vans filed its Complaint in this action (*i.e.,* last month), Walmart continued to introduce new colorways of its infringing shoes.  Walmart's actions demonstrate it has no intention of slowing down, and rather, with orders now being placed for 2022 merchandise, Walmart seemingly intends to distribute even larger quantities in the coming year.  Unless enjoined, Defendants will cause irreparable harm to Vans' goodwill by flooding the market with huge quantities of cheaply made knockoffs. Pursuant to Fed. R. Civ. P. 65(a), Vans respectfully requests a preliminary injunction.

## II.   STATEMENT OF FACTS

### A.   Vans and its Intellectual Property Rights

Founded in 1966, Vans is an industry-leading shoe and apparel company, which is known for its original, authentic, and distinctive footwear and apparel that embody Southern California counterculture.  *See* Declaration of Kia Wimmer ("Wimmer Decl.") ¶¶ 4-6.  Since the 1970s and 1980s, Vans has been developing, promoting, and selling some of its most iconic shoe lines, including its OLD SKOOL shoes, SK8-HI shoes, and Checkerboard Slip-On shoes.  Declaration of Rian Pozzebon ("Pozzebon Decl.") ¶¶ 4-6; 17-19; 28-29.

Vans has continuously promoted and sold these shoe lines for over four decades.  *Id.*; *see also* Declaration of Justin Regan ("Regan Decl.") ¶¶ 19; 30; 37-38. Vans distributes its iconic footwear through a carefully selected, global network of distribution channels, including major department stores and retailers; sporting goods and outdoor retailers; through Vans' own 450+ retail stores throughout the United States; and via online sales through Vans' own website (https://www.vans.com/). Declaration of Daniel Callahan ("Callahan Decl.") ¶ 20.

Vans' shoes are now some of the most popular footwear in the U.S.  For each of the past several years, an independent third-party survey called "*Taking Stock with Teens*" has consistently found that Vans is the No. 2 overall favorite footwear brand among all U.S. teens.  According to the survey, Vans trails only Nike in popularity among teens.  Callahan Decl. ¶ 18; Ex. 1.  This popularity has also been reflected in Vans' sales.  For each of the past few years, Vans' annual sales have surpassed $1 billion for the combined U.S. sales of the shoes at issue in this litigation.  *Id.* at ¶¶ 7; 9; 11; 14; 16.

Vans' success has been driven by factors such as its focus on just a few iconic shoe lines, its reputation for creating lasting and durable footwear without sacrificing style, and its longstanding and consistent use of its trademarks and trade dress rights, including those rights discussed below.  Wimmer Decl. ¶ 6; Callahan Decl. ¶¶ 17; 35.

## 1. <u>Vans' Side Stripe Trademark</u>

In the 1970s, Vans began using its now-iconic "jazz stripe," which adorns the side panel of many Vans shoes (the "Side Stripe Mark").  *See* Pozzebon Decl., ¶ 2. Since then, Vans has continuously manufactured, promoted, and sold footwear using the Side Stripe Mark.  *Id.* at ¶¶ 6; 17-19.  During its four-plus decades of continuous use, Vans has utilized the Side Stripe Mark across multiple Vans shoe lines and in countless color combinations.  Pozzebon Decl. at ¶¶ 10-11; 14; 18; 21-22; Regan Decl. at ¶ 13.  In connection with the Side Stripe Mark, Vans owns all right, title, and interest in the following U.S. Trademark Registrations:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 2,177,772 | August 4, 1998 | *Class 25*: Footwear |
|  | 2,170,961 | July 7, 1998 | *Class 25*: Footwear |
|  | 2,172,482 | July 14, 1998 | *Class 25*: Footwear |

*See* Wimmer Decl., ¶¶ 8-9; Exs. 1-3.  Pursuant to Sections 8 and 15 of the Lanham Act, each of these registrations is "incontestable."  *Id*. at ¶ 10.

Since placing the Side Stripe Mark on shoes, including the OLD SKOOL and SK8-HI, Vans has sold hundreds of millions of shoes bearing the Side Stripe Mark in the U.S. alone.  Callahan Decl. ¶¶ 7; 9; 11; 14.  In its lifetime, Vans has generated well over $10 billion in revenue based solely on U.S. sales of footwear with the Side Stripe Mark.  *See id*.  Moreover, for each of the past few years, Vans generated over $1 billion per year based on U.S. sales of such shoes.  Callahan Decl. ¶¶ 7; 9; 11; 14.

Over the years, Vans has spent tens of millions promoting the Side Stripe Mark. Regan Decl. ¶ 14.  Vans advertises and promotes footwear bearing the Side Stripe Mark through a wide variety of traditional and non-traditional means, including print, television, and internet advertising, event sponsorship, and athlete endorsement, to name a few.  *Id*. at ¶¶ 14-17.  As a result of Vans' efforts, the public recognizes and understands that the Side Stripe Mark distinguishes and uniquely identifies Vans' products, as evidenced by the significant unsolicited news coverage referring to the "famous" and "iconic" nature of the mark.  Regan Decl. ¶¶ 17-18, Ex. 1.

## 2.  **Vans' OLD SKOOL Trade Dress**

In 1977, Vans introduced its iconic low-top skate shoe now known as the "OLD SKOOL."  Debuting under the name "Style 36," the OLD SKOOL was one of the

first Vans shoes to feature the Side Stripe Mark.  Pozzebon Decl. ¶ 5.

Vans owns the "OLD SKOOL Trade Dress," which consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching, including where the eyestay meets the vamp; and (6) the placement and proportion of these elements in relation to one another.  Wimmer Decl., ¶ 13;  Pozzebon Decl. ¶¶ 5-7.



*Vans OLD SKOOL*

Since first launching the OLD SKOOL, Vans has continuously manufactured, promoted, and sold shoes bearing the OLD SKOOL Trade Dress.  Vans has manufactured, promoted, and sold well over 1,000 colorways (including numerous high-profile collaborations) within the OLD SKOOL shoe line.  *Id.* at ¶¶ 9-11.

Due to Vans' significant investments and efforts, Vans has sold over 200 million pairs of OLD SKOOL shoes in the U.S.  Callahan Decl. ¶ 7.  In its lifetime, Vans has generated over $10 billion in revenue based solely on U.S. sales of OLD SKOOL shoes.  *Id.*  Moreover, for each of the past few years, Vans generated over $1 billion per year based on U.S. sales of such shoes.  *Id.*

Vans has spent tens of millions of dollars promoting its OLD SKOOL Trade Dress.  Regan Decl. ¶ 20.  Vans advertises and promotes footwear bearing the OLD SKOOL Trade Dress through a wide variety of traditional and non-traditional means, as outlined in the Declaration of Justin Regan.  *Id.* at ¶¶ 20-21; Ex. 2.

Over 40 years since the introduction of the OLD SKOOL shoe, the OLD SKOOL Trade Dress remains immensely popular and continues to grow in popularity. Vans shoes bearing the OLD SKOOL Trade Dress are routinely worn and popularized by athletes, pop stars, rappers, artists, and other influential celebrities, including Frank Ocean, Justin Bieber, Kanye, A$AP Rocky, Tyler the Creator, Russell Westbrook, Julia Roberts, Paul Walker, Gwen Stefani, Miguel, Olivia Wilde, Kylie Jenner, and Kristen Stewart.  Regan Decl. ¶¶ 24-26.  Similarly, third party news organizations comment on the popularity and distinctiveness of the OLD SKOOL Trade Dress.  By way of example only, a 2018 article in *W Magazine* named the OLD SKOOL as the "most popular shoe of the summer," and *Business Insider* observed that the OLD SKOOL shoe was "blowing up the fashion world" and had "surpassed its humble roots to become an icon in its own right."  Regan Decl. ¶ 22; Exs. 3-5.

The OLD SKOOL shoe is one of the most sought-after sneakers in the world. In 2017, Online fashion website *Lyst* found the OLD SKOOL shoe was the No. 4 most searched sneaker in the world.  *Id*. at ¶ 23; Ex. 6.  Meanwhile, according to a 2019 research study by SEMrush, Vans' OLD SKOOL was the No. 3 most popular sneaker search on Google in the U.S. within the previous 12 months.  *Id*. at ¶ 23; Ex. 7.

As a result of Vans' extensive use and promotion of the OLD SKOOL Trade Dress, Vans built up and now owns valuable goodwill symbolized by the trade dress. Wimmer Decl., ¶ 15;  Pozzebon Decl., ¶¶ 8.  Vans' OLD SKOOL Trade Dress is distinctive and non-functional, and it has achieved significant secondary meaning. Pozzebon Decl., ¶ 8.  Indeed, multiple consumer surveys, including a survey conducted in support of this motion, have demonstrated that the OLD SKOOL Trade Dress has secondary meaning as a source identifier for Vans.  Sowers Report., ¶¶ 17; 53-55;  Wimmer Decl., ¶ 16, Ex. 5.

### 3.    Vans' OLD SKOOL Toddler Trade Dress

Vans also owns the rights to the "OLD SKOOL Toddler Trade Dress," which consists of a distinctive combination of source-identifying elements, including: (1)

the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching; and (6) the placement and proportion of these elements in relation to one another.  Pozzebon Decl. ¶ 14; Wimmer Decl., ¶ 17.



*Vans OLD SKOOL Toddler*

Vans sells toddler-sized shoes in certain styles.  Vans' OLD SKOOL toddler shoes incorporate many of the same features and elements as Vans' regular OLD SKOOL shoes.  However, the OLD SKOOL toddler shoes are smaller in size and incorporate hook-and-loop straps instead of laces.  Wimmer Decl., ¶ 18.

Vans' OLD SKOOL Toddler Trade Dress is non-functional and benefits from the immense goodwill it gains from the OLD SKOOL Trade Dress, due to its common distinctive elements.  Vans' OLD SKOOL Toddler Trade Dress also acquired secondary meaning individually through use and recognition in the marketplace. Pozzebon Decl. ¶ 16; Wimmer Decl. ¶¶ 19-20.  As such, Vans' OLD SKOOL Toddler Trade Dress has significant goodwill and conveys that the shoes originate from Vans.

### 4.    Vans' SK8-HI Trade Dress

Another legendary Vans shoe is the SK8-HI, which Vans introduced in 1978. Originally launched under the name "Style 38," Vans' "SK8-HI Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a

-6-

three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) a ribbed collar formation that encircles the uppermost part of the shoe; (6) visible stitching, including separating the individual ankle collar corrugations; and (7) the placement and proportion of these elements in relation to one another.  Pozzebon Decl. ¶ 18; Wimmer Decl., ¶ 23.



*Vans SK8-HI*

Since first introducing the SK8-HI in the 1970s, Vans has continuously manufactured, promoted, and sold shoes bearing the SK8-HI Trade Dress.  Pozzebon Decl. ¶ 19.  Vans has sold numerous colorways, including numerous high-profile collaborations with other designers, within the SK8-HI shoe line.  *Id.* at ¶¶ 21-22.

Due to Vans' significant investments and efforts, Vans has sold over 100 million pairs of SK8-HI shoes in the U.S. alone.  Callahan Decl. ¶ 11.  In its lifetime, Vans has generated over $6 billion in revenue based solely on U.S. sales of SK8-HI shoes.  *Id.*  Moreover, for each of the past few years, Vans generated over $500 million per year based on U.S. sales of such shoes.  *Id.*

Over the years, Vans has spent tens of millions promoting its SK8-HI Trade Dress.  Regan Decl. ¶ 31.  Vans promotes footwear bearing the SK8-HI Trade Dress through a wide variety of carefully-selected methods, including print, television, and internet advertising, event sponsorship, and athlete endorsement.  *Id.* at ¶ 31; Ex. 9.

Due to Vans' efforts, the SK8-HI shoe is immensely popular.  Vans shoes bearing the SK8-HI Trade Dress are often worn by athletes, musicians, artists, and scores of other influential celebrities, including Justin Bieber, Kanye, Zac Efron,

David Beckham, Chris Brown, Chloe Grace Moretz, Alessandra Ambrosio, and Kylie Jenner. Regan Decl. ¶ 33. Moreover, the popularity, distinctiveness, and iconic nature of the SK8-HI Trade Dress is frequently referenced in unsolicited third-party publications. Regan Decl. ¶ 32; Ex. 10. And the SK8-HI Trade Dress often appears in movies, television shoes, and music videos. *Id.* at ¶ 34.

In short, the combination of elements comprising the SK8-HI Trade Dress is non-functional and distinctive, and the public recognizes and understands that the SK8-HI Trade Dress distinguishes and identifies genuine Vans brand shoes. In fact, multiple consumer surveys, including a survey conducted in support of this motion, have demonstrated that the SK8-HI Trade Dress has secondary meaning as a source identifier for Vans. Sowers Decl., ¶¶ 17; 66-68; Wimmer Decl., ¶ 26, Ex. 5.

### 5.    Vans' SK8-MID Trade Dress

Vans also owns the rights to the "SK8-MID Toddler Trade Dress," which consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) a ribbed collar formation that encircles the uppermost part of the shoe; (6) visible stitching, including separating the individual ankle collar corrugations; and (7) the placement and proportion of these elements in relation to one another. Wimmer Decl., ¶ 27; Pozzebon Decl. ¶ 25.

Since at least 2015, Vans has been selling SK8-MID shoes for toddlers, while incorporating the SK8-MID Toddler Trade Dress. *Id*. at ¶ 25. Since then, Vans has continuously manufactured, promoted, and sold shoes bearing the SK8-MID Toddler Trade Dress. Regan Decl. ¶ 35; Pozzebon Decl. ¶ 25. Vans' SK8-MID Toddler Trade Dress is non-functional and benefits from the immense goodwill it gains from the SK8-HI Trade Dress due to its common distinctive elements. Vans' SK8-MID Toddler Trade Dress also acquired secondary meaning individually through use and

recognition in the marketplace.  Pozzebon Decl. ¶ 27; Wimmer Decl., ¶¶ 29-31.

### 6. <u>Vans' Checkerboard Slip-On Marks and Trade Dress</u>

One last Vans shoe at issue in this litigation is Vans' "Checkerboard Slip-On," a twin-gore slip-on with distinctive checkerboard patterns.  Vans introduced "Style 98," its Classic slip-on silhouette, in 1977.  Pozzebon Decl. ¶ 28.  Shortly thereafter, Vans started manufacturing its Checkerboard Slip-On shoe line, which incorporated checkerboard patterns on the Classic slip-on silhouette.  *Id*. at ¶ 28.

 

*Vans Checkerboard Slip-On shoes*

For four decades, Vans has continuously manufactured, promoted, and sold its Checkerboard Slip-On shoes.  *Id*. at ¶ 29.  With regard to its Checkerboard Slip-Ons, Vans owns all right, title, and interest in the following U.S. Trademark Registrations:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
| | 1,583,727 | February 20, 1990 | ***Class 25***: Shoes |
| | 5,070,471 | November 1, 2016 | ***Class 25***: Footwear, namely, twin-gore slip-on shoes. |
| | 5,070,470 | November 1, 2016 | ***Class 25***: Footwear, namely, twin-gore slip-on shoes. |

*See* Wimmer Decl., ¶¶ 34-35; Exs. 6-8.  Pursuant to Sections 8 and 15 of the Lanham Act, each of these registrations is now "incontestable."  *Id*. at ¶ 37.  And significantly, a prior consumer survey shows that each of the above Checkerboard Slip-On Marks has secondary meaning as a source identifier for Vans.  Wimmer Decl., ¶ 42; Ex. 10.

-9-
MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

Vans also owns common law trade dress rights.  Vans' "Checkerboard Slip-On Trade Dress" consists of a distinctive combination of source-identifying elements, including: (1) checkerboard pattern on the upper portion of a twin-gore slip-on shoe, including on the vamp; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; and (5) the placement and proportion of these elements in relation to one another. Pozzebon Decl. ¶ 30; Wimmer Decl., ¶ 38.  Vans' Checkerboard Slip-On Trade Dress is non-functional and embodies substantial consumer goodwill.

Over the years, Vans has spent tens of millions promoting its Checkerboard Slip-On Marks and Trade Dress.  Regan Decl. ¶ 41.  Vans promotes the footwear through numerous methods, including print, television, and internet advertising, in-store signage, and social media.  *Id*. at ¶¶ 42-43; Ex. 10.  Vans' Checkerboard Slip-On shoes have also been worn and popularized in popular culture, such as in the movie "*Fast Times at Ridgemont High,*" and by celebrities including Kristen Stewart, Frank Ocean, Justin Bieber, Ty Dolla $ign, Russell Westbrook, Jennifer Lawrence, Gwen Stefani, Ryan Reynolds, Jared Leto, Kylie Jenner, and Kourtney Kardashian. *Id*. at ¶¶ 39-40; 45-47.  The fame and popularity of Vans' Checkerboard Slip-Ons are further evidenced by unsolicited media coverage, in which the shoe is referred to as a "cultural icon," "iconic," and "an iconic symbol in footwear."  *Id*. at ¶ 48; Ex. 13.

Due to its efforts, Vans has sold over 100 million pairs of shoes within its Checkerboard Slip-On shoe line in the U.S. alone.  Callahan Decl. ¶ 16.  Vans has generated over $3 billion in revenue based on U.S. sales of Checkerboard Slip-On shoes.  *Id*.  Moreover, for each of the past few years, Vans generated over $150 million per year based on U.S. sales.  *Id.*

### 7.   **Vans' Additional U.S. Trademark Registrations**

Finally, Vans also owns three additional U.S. Trademark Registrations pertinent to this litigation:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 5,320,384 | October 31, 2017 | *Class 25*: Footwear |
|  | 6,451,279 | August 17, 2021 | *Class 25*: Footwear |
|  | 6,436,779 | August 3, 2021 | *Class 25*: Footwear |

*See* Wimmer Decl., ¶¶ 43-44; Exs. 11-13.  As described more fully in the Declaration of Kia Wimmer, Vans has used each of these marks continuously and substantially exclusively since the dates of first use in their registrations.  *Id*. at ¶¶ 44-45.

### B. Defendants and Their Unlawful Use of Vans' Intellectual Property

In contrast to Vans, Defendants sought to skip the significant investments required to develop original, authentic, and high-quality shoes, and hoped instead to steal a portion of Vans' sales overnight.  Defendants recently started promoting and selling copycat versions of Vans' shoes, aimed at overlapping consumers, while willfully infringing Vans' asserted trademarks and trade dress rights.

Defendant Walmart's infringement has been particularly egregious.  Over the past months, Walmart has engaged in a systematic and escalating campaign to rip off dozens of Vans' bestselling shoes.  In March 2021, Vans discovered that Walmart was selling just one of the infringing shoe designs at issue in this litigation, Walmart's Time and Tru women's shoe.  Wimmer Decl., ¶ 48.  Upon learning about Walmart's sales of the Time and Tru shoe, Vans demanded that Walmart discontinue use of the infringing design.  *Id*. at ¶ 49.  In April 2021, in response to Vans' request, Walmart refused to address any of Vans' concerns and continued selling the shoe.  *Id*. at ¶ 50.

Worst yet, in the ensuing months, Walmart's misappropriation of Vans'

trademarks and trade dress rights began escalating—and continues to escalate to this day, even *after* the filing of Vans' Complaint.  Here is the timeline:

- In or around June 2021, Vans learned about a few additional infringing shoes being sold by Walmart, including Walmart's Wonder Nation Boys' Skate Sneaker in black and gray; and Walmart's Wonder Nation Baby Boy Skate Shoe in black; and the Wonder Nation Boys' Skate High Top in black.  Wimmer Decl., ¶ 51.

- In or around July or August 2021, Vans discovered that Walmart debuted six additional infringing shoes, including three colorways of the No Boundaries Men's Low Retro Sneaker and three colorways of the No Boundaries Men's Mid Retro Lace-up Casual Sneakers.  *Id*. at ¶ 52. Based on customer reviews visible on Walmart's website, it appears Walmart did not begin selling these shoes until at least July 2021.  *Id*.

- In or around mid-September 2021, Vans discovered that Walmart was selling at least ten more infringing shoes, including the Wonder Nation Girls' Rainbow Skate Sneaker, Wonder Nation Boys' Skate Sneaker in camo, four additional colorways of the Wonder Nation Boys' Low-Top Skate Sneaker, two additional colorways of the Wonder Nation Baby Boy Casual Skate Shoe, and the No Boundaries Men's Low-Top Shoe in camo and burgundy.  Wimmer Decl., ¶ 53.  Vans then filed its Complaint in November 2021.

- On December 20, 2021, a month *after* Vans had filed its Complaint in this action, Vans discovered that Walmart debuted at least five more infringing designs.  Wimmer Decl., ¶ 55; Ex. 14.

For the Court's reference, Vans is providing a visual chart with Walmart's presently known infringing shoes sold through Walmart's in-house labels ("Time and Tru," "No Boundaries," and "Wonder Nation"), along with information about Vans' asserted trademarks and/or trade dress rights that each violates.  *See* Greene Decl., ¶

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

3; Ex. 1.  As noted above, Vans is also providing a visual chart comparing some of Walmart's knockoff shoes to Vans' shoes.  Wimmer Decl., ¶¶ 56; 65; Exs. 15-16.

Based on these actions, Walmart has truly flooded the market with cheap, poorly made, and confusingly similar knockoff Vans shoes.  Walmart sells the shoes in its thousands of retail stores across the United States and through its online website (https://www.walmart.com/) for prices between $9.97 and $18.64, before tax. Hoffman Decl. ¶ 4; Ex. 2; Buckner Decl. ¶ 9.

In addition to the shoes Walmart sells through its in-house labels, this litigation also involves three additional shoes designed, manufactured, imported, distributed, offered for sale, and/or sold by Defendants Walmart, Doll Maker, and Trendy Trading.  *See* Wimmer Decl., ¶ 65; Ex. 16.  Doll Maker and Trendy Trading promote, offer for sale, and sell the two Doll Maker branded shoes through Walmart and other retailers.  *See* Hoffman Decl. ¶ 11; Ex. 8.  Against Doll Maker and Trendy Trading, this motion seeks to stop all U.S. sales of these shoes, regardless of point of purchase.

None of the infringing shoes are manufactured by Vans; nor are Defendants' shoes associated, affiliated, or connected with Vans, or licensed, authorized, sponsored, endorsed, or approved by Vans in any way.  Wimmer Decl., ¶ 69.  Instead, Defendants are blatantly attempting to trade off Vans' reputation and goodwill.

## III.   LEGAL STANDARD

A preliminary injunction should be imposed if a plaintiff establishes that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, these factors are analyzed via a "sliding scale approach," where "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Here, each factor strongly favors Vans, and a preliminary injunction is therefore warranted.

## IV.    ARGUMENT

### A.    Vans is Likely to Succeed on the Merits of its Claims

The Lanham Act expressly authorizes injunctive relief in cases of trademark infringement and unfair competition.  *See, e.g.*, 15 U.S.C. §§ 1116, 1125(a).  In a trademark infringement action, a plaintiff must show that (1) it owns a valid trademark, and (2) the defendant's mark is likely to cause confusion.  *See* 15 U.S.C. § 1114(1); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).  To prove infringement of an unregistered trade dress, "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products."  *Adidas America, Inc. v. Skechers USA, Inc.* ("*Adidas*"), 890 F.3d 747, 754 (9th Cir. 2018) (internal citation omitted).

Likelihood of confusion is assessed via the *Sleekcraft* factors, including:

> (1) the strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) types of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the products line.

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  Likelihood of confusion is not limited to direct purchasers, but also includes a likelihood of post-sale confusion.  *Adidas*, 890 F.3d at 761 (affirming finding of post-sale confusion); *adidas-Am., Inc. v. Payless ShoeSource, Inc. ("Payless")*, 546 F. Supp. 2d 1029, 1052 (D. Or. 2008) ("Regardless of the type of alleged confusion at issue—point-of-sale, initial interest, or post-sale confusion—the court's likelihood of confusion analysis should be guided by an evaluation of the so-called *Sleekcraft* factors.").

### 1.    Vans Owns Valid Trademark and Trade Dress Rights.

Vans owns exclusive rights in each of its trademarks and trade dresses asserted in this motion.  Wimmer Decl., ¶¶ 8; 13; 17; 23; 27; 34-35; 38; 43.  For Vans'

-14-

incontestable registrations covering the Side Stripe Mark and its incontestable registrations covering the Checkerboard Slip-Ons Marks, such registrations constitute "conclusive evidence" of Vans' exclusive right to use the mark.  15 U.S.C. §1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc*., 469 U.S. 189, 192 (1985).

Additionally, through its many years of continuous and exclusive use, Vans owns the exclusive right to use its OLD SKOOL Trade Dress, OLD SKOOL Toddler Trade Dress, SK8-HI Trade Dress, SK8-MID Toddler Trade Dress, and Checkerboard Slip-On Trade Dress.  *See Adidas*, 890 F.3d at 754 (Ninth Circuit affirming preliminary injunction as to Stan Smith knockoff; holding that Adidas' continuous use since 1970s, over 40 million pairs sold, and use by many celebrities constituted "ample evidence" of acquired secondary meaning).  Vans began selling shoes bearing its OLD SKOOL Trade Dress, SK8-HI Trade Dress, and Checkerboard Slip-On Trade Dress in the 1970s and has sold over 100 million pairs of each shoe line in the years since then.  Callahan Decl. ¶¶ 7; 11; 16.  For each of these shoe lines, Vans has earned several *billion* dollars in revenue based on U.S. sales alone.  *Id*.; *see Transgo, Inc., v. Ajac Transmission Parts Corp*., 768 F.2d 1001, 1016 (9th Cir. 1985) (noting that sales in excess of $5 million were "significant" in secondary meaning analysis).

Vans has further engaged in significant advertising and promotional efforts for each of these shoes, including advertising that has costs many millions of dollars. Regan Decl. ¶¶ 20; 31; 41.  And the media has given each of these shoes significant unsolicited praise and attention.  Regan Decl. ¶¶ 22; 32; 44.  *See Lisa Frank, Inc. v. Impact Int'l, Inc*., 799 F. Supp. 980, 993 (D. Ariz. 1992) ("Evidence of extensive unsolicited media coverage supports a finding of secondary meaning.").  Based on significant advertising, sales, product placement, and unsolicited media attention, the public has come to associate each trade dress exclusively with Vans.  Moreover, Vans' OLD SKOOL Toddler Trade Dress and SK8-MID Toddler Trade Dress have acquired secondary meaning both individually and through their familial relationships to the OLD SKOOL Trade Dress and SK8-HI Trade Dress, respectively.

In addition, Walmart's intentional copying further indicates secondary meaning.  *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc*., 826 F.2d 837, 844 (9th Cir. 1987) ("Our cases recognize that evidence of deliberate copying is relevant to a determination of secondary meaning."); *Transgo*, 768 F.2d at 1016 (noting that copying alone can be sufficient to prove secondary meaning).

Finally, each of Vans' trade dresses is nonfunctional because the combination of elements is not essential to the shoe's use, nor do they reduce the cost.  *See Qualitex Co. v. Jacobson Prods. Co*., 514 U.S. 159, 165 (1995) (trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article"); Pozzebon Decl. ¶¶ 8; 16; 20; 27; 31; Callahan Decl. ¶¶ 27; 31.

### 2.   Defendants' Infringing Shoes Are Likely to Cause Confusion.

#### a.   Vans' Marks and Trade Dress Rights Are Strong

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058 (reversing denial of preliminary injunction; finding likelihood of confusion despite "weak" mark).

Vans' asserted trademarks and trade dress rights are both conceptually and commercially strong.  The commercial strength of Vans' trademarks and trade dress rights is evidenced by its expenditures of tens of millions of dollars to promote such rights in connection with footwear and apparel, Vans' significant sales of products bearing its asserted rights, and the numerous unsolicited media references for Vans' trademarks and trade dresses.  *See* Regan Decl. ¶¶ 20; 22; 31-32; 41; 44; Exs. 3-5; 10; 12-13; Callahan Decl. ¶¶ 7; 9; 11; 14; 16; *see also Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1280 (C.D. Cal. 1997) (holding that the strength of a mark is "demonstrated by extensive advertising . . . ."); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350-51 (9th Cir. 1987) (extensive media coverage supported finding that the mark was strong); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of the strength of Century 21's mark includes the fact that it

-16-

has expended several million dollars in advertising … services rendered in connection with the 'Century 21' mark, and that the mark has been used in connection with real estate sales in excess of one billion dollars.").  Likewise, there is little debate that Vans' OLD SKOOL, SK8-HI, and Checkerboard Slip-On shoes are among the most well-known and popular sneakers in the world.  Regan Decl. ¶¶ 22-24; 32-33; 44-48; Exs. 6-7; 10; 12-13.

Notably, the strength of Vans' OLD SKOOL Trade Dress, SK8-HI Trade Dress, and Checkerboard Slip-On Marks is further evidenced by consumer surveys that specifically found that these rights have secondary meaning such that they serve as a unique source identifier for Vans.  Sowers Report, at ¶¶ 17; 53-55; 66-68; Wimmer Decl., at ¶¶ 16; 26; 42; Exs. 5; 10.  For these reasons, Vans' trademarks and trade dress rights are strong.

> b.  <u>Defendants Sell Identical Goods to Overlapping Consumers</u>

The relatedness of the goods and the use of common marketing channels, together with the similarity of the marks, "constitutes part of the controlling troika in the *Sleekcraft* analysis." *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1205 (9th Cir. 2000).  Here, since Vans' and Defendants' products are both shoes, the goods could not be any more related.  *See Adidas*, 890 F.3d at 755 (holding there could "be little doubt" that Sketchers' Stan Smith knockoff shoes were related to Adidas' footwear).  As such, the risk of confusion is significantly heightened.  *E. & J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened.").

Defendants are also offering their footwear to overlapping consumers.  *See Sleekcraft*, 599 F.2d at 353 (finding similar marketing channels even though "different submarkets" were involved, where the "general class of boat purchasers" were exposed to both parties' goods); *Payless*, 546 F. Supp. 2d at 1055 (finding overlapping marketing channels, despite the fact that the parties sold their goods through different retail outlets and at different prices).  In fact, Walmart purports to sell genuine Vans

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

shoes on its website, alongside its infringing shoes.  *See* Hoffman Decl., at ¶ 5; *Anheuser-Busch, Inc. v. The Customer Co., Inc.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996) (finding overlapping marketing channels weighed in favor of likelihood of confusion where the goods were found next to each other).  Accordingly, this factor weighs heavily toward a likelihood of confusion.

> c. Defendants Use Confusingly Similar Imitations of Vans' Trademarks and Trade Dress Rights

The "similarity of the marks" is of considerable importance to the likelihood of confusion analysis, given that "the greater the similarity between the two marks at issue, the greater the likelihood of confusion."  *Adidas*, 890 F.3d at 755 (*citing GoTo.com*, 202 F.3d at 1206) (quotations omitted).  The similarities between Vans' marks and Defendants' imitations are unmistakable.

First, on *all* of Walmart's in-house infringing shoes, Walmart blatantly copies at least two-thirds of Vans' Side Stripe Mark, as well as the exact sizing and placement of the mark on the shoe upper.  A comparison is included below:

    

*Reg. No. 2,177,772*          *Walmart Time and Tru*

Wimmer Decl., at ¶ 57.  Indeed, marks "should be considered in their entirety and as they appear in the marketplace," and "similarities weigh more heavily than differences."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1128 (9th Cir. 2014) (reversing denial of preliminary injunction; holding that trial court "clearly erred" when ruling that differences between "POM" and "pŏm" weighed against confusion).  Walmart even applies its imitation side stripe across all of its OLD SKOOL and SK8-HI knockoffs, *i.e.,* in the same way Vans uses the actual Side Stripe Mark on its genuine versions of OLD SKOOL and SK8-HI shoes.  For the Side Stripe Mark, this

factor therefore weighs heavily in favor of Vans.

Second, Defendants chose designs that are confusingly similar to Vans' trade dresses. Walmart's infringing in-house shoes, for example, blatantly copy the overall look and feel of Vans' respective trade dress rights. *See* Wimmer Decl., at ¶¶ 56-68; Exs. 15; 16. In *Adidas*, the Ninth Circuit affirmed a preliminary injunction for knockoff shoes, while finding the similarities "unmistakable" and noting that "[m]inor differences, including the use of Skechers's logo, do not negate the overall impression of similarity between these two shoes." *Adidas*, 890 F.3d at 755; *see also Clicks Billiards Inc. v. Sixshooters Inc*., 251 F.3d 1252, 1259 (9th Cir. 2001) ("[T]he issue is not whether defendant's package or trade dress is identical to plaintiff's in each and every particular. Rather, it is the similarity of the total, overall impression that is to be tested ...." (alterations in original) (*quoting* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:2 (4th ed. 2000))). In this case, Defendants' shoes not only create a nearly identical overall impression, but they have zero other logos visible to consumers in the post-sale context. For these reasons, Defendants' use of confusingly similar trade dresses strongly favors confusion.

Finally, some of Defendants' infringing shoes directly copy Vans' low-top stitching mark (Reg. No. 5,320,384), Vans' Checkerboard Slip-On Marks (Reg. No. 1,583,727, Reg. No. 5,070,471, and Reg. No. 5,070,470), and Vans' checkerboard sidewall marks (Reg. No. 6,451,279 and Reg. No. 6,436,779). *See* Wimmer Decl., at ¶¶ 66; 68; Green Decl., Ex. 1. Accordingly, the similarities between Vans' marks and Defendants' imitation marks strongly favor a finding of likelihood of confusion.

### d.   There is Evidence of Actual Confusion

Even in cases without proof of actual confusion, the absence of such evidence does not rule out the possibility of a *likelihood* of confusion. *Gallo*, F.2d at 1292. In this case, however, there is no question that consumers, and prospective purchasers of Vans shoes, have already been confused by Defendants' sales of knockoff shoes. Although Walmart's infringing shoes have only been on the market for a short period,

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

1  there are already examples of actual confusion on social media and within Walmart's

2  customer reviews.  *See* Hoffman Decl., at ¶ 8; Ex. 6.

3      In addition, prior to filing this motion for a preliminary injunction, Vans had a

4  consumer survey expert, Brian Sowers, complete surveys to assess post-sale

5  confusion caused by Walmart's knockoff versions of the OLD SKOOL and SK8-HI.

6  The consumer surveys found net confusion of **23.2%** for Walmart's shoes that

7  infringe the OLD SKOOL Trade Dress and net confusion of **29.8%** for Walmart's

8  shoes that infringe the SK8-HI Trade Dress.  Sowers Report, at ¶¶ 17; 112-120; 131-

9  139;  *see Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618

10  F.3d 1025, 1035 (9th Cir. 2010) ("[s]urvey evidence may establish actual confusion").

11          e.      Consumers are Unlikely to Exercise Significant Care

12      In general, purchasers of footwear are "not likely to exercise a great deal of

13  care in distinguishing between trademarks when purchasing the goods."  *M'Otto*

14  *Enter., Inc. v. Redsand, Inc*., 831 F. Supp. 1491, 1502 (W.D. Wash. 1993); *see also*

15  *K–Swiss, Inc. v. USA AISIQI Shoes, Inc.,* 291 F.Supp.2d 1116, 1125 (C.D.Cal.2003)

16  (Footwear is a "common consumer item," purchasers of which are "unlikely to

17  exercise a high degree of care in selecting.").

18      Accordingly, this factor tips in favor of Vans.  *See Payless*, 546 F. Supp. 2d at

19  1060 (holding "degree of care" factor favored adidas since shoe purchasers are not

20  particularly sophisticated and are "more likely to be attracted to, and confused by

21  imitations of adidas' Three–Stripe Mark.").

22          f.      Defendants Have Intentionally and Willfully Copied

23      Next, the intent factor favors the plaintiff where the alleged infringer adopted

24  its mark with knowledge (actual or constructive) that it was another's trademark.

25  *Brookfield*, 174 F.3d at 1059.  In this case, there is no doubt that Defendants were

26  aware of Vans' intellectual property rights when adopting their cheap imitations.

27  Indeed, in the years prior to launching its infringing shoes, Walmart's customers often

28  requested that Walmart begin selling Vans shoes—and in response, Walmart was

-20-

forced to explain it was not an authorized retailer of Vans brand shoes.  *See Hoffman Decl.*, at ¶ 3; Ex. 1; *see also Official Airline Guides v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public"); *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 435 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1984 (2018).

In addition, the Court should find that Walmart intentionally copied Vans' trademarks and trade dress rights because (1) Walmart continued selling its infringing shoes after receiving Vans' cease and desist request in March 2021 and (2) Walmart continued selling its infringing shoes even after Vans' filed its Complaint.  In both instances, Walmart introduced *additional* infringing shoes, thereby escalating its infringement and indicating clear intent to confuse consumers.  *See Boldface Licensing + Branding v. By Lee Tillett, Inc.,* 940 F.Supp.2d 1178, 1195 (C.D. Cal. 2013) (intent factor favored confusion where company was aware of other company's trademark through cease-and-desist letter yet continued with product roll out); *Kreation Juicery, Inc. v. Shekarchi*, 2014 WL 7564679, at *9 (C.D. Cal. Sept. 17, 2014) (intent factor favored plaintiff where defendant continued to sell its products after receiving a cease and desist letter);  *UGG Holdings, Inc. v. Severn*, 2005 WL 5887187, at *8 (C.D. Cal. Feb. 23, 2005) (finding bad faith intent where the defendants continued to use the plaintiff's mark after plaintiff objected).  Accordingly, this factor weighs heavily in favor of a likelihood of confusion.

g.    Likelihood of Expansion of the Product Lines

Where the parties already sell the same goods in overlapping markets, as here, this factor weighs in plaintiff's favor. *See M'Otto Enter., Inc*., 831 F. Supp. at 1504. Further, since Vans sells its shoes in numerous colorways and allows "Customs," any new colorway of Defendants' infringing designs will naturally fall within Vans' product lines.  Pozzebon Decl., at ¶¶ 12-13; 23.  Accordingly, this factor favors Vans.

* * *

-21-

In sum, because the *Sleekcraft* factors weigh strongly in favor of Vans, Vans is very likely to succeed on the merits of its trademark infringement, trade dress infringement, and unfair competition claims. Therefore, a preliminary injunction is warranted. *See Brookfield*, 174 F.3d 1036, 50 U.S.P.Q.2d (BNA) 1545 (reversing denial of preliminary injunction motion and finding *Sleekcraft* factors weighed in favor of plaintiff); *Pom*, 775 F.3d 1118, 113 U.S.P.Q.2d 1369 (same).

**B.    Vans Will Suffer Irreparable Harm Without an Injunction**

A preliminary injunction is imminently necessary to prevent irreparable harm to Vans. Notably, following the Trademark Modernization Act of 2020, a plaintiff seeking a preliminary injunction "shall be entitled to a rebuttable presumption of irreparable harm ... upon a finding of likelihood of success on the merits…." 15 U.S.C. § 1116(a). Thus, Vans is *presumed* to be suffering irreparable injury.

In addition to the presumption, Vans demonstrates irreparable harm in multiple ways. First, Defendants' actions interfere with Vans' basic right to control *how*, *when*, and *where* consumers can obtain products bearing Vans' trademarks and trade dress. Vans exercises strict control over the collaborations it enters into in relation to the shoes, the distribution channels that it uses, and the amounts of shoes it releases at any given time or location. Callahan Decl., at ¶¶ 20-22. As explained by Vans' Vice President Dan Callahan, these controls are critical to prevent oversaturation of the market and to maintain Vans' reputation. *Id*. at ¶¶ 20-25; 37-39; *see also* Regan Decl., at ¶ 49 (discussing Vans' carefully constructed premium brand image). In contrast, Walmart has flooded the market with its cheap infringing shoes, including by selling them in its **4000+** stores across the United States. Vans' loss of control amounts to irreparable harm warranting a preliminary injunction. *See Adidas*, 890 F.3d at 756-57 (affirming preliminary injunction for Stan Smith knockoff shoe and holding that Adidas' "concerns about damage to the Stan Smith's reputation if the marketplace were flooded with similar shoes" established irreparable harm).

Second, the irreparable harm is particularly grave here since Walmart's shoes

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

are poor quality, as recognized by numerous consumers.  *See* Hoffman Decl., at ¶ 9; Ex. 7; *see also* Callahan Decl., at ¶¶ 26-33 (discussing inferior quality of Walmart's shoes following examination).  Post-sale confusion poses a significant danger where, as here, the infringing products are of an inferior quality.  *See Payless Shoesource, Inc. v. Reebok Intern. Ltd*., 998 F.2d 985, 989, 27 U.S.P.Q.2d 1516 (Fed. Cir. 1993) (reversing denial of preliminary injunction; holding that, in the post-sale confusion context, the "consumer may attribute any perceived inferior quality of Payless shoes to Reebok, thus damaging Reebok's reputation and image.").  In contrast, Vans goes to great lengths to maintain the quality of its shoes.  Callahan Decl., at ¶¶ 24-25; Pozzebon at ¶¶ 33-34.  Vans' loss of such quality control over shoes bearing its trademarks and trade dress rights—and the likelihood that consumers will attribute the poor quality of Defendants' shoes to Vans—poses imminent, irreparable harm.

Third, Walmart's infringement is escalating, even after Vans filed its Complaint.  Rather than slowing its infringement, Walmart has demonstrated that it intends flood of the market more by systematically introducing new infringing shoes during the pendency of this litigation.  Since filing its Complaint, Vans has discovered at least five new infringing shoes that Walmart began selling this month.  Wimmer Decl., at ¶ 55; Ex. 14.  With orders being placed now for 2022 merchandise, Walmart seemingly intends to distribute even larger quantities in the coming year.  This proliferation of cheap, low quality Vans knockoffs grossly impacts Vans' reputation and goodwill.  Callahan Decl., at ¶¶ 23; 38; Regan Decl., at ¶ 49;  *see also Hand v. Nail Harmony, Inc. v. ABC Nail & Spa Prods*., 2016 WL 3545524, *7 (C.D. Cal. June 28, 2016) (Carter, J.) (granting TRO and finding that defendants' proliferation of counterfeit beauty products diminished the value of plaintiffs' reputation and goodwill); *Boldface Licensing*, 940 F.Supp.2d at 1196-97  (use of confusingly similar mark would likely result in lost business opportunities, customers, and goodwill); *MySpace v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.").

Fourth, in connection with this litigation, Vans' consumer survey expert, Brian Sowers, completed surveys to assess post-sale confusion caused by Walmart's knockoff versions of the OLD SKOOL and SK8-HI. The consumer surveys found net confusion of **23.2%** for Walmart's shoes that infringe the OLD SKOOL Trade Dress and net confusion of **29.8%** for Walmart's shoes that infringe the SK8-HI Trade Dress. Sowers Report, ¶¶ 17; 112-120; 131-139. These levels of confusion support irreparable harm. *See Adidas*, 890 F.3d at 756 (holding that consumer survey showing "approximately twenty percent of surveyed consumers believed Skechers's Onix was made by, approved by, or affiliated with adidas" supported irreparable harm).

"[I]rreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial)." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741, 108 U.S.P.Q.2d 1630 (7th Cir. 2013) (affirming a preliminary injunction). For each of these reasons, in the unlikely event that Defendants rebut the presumption of harm, the evidence in the record also justifies a preliminary injunction.

**C.    The Ongoing Injury to Vans Outweighs Any Harm to Defendants**

The potential harm to Vans' brand and reputation vastly exceeds potential prejudice to Defendants if they cannot sell their knockoff shoes. As noted above, Vans will suffer harm to its reputation and goodwill, which outweighs any potential harm to Defendants. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Hand & Nail Harmony*, 2016 WL 3545524 at *7 (Carter, J.) (finding counterfeiter would suffer no legitimate hardship) (internal citation omitted); *see also Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 508 (9th Cir. 1991) (affirming preliminary injunction and holding that "it would have been an abuse of discretion for the district court *not* to grant the

-24-

1  preliminary injunction" based on evidence of likelihood of confusion);  *M'Otto*

2  *Enter., Inc*., 831 F. Supp. at 1504 ("It may well be harm to M'Otto from the issuance

3  of an injunction on Redsand's behalf, but that harm occurs in the context of a party

4  who took a calculated business risk that it would find itself in precisely such a position

5  it will now occupy.").

6       Moreover, Defendants sell numerous other shoes.  For example, although

7  Walmart's systematic infringement of Vans' shoes stands to decimate Vans'

8  goodwill, Walmart's infringing shoes make up just a small proportion of Walmart's

9  overall footwear offerings.  Walmart sells hundreds of other shoes that have nothing

10  to do with this litigation.   As such, the requested preliminary injunction would do no

11  harm to Walmart during the pendency of this litigation for this reason as well.  *See*

12  *Ocean Garden,* 953 F.2d at 508 (rejecting hardship argument where preliminary

13  injunction only prevented defendants from using a confusingly similar mark, not from

14  using pink seafood cans).  As such, this factor also favors a preliminary injunction.

15      **D.**    **A Preliminary Injunction will Serve the Public Interest**

16       Granting a preliminary injunction to prevent trademark infringement serves the

17  public interest because it protects "the right of the public not to be deceived or

18  confused." *CytoSport, Inc. v. Vital Pharms*., Inc., 617 F. Supp. 2d 1051, 1081 (E.D.

19  Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).   Simply put, Vans has

20  demonstrated that it spent considerable time, energy, and money to have the public

21  recognize its trademarks and trade dress rights as source identifiers for Vans.  By

22  using confusingly similar marks, Defendants deprive consumers of their ability to

23  distinguish among the parties' goods.  "As the public has a right not to be deceived or

24  confused, the public interest and goals of the Lanham Act favor an injunction…."

25  *Moroccanoil, Inc. v. Moroccan Gold*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008).

26  **V.**    **CONCLUSION**

27       For the foregoing reasons, the Court should grant Vans' Motion and enjoin

28  Defendants from selling shoes that violate Vans' trademarks and trade dress rights.

1    DATED: December 27, 2021          MCGUIREWOODS LLP

2

3

4                                       By: */s/ Tanya L. Greene*
                                            ────────────────────────
5                                           Tanya L. Greene
                                            Lucy Jewett Wheatley
6                                           Nicholas J. Hoffman

7                                           Attorneys for Plaintiffs Vans, Inc.
                                            and VF Outdoor, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on **December 27, 2021**, I electronically transmitted the

3  foregoing document to the Clerk's Office using the CM/ECF System for filing and

4  service via transmittal of a Notice of Electronic Filing.

5      I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.

7      Executed on **December 27, 2021**, at Los Angeles, California.

8

9                                 */s/ Tanya L. Greene*

10                                Tanya L. Greene
                                 McGuireWoods LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION