1  KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
   LAWRENCE Y. ISER (SBN 094611)
2    liser@kwikhlaw.com
   GREGORY P. KORN (SBN 205306)
3    gkorn@kwikhlaw.com
   808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California 90401
   Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  AMSTER, ROTHSTEIN & EBENSTEIN LLP
   ANTHONY F. LO CICERO (*pro hac vice*)
7    alocicero@arelaw.com
   MARC J. JASON (*pro hac vice*)
8    mjason@arelaw.com
   90 Park Avenue
9  New York, NY 10016
   Telephone: 212.336.8000
10 Facsimile: 212.336.8001

11 Attorneys for WALMART INC.

12          UNITED STATES DISTRICT COURT

13   CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

14

15 VANS, INC.; and VF OUTDOOR, LLC,,          Case No. 8:21-cv-01876
16          Plaintiffs,                        [Hon. David O. Carter]
17    vs.                                      **DEFENDANT WALMART INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
18 WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC,,
19
20          Defendants.                        Date:  February 14, 2022
21                                             Time:  8:30 a.m.
                                               Court: 9D
22                                             Complaint Filed: November 15, 2021
23

24

25   **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**
26

27

28                                             8:21-cv-01876-DOC-KES

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................... 1

II.     FACTUAL BACKGROUND ................................................. 5

III.    SOWERS SURVEYS ARE BIASED AND UNRELIABLE .......................... 6

        A.    Secondary Meaning Surveys .................................... 6

        B.    Likelihood of Confusion Surveys ............................ 7

IV.     "EXTRAORDINARY REMEDY" REQUESTED BY VANS ...................... 9

V.      VANS' DELAY REBUTS PRESUMPTION OF IRREPARABLE HARM ............ 10

        A.    Vans Is Not Suffering Irreparable Harm ................ 11

        B.    Accused Shoes of Third Parties Removed From Walmart.com ......... 13

        C.    Balance Of Equities Overwhelmingly Favors Walmart ............ 14

VI.     VANS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ............... 15

        A.    Vans' Will Not Prevail on its Trade Dress Infringement Claims ........ 15

        B.    Vans Cannot Establish A Likelihood Of Confusion ............ 17

              1.    Similarity of the Marks ............................. 18

              2.    Proximity of the Goods ............................ 19

              3.    Strength ............................................. 20

              4.    Actual Confusion ................................... 20

              5.    Marketing and Distribution Channels ............ 21

              6.    Degree Of Care ..................................... 22

              7.    Walmart's intent in selecting the mark ......... 23

              8.    Likelihood of expansion ........................... 23

VII.    NO INJUNCTION COULD ISSUE ABSENT A VERY LARGE BOND ........... 24

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Active Sports Lifestyle USA, LLC v. Old Navy. LLC.*
2014 U.S. Dist. LEXIS 45575  (C.D. Cal. Mar. 21, 2014) .............................12

*Adidas Am., Inc. v. Skechers USA, Inc.,*
890 F.3d 747 (9th Cir. 2018) .............................................................13, 15, 18

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
750 F.2d 1470, 1473 (9th Cir. 1985) .........................................................13

*AMF, Inc. v. Sleekcraft Boats,*
599 F. 2d 341 (9th Cir. 1979) ......................................................................17

*Aromatique, Inc. v. Gold Seal, Inc.,*
28 F.3d 863 (8th Cir. 1994) .........................................................................23

*Aurora World, Inc. v. Ty Inc.,*
719 F.Supp.2d 1115 (C.D. Cal. 2009) .......................................................19

*Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) .....................................................................18

*Clamp Mfg. Co. v. Enco Mfg. Co.,*
870 F.2d 512 (9th Cir. 1989) .......................................................................16

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
251 F.3d 1252 (9th Cir. 2001) .....................................................................15

*ConocoPhillips Co. v. Gonzalez,*
2012 WL 538266 (N.D. Cal. Feb. 17, 2012) ..............................................13

*Dreamwerks Prod. Group v. SKG Studio,*
142 F.3d 1127 (9th Cir. 1998) .....................................................................18

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992) .....................................................................17

*Eclipse Assoc. Ltd. v. Data General Corp.,*
894 F.2d 1114 (9th Cir. 1990) .....................................................................18

*Entrepreneur Media, Inc. v. Smith,*
279 F.3d 1135 (9th Cir. 2002) ...............................................................18, 23

*First Brands Corp. v. Fred Meyer, Inc.,*
809 F.2d 1378 (9th Cir. 1987) .....................................................................19

*First Interstate Bank of Oregon, N.A. v. Nat'l Bank & Trust Co. of Norwich, N.A.,*
1991 WL 27442 (D. Or. Feb. 22, 1991) ......................................................24

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ........................................................................ 18

*Groupion, LLC v. Groupon, Inc.*,
    826 F.Supp.2d 1156 (N.D. Cal. 2011) ...................................................... 12, 20

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp. 3d 1109, 1132-33 (S.D. Cal. 2014) ............................................ 10

*iCall, Inc. v. Tribair, Inc.*,
    2012 WL 5878389 (N.D. Cal. Nov. 21, 2012) ............................................... 13

*iFreedom Direct Corp. v. McCormick*,
    2016 WL 9049647 (C.D. Cal. June 15, 2016) ............................................... 10

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
    994 F.3d 1107 (9th Cir. 2021) ........................................................................ 18

*Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*,
    853 F.2d 888, 891 (Fed. Cir. 1988) ............................................................... 23

*K-Swiss, Inc. v. USA Aisiqi Shoes, Inc.*,
    291 F. Supp. 2d 1116 (C.D. Cal. 2003) ......................................................... 22

*L.A. Gear. Inc. v. Thom McAn Shoe Co. .*
    988 F.2d 1117, 1134 (Fed. Cir. 1993) ........................................................... 22

*Lindy Pen Co. v. Bic Pen Corp.*,
    725 F.2d 1240 (9th Cir. 1984) ........................................................................ 22

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F. 3d 792 (9th Cir. 2003) ........................................................................ 17

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................................ 10

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
    762 F.2d 1374 (9th Cir. 1985) ........................................................................ 10

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    55 F.Supp.2d 1070 (C.D. Cal. 1999) ............................................................. 11

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ........................................................................ 18

*Puma SE v. Forever 21, Inc.*,
    2017 U.S. Dist. LEXIS 211140 (C.D. Cal. June 29, 2017) ............................ 15

*Safeworks, LLC v. Spydercrane.com, LLC*,
    2009 WL 4730821 (W.D. Wash. Dec. 7, 2009) ............................................. 21

*Skechers U.S.A., Inc. v. Vans, Inc.*,
    2007 U.S. Dist. LEXIS 88635 (C.D. Cal. Nov. 20, 2007) .................. 16, 22, 23

8:21-cv-01876-DOC-KES

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*Spark Indus., LLC v. Kretek Int'l, Inc.*,
    2014 U.S. Dist. LEXIS 125538 (C.D. Cal. Aug. 28, 2014) ............................ 19

*Stokely–Van Camp, Inc. v. Coca–Cola Co.*,
    1987 WL 6300, 2 U.S.P.Q.2d 1225 (N.D.Ill.1987) ......................................... 11

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...................................................................... 10

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005) ..................................................... 11

*Wahoo Int'l, Inc. v. Phix Dr., Inc.*,
    2014 U.S. Dist. LEXIS 74927 (S.D. Cal. May 20, 2014) ............................... 14

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) ..................................................................................... 16

*Walter v. Mattel, Inc.*,
    31 F.Supp.2d 751 (C.D. Cal. 1998)
    *aff'd*, 210 F.3d 1108 (9th Cir. 2000) ............................................................ 19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................... 10


**FEDERAL STATUTES**

15 U.S.C. § 1116(a) ............................................................................................ 11


**RULES**

Fed. R. Civ. P. 65(c) ..................................................................................... 1, 24

8:21-cv-01876-DOC-KES
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1  I.  **INTRODUCTION**

2      Plaintiffs Vans, Inc. and VF Outdoor, LLC (together, "Vans") are seeking the

3  extraordinary remedy of a preliminary injunction – the issuance of which would cost

4  defendant Walmart Inc. ("Walmart") tens of millions of dollars – in a case that does

5  not involve alleged counterfeiting, does not involve identical marks, and in which

6  Vans' claims are weak and the issues of infringement and validity of Vans'

7  purported trade dress are hotly contested.  There was no urgency precipitating this

8  motion.  Vans filed the motion at least **eighteen months** after Walmart began selling

9  accused shoes, **nine months** after Vans engaged in communications with Walmart

10 about the accused shoes, and more than **one month** after filing the complaint.  Vans

11 is not losing sales and its reputation is not being diminished. Vans is not suffering

12 any irreparable harm.[1]

13     For Walmart, on the other hand, entry of a preliminary injunction would

14 result in significant tangible harm.  Walmart would lose sales estimated to be at least

15 ████████.  In addition, Walmart would incur the enormous logistical costs of

16 removing from sale and disposing of more than ███████ pairs of shoes from

17 thousands of stores across the country, estimated to be at least $1.4 million.  Perhaps

18 not surprisingly, nowhere in the hundreds of pages filed by Vans in support of its

19 motion is there any mention of the requirement that it post security in the event its

20 motion is granted. Fed. R. Civ. P. 65(c).

21     Vans is not likely to prevail on the merits.  Its so-called trade dress, based on

22 common law rights, is comprised of common elements – a rubberized sidewall with

23 consistent height; upper portion of sidewall having a grooved appearance; textured

24 toe box around front of the sidewall; visible stitching -- all used by numerous

25

26       [1] All accused shoes sold by third-parties on Walmart's online marketplace
already have been removed from sale.  Co-defendants and third-party sellers, The
27 Doll Maker, LLC and Trendy Trading, LLC, have consented to a preliminary
injunction (ECF No. 25), thereby further obviating any potential harm to Vans.
28

sneaker brands, a small sample of which is below[2]:



Airwalk          DC          Etnies

Lakai          Vox          Air Speed

Emerica          Hurley

Thus, Vans' alleged "trade dress" is not unique to Vans and is wholly unprotectable.

The only aspect of Vans' asserted trade dress that is arguably distinctive is the logo, the so-called Side Stripe Mark.  However, the design on Walmart's shoes is totally different than the Vans Side Stripe Mark.  Walmart's design, in which the front and rear "legs" are virtually parallel to one another, brings to mind various foreign letters, such as the Greek letter Pi, π, the Hebrew letter Tav, ת, and the Cyrillic letter L, Л.  It is strikingly different from the Vans "wave," and the overall commercial impression of the designs is completely different.

          

Vans                    Walmart

The vastly different logo designs alone are enough to obviate any likelihood of

---

[2] More examples of sneakers with these elements are attached to the declarations of Sarah Butler (Butler Decl. ¶ 11, Ex. D) and Danica Acosta (Acosta Decl. Ex. 1).

1  confusion, particularly in a sneaker market where shoe designs are often quite

2  similar, and the logo is an important distinguishing feature.

3       Moreover, Walmart's shoes, which all sell for less than $20, are only sold at

4  Walmart stores and on Walmart.com. They all are sold with Walmart labeling as

5  well as labeling of Walmart's in-house apparel brands (i.e., Time and Tru, No

6  Boundaries, and Wonder Nation), each of which is a registered trademark.



*Walmart Wonder Nation Shoes*

15  For example, Walmart's Wonder Nation shoes shown above are sold on a plastic

16  hanger with a sizeable Wonder Nation hang tag, and the Wonder Nation mark

17  appears on both the inner sole and the outer sole of the shoes.  Walmart shoppers

18  know what they are buying, and they are not confused or tricked into believing that

19  they are buying Vans shoes.

20       Vans seeks to support its infringement arguments with deeply flawed and

21  biased surveys.  Aside from testing only two of the approximately twenty shoe

22  models alleged to infringe, the universe of survey respondents only included

23  consumers who would pay more than $30 for "skate shoes," thereby effectively

24  excluding the entirety of Walmart's shoe customers from the surveys. In addition,

25  the consistent reference to the tested products as "skate shoes" throughout the

26  surveys, rather than simply shoes or sneakers, introduced a bias known as a

27

28

"demand effect"[3] that skewed the survey results.  (None of the accused shoes sold under Walmart's Time and Tru or No Boundaries brands are called "skate shoes." The shoes tested by Vans' expert are offered for sale by Walmart as "Retro" sneakers.)  The likelihood of confusion surveys are further flawed because they seek to measure only post-sale confusion and do not measure point-of-sale confusion. This is especially problematic where the accused shoes are sold only at Walmart stores and on Walmart.com.  The numerous deficiencies in the Vans surveys are addressed more fully below and in the declaration of Sarah Butler filed herewith. Walmart has not yet had the opportunity to conduct its own survey.

Vans also seeks to support its arguments with materials from the internet, such as social media posts, that lack foundation, are unauthenticated, and constitute hearsay.  These documents are not admissible evidence.  However, even assuming, *arguendo*, that this documentation <u>were</u> admissible evidence, it does <u>not</u> support Vans' arguments.  For example, social media posts that Vans relies on to show actual confusion do the opposite: they show that consumers are <u>not</u> confused and can easily distinguish Vans from Walmart brands.  For example, someone named "Laurie (Passionate Penny Pincher)" purportedly says that Walmart's $7 shoes "Look Like $60 Vans!"[4]   This statement, and statements like it, illustrate that consumers are <u>not</u> confused and can easily distinguish between Vans and Walmart shoes.

While Vans devoted most of its brief to the merits of its infringement claims, it all but ignored the remaining factors which are also indispensable to the issuance of a preliminary injunction.  Vans provided no explanation for its months-long delay in making the motion, which serves to rebut the presumption of irreparable harm.

---

[3] The demand effect encouraged the survey respondents to simply name a top of mind skateboarding shoe brand rather than accurately measure the association of the tested shoe with Vans. Butler Decl. ¶¶ 4-7.

[4] ECF No. 21-39, Hoffman Decl. at page 4.

1   With the presumption rebutted, Vans provided no competent evidence that its
2   business is suffering irreparable harm.  It did not, and could not, provide any
3   evidence that it is losing sales to Walmart.  And Vans provided no credible evidence
4   of damage to its reputation or goodwill.  Vans relied on self-serving declarations
5   from its employees containing conclusory statements cut and pasted from its
6   Complaint that this Court should discount when assessing the irreparable harm
7   element.

8       Walmart's position on the merits is strong.  The parties' shoes bear different
9   designs and are sold in distinct channels of commerce; no rational consumer is
10  likely to confuse the products, particularly at the point of sale.  Yet, the Court need
11  not even reach the merits.  Vans falls woefully short of carrying its burden to prove
12  that it is suffering irreparable harm and that the balance of hardships weighs in its
13  favor.  Its motion should be denied on those bases alone.

14  **II.    FACTUAL BACKGROUND**

15      Walmart began selling accused shoes in June 2020 and have been selling
16  them continuously since then. Carroll Decl. ¶ 5.  The shoes are sold only at Walmart
17  stores and online at Walmart.com under the Time and Tru (women's), No
18  Boundaries (men's and women's), and Wonder Nation (children's) in-house brands.
19  Carroll Decl. ¶¶ 3, 6.

20      Vans first made allegations of infringement of its Side Stripe Mark and
21  purported trade dress in March 2021 and engaged Walmart in discussions about
22  Walmart's shoes at that time. Acosta Decl. ¶¶ 4-5.  After conducting a thorough
23  investigation and evaluating Vans' claims, Walmart's in-house counsel provided a
24  cogent written response rebutting Vans' allegations of infringement on April 19,
25  2021.  Acosta Decl. ¶ 6; Ex. 1.  Walmart's response detailed the significant
26  differences between the Vans Side Stripe Mark and Walmart's side design, and it
27  also included charts showing examples of the numerous third party sneakers in the
28  marketplace that incorporate features claimed by Vans to be its proprietary trade

1  dress.  Acosta Decl. Ex. 1.   After receiving this correspondence from Walmart in

2  April 2021, Vans did not respond and took no action against Walmart.  Acosta Decl.

3  ¶ 7.  Walmart continued with its business.  Not until seven months later, on

4  November 15, 2021, did Vans respond by filing this lawsuit.

5      Even then, Vans displayed a lack of urgency.  No motion for preliminary

6  injunction accompanied its Complaint.  Only after allowing 1 ½ more months to

7  pass did Vans decide that it was being irreparably harmed and needed immediate

8  injunctive relief and filed its motion the first business day following Christmas.

9  **III.   <u>SOWERS SURVEYS ARE BIASED AND UNRELIABLE</u>**

10      To support its preliminary injunction motion, Vans engaged survey expert

11  Brian Sowers who designed and conducted four surveys – two secondary meaning

12  surveys and two post-sale likelihood of confusion surveys.  As set forth below and

13  in the declaration of Walmart's rebuttal expert, Sarah Butler, these surveys are

14  biased and unreliable.  Remarkably, as will be discussed further below, Vans did not

15  conduct any survey purporting to test confusion at the point of sale.

16      **A.   <u>Secondary Meaning Surveys</u>**

17      Mr. Sowers' secondary meaning surveys are insufficient for determining

18  whether the Vans shoes tested have acquired secondary meaning. At the outset, the

19  screening questions limited the universe of respondents to consumers who were

20  "likely to purchase skate shoes."  ECF No. 21-36, Sowers Report ¶ 3.  Thus,

21  consumers who were simply likely to purchase sneakers, but not necessarily "skate

22  shoes," were excluded.  Limiting the respondents to such a particular consumer

23  skewed the results of the surveys from the very beginning.  Butler Decl. ¶ 3.

24      Thereafter, the survey questions primed respondents by making repeated

25  references to "skate shoes." Butler Decl. ¶¶ 3, 4.  For example, question 1 asked

26  respondents "whether they associated the design and appearance of the skate shoes

27  with one company, more than one company, or no particular company."  Sowers

28  Report at ¶¶ 53, 66.  These repeated references to "skate shoes" throughout the

1   surveys created demand effects, i.e., encouraged respondents to simply name the top
2   of mind brand selling skateboarding style shoes rather than sneakers generally.
3   Butler Decl. ¶ 3.

4        In addition, the surveys did not include any open-ended questions asking why
5   respondents believed the "skate shoe" was made by Vans.  Consequently, there is no
6   way to evaluate the extent to which the responses were generated as a result of the
7   biased questions.  Butler Decl. ¶¶ 6-7.

8        Finally, the Control sneaker used by Mr. Sowers did not contain the typical
9   elements of a "skate shoe" and therefore could not control for the suggestiveness of
10   his survey questions. Butler Decl. ¶¶ 3, 9, 10; Ex. C.  There are numerous other
11   brands selling "skate shoes" that have many of the common elements found in the
12   Vans sneakers tested. Butler Decl. ¶ 11; Ex. D.  Despite the fact that there is a style
13   of shoe associated with skateboarding, Mr. Sowers used a running shoe for his
14   Control.  The combination of a lack of open ended questions and the poor Control
15   makes the responses to these surveys meaningless.

16        **B.    <u>Likelihood of Confusion Surveys</u>**

17        The likelihood of confusion surveys were similarly flawed and unreliable. As
18   Mr. Sowers stated in his report, "[t]o measure likelihood of post-sale confusion, the
19   appropriate universe is potential customers of both the junior user and the senior
20   user.  Accordingly, for both surveys, potential purchasers of the Walmart and Vans
21   skate shoes at issue are the individuals whose confusion would be relevant in this
22   matter."  Sowers Report at ¶ 69; Butler Decl. ¶ 15.  Despite this clear guideline, Mr.
23   Sowers' screening process excluded potential purchasers of Walmart's shoes.

24        Specifically, survey respondents "had to have at least some involvement in
25   choosing which brand of **skate shoes** to purchase and indicate that they would
26   consider paying **more than $30** for the skate shoes."  Sowers Report at ¶ 69
27   (emphasis added). This screening process served to exclude Walmart customers
28   because (1) Walmart does not call its sneakers "skate shoes" and (2) Walmart's

1 sneakers cost less than $20 and customers may not consider paying "more than $30"

2 for sneakers.  So once again, Mr. Sowers' screening process skewed the survey

3 results from the beginning.  Butler Decl. ¶¶ 3, 15.

4      The substance of the surveys was similarly flawed.  As in the secondary

5 meaning surveys, Mr. Sowers repeatedly primed respondents to think about brands

6 of "skate shoes." Butler Decl. ¶ 16.  This priming is even more problematic in the

7 confusion studies, as Walmart does not classify the sneakers sold under its Time and

8 Tru and No Boundaries brands, including the sneakers tested by Mr. Sowers, as

9 "skate shoes."  Butler Decl. ¶ 18.  Walmart calls them "Retro" sneakers. Mr. Sowers

10 referred to "skate shoes" 23 times in his confusion surveys.  Butler Decl. ¶ 16.

11      Mr. Sowers also only conducted surveys seeking to measure post-sale

12 confusion.  Butler Decl. ¶¶ 20-21.  He did not conduct a survey to measure point-of-

13 sale confusion, which would include showing sneakers with Walmart's in-house

14 labeling.  Mr. Sowers knew that such a survey would show no confusion.

15      Mr. Sowers also used the same flawed Control sneakers in the confusion

16 surveys, making it impossible to estimate the extent to which mentions of Vans are

17 artifacts of being asked to name a top of mind "skate shoe."  Butler Decl. ¶ 19.

18      Unlike in his secondary meaning surveys, Mr. Sowers did include open-ended

19 questions in his confusion surveys. A number of these responses demonstrate results

20 attributable to "noise" (*i.e.,* guessing and/or demand effects). Further, verbatim

21 responses from the Control group provide evidence that the Control sneaker is

22 inappropriate. Butler Decl. ¶ 19.

23      The effects of Mr. Sowers' biased questioning and repeated references to

24 "skate shoes" becomes clear when reviewing responses to the open-ended questions.

25 A number of respondents indicated that the reason they identified Vans was because

26 it was a well-known, top of mind skate shoe brand. For example, Respondent 3095

27 stated "Vans makes some skater shoes so I associate skater shoes with them most."

28 Respondent 2859 explained, "skater shoes are typically made by vans."  Similarly,

1  Respondent 1716 said "vans is the leader in skate shoes;" and Respondent 2204

2  explained, "thats really the only brand of skate shoes that i know of and these are

3  kind of low cut like the style that vans would be." These responses do not reference

4  the specific design elements alleged to be at issue but instead reflect the fact that

5  Vans is a well-known skate shoe brand. Butler Decl. ¶ 17.  Mr. Sowers ignored

6  these statements in his analysis.

7       Finally, Mr. Sowers did not identify how or why he selected the two shoes he

8  tested from the range of shoes accused in this case. The testing of two styles does

9  not cover all of the accused shoes and styles and his results, without further

10 evidence, are limited to these particular shoes.[5]

11 **IV.   "EXTRAORDINARY REMEDY" REQUESTED BY VANS**

12      "[A] preliminary injunction is an extraordinary and drastic remedy, one that

13 should not be granted unless the movant, <u>by a clear showing</u>, carries the burden of

14

15      [5] In addition to Mr. Sowers' surveys, Vans included several older surveys that
16 are not relevant and provide no support to Vans' motion.

17      First, a 2020 survey report by the Piper Sandler research firm entitled "Taking
   Stock With Teens Survey" (ECF No. 21-3, Callahan Decl. Ex. 1) purports to be a
18 broad examination of teen habits and trends.  (There is no foundation provided by
   Vans for this hearsay evidence.)  Most of the report and the surveys are not limited
19 to shoes, and the portions that are related to shoes do not address the particular shoes
   and designs at issue in this case.  This information has no relevance to the issues
20 presently before the Court.

21      Another survey included by Vans was a 2014 survey conducted by Hal Poret
   purporting to measure whether Vans' checkerboard slip-on marks had acquired
22 secondary meaning.  (ECF No. 21-14, Wimmer Decl. Ex. 10.)  Since the allegedly
   infringing "Doll Maker" Slip-On shoe has been pulled from sale, and third-party
23 sellers The Doll Maker and Trendy Trading have consented to a preliminary
   injunction, Mr. Poret's survey has no relevance to the issues before the Court.

24      Finally, there is a set of surveys conducted in 2019 by Michael Rappeport.
   (ECF No. 21-9, Wimmer Decl. Ex. 5.)  Two of these surveys purport to measure
25 whether Vans' alleged Old Skool and Sk8-Hi trade dresses have acquired secondary
   meaning.  However, the universe of survey respondents for these studies was limited
26 to people aged 16 to 30.  This limited universe skewed the results significantly.  Mr.
   Rappeport's Old Skool survey reaches a result with a more than 30% differential
27 from the result reached by Mr. Sowers for the same shoe and trade dress.  The
   results of these surveys are all skewed and worthless.

28

1   persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original,

2   citation omitted).  "A plaintiff seeking a preliminary injunction must establish that

3   he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

4   absence of preliminary relief, that the balance of equities tips in his favor, <u>and</u> that

5   an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc*., 555

6   U.S. 7, 20 (2008) (emphasis added).  Before *Winter*, the Ninth Circuit applied a

7   flexible standard to these four requirements; a stronger showing on one could

8   alleviate the strength of showing required on another.  *Stormans, Inc. v. Selecky*, 586

9   F.3d 1109, 1127 (9th Cir. 2009).  However, "[a]pplying *Winter*," the Ninth Circuit

10  has "since held that, '[t]o the extent that our cases have suggested a lesser standard,

11  they are no longer controlling, or even viable.'"  *Id*.  Accordingly, Vans must make

12  a "clear showing" on **all four elements**.  *Id*.

13      Finally, the Court "should pay particular regard for the public consequences

14  in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

15  **V.    <u>VANS' DELAY REBUTS PRESUMPTION OF IRREPARABLE HARM</u>**

16      Vans' unexplained delay in seeking injunctive relief compels the denial of its

17  motion.  The Ninth Circuit has held that a "long delay before seeking a preliminary

18  injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v.*

19  *Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

20      In situations such as this where a plaintiff delays after sending a cease and

21  desist letter, even if the parties continue to communicate back and forth, courts have

22  not found irreparable harm.  *See, e.g., iFreedom Direct Corp. v. McCormick*, 2016

23  WL 9049647 (C.D. Cal. June 15, 2016)(ten-month delay filing complaint after

24  sending cease and desist letter, and further one-month delay filing preliminary

25  injunction motion after the complaint, undermined plaintiff's claim of irreparable

26  harm).  *See also Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1132-33

27  (S.D. Cal. 2014) (suggesting that a seven-month delay weighs against a finding of

28  irreparable harm).

1   Even delays of only a few months belie a claim of irreparable harm and

2   preclude injunctive relief.  *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,

3   55 F.Supp.2d 1070, 1090 (C.D. Cal. 1999) (a five month delay in seeking injunctive

4   relief "demonstrates the lack of any irreparable harm"); *Stokely–Van Camp, Inc. v.*

5   *Coca–Cola Co.*, 1987 WL 6300, 2 U.S.P.Q.2d 1225, 1227 (N.D.Ill.1987) ("the fact

6   the [plaintiff] waited for three months indicates a lack of need for the extraordinary

7   remedy of a preliminary injunction"); *Valeo Intellectual Prop., Inc. v. Data Depth*

8   *Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three month delay).

9   Van's motion seeks to stop sales that have been continuing for more than one

10   year, during which time Vans was aware of Walmart's shoe design.  *See, e.g.,* ECF

11   No. 1, Complaint ¶ 162 (Facebook posts showing Walmart's shoes by "Live Laugh

12   Dress" dated July 3, 2020 and "Chic Bargain Finds" dated July 17, 2020).

13   After a series of communications between Vans and Walmart in March and

14   April 2021, Walmart did not hear from Vans for seven months, until the Complaint

15   was filed.  Acosta Decl. ¶ 7.  Walmart's April 2021 correspondence to Vans had

16   detailed the significant differences between the Vans Side Stripe Mark and

17   Walmart's side design, and it also included charts showing examples of the

18   numerous third party sneakers in the marketplace that incorporate features claimed

19   by Vans to be its proprietary trade dress.  Acosta Decl. Ex. 1.  After not hearing

20   from Vans for seven months, the filing of the Complaint came as a surprise to

21   Walmart.  The holiday filing of the preliminary injunction motion 1 ½ months after

22   the Complaint was filed came as even more of a surprise, as there cannot possibly be

23   any urgency on the part of Vans.  Vans' delay serves to rebut the presumption of

24   irreparable harm under 15 U.S.C. § 1116(a).

25   **A.    <u>Vans Is Not Suffering Irreparable Harm</u>**

26   Because Vans' delay serves to rebut the presumption of irreparable harm,

27   Vans now must be "required to demonstrate, by the introduction of admissible

28   evidence and with a clear likelihood of success that the harm is real, imminent and

1    significant, not just speculative or potential." *Groupion, LLC v. Groupon, Inc.*, 826

2    F.Supp.2d 1156, 1167 (N.D. Cal. 2011).  Vans falls far short of carrying that burden.

3           In its motion papers, Vans principally relied on the newly enacted statutory

4    presumption and only made cursory, unsupported arguments regarding irreparable

5    harm.  These arguments included that Walmart's alleged infringement interferes

6    with Vans' right to control distribution of its products, and that the alleged poor

7    quality of Walmart's shoes adversely impacts Vans' reputation and goodwill.  These

8    conclusory allegations were supported by nothing more than self-serving,

9    conclusory declarations from Vans' own employees.  Vans has not alleged the loss

10   of a single sale of shoes.

11          The "existence of intangible harms such as the loss of goodwill must be

12   shown by evidence."  *Active Sports Lifestyle USA, LLC v. Old Navy, LLC*, 2014

13   U.S. Dist. LEXIS 45575 at *5 (C.D. Cal. Mar. 21, 2014).  Vans has proffered no

14   evidence that it has suffered diminishment of its reputation, that its distribution

15   channels have been affected, or that its markets have been oversaturated.

16          The declaration of Vans Vice President, Daniel Callahan, cited by Vans in

17   support of its argument for irreparable harm, contains generalized statements about

18   Vans' distribution channels and controls of those channels.  Those distribution

19   channels include retailers such as Nordstrom's, Urban Outfitters, Foot Locker, and

20   Vans' own retail stores.  ECF No. 21-2, Callahan Decl. ¶ 20.  These are different

21   than Walmart's channels since Walmart's shoes are sold only at Walmart stores and

22   on Walmart.com.  Carroll Decl. ¶¶ 6, 13.  There is no evidence of any nexus

23   between allegations of market saturation by Walmart and alleged damage to Vans'

24   reputation.  Vans' allegations of harm are purely speculative and do not make sense

25   in view of the different distribution channels.  If such evidence were to exist, one

26   would expect it to be proffered since Walmart's shoes have co-existed with Vans'

27   shoes for well over one year.

28          Allegations of poor or inferior quality also must be grounded in evidence.

1   *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 760 (9th Cir. 2018).  Since

2   Vans only alleges post-sale confusion and does not allege confusion at the point of

3   sale, Vans does not explain how it is harmed by alleged poor quality of Walmart's

4   shoes.  Vans must provide evidence that poor quality seen from afar, on people

5   wearing Walmart's shoes, negatively impacts Vans' reputation and goodwill.  *Id.* at

6   760-61.  Vans makes no such showing.

7   　　　As with the declaration of Daniel Callahan, the declaration of Justin Regan,

8   another Vans manager, provides no more than conclusory statements to support

9   Vans' claims of irreparable harm.  For example, his statement that "Vans' loss of

10  control over how it markets and promotes products bearing its trademarks and trade

11  dress rights will irreparably harm Vans' goodwill and reputation . . ." (ECF No. 21-

12  21, Regan Decl. ¶ 49) is a "conclusory statement, without citation to any evidence,

13  [which] is insufficient to make a 'clear showing' that the threatened harm is

14  immediate and irreparable."  *ConocoPhillips Co. v. Gonzalez*, 2012 WL 538266 at *

15  3 (N.D. Cal. Feb. 17, 2012); *see also iCall, Inc. v. Tribair, Inc.*, 2012 WL 5878389

16  at * 14 (N.D. Cal. Nov. 21, 2012) (holding that the "conclusory declaration of

17  [plaintiff's] CEO" was insufficient to establish irreparable harm); *Am. Passage*

18  *Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (rejecting

19  "affidavits [that] are conclusory and without sufficient support in facts.").

20  　　　In sum, Vans' "showing" of irreparable harm consisted solely of self-serving,

21  conclusory allegations that lack any evidentiary support.  Since the statutory

22  presumption of irreparable harm was rebutted, on this basis alone the motion must

23  be denied.

24  　　**B.**　　**Accused Shoes of Third Parties Removed From Walmart.com**

25  　　　As reflected in the declaration of Yvonne Yip filed herewith, all accused

26  shoes being offered for sale by third parties on Walmart's virtual marketplace on

27  Walmart.com have been removed from sale.  Yip Decl. ¶ 5.  In addition, third party

28  sellers and co-defendants, The Doll Maker, LLC and Trendy Trading, LLC, have

13

1   consented to a preliminary injunction with respect to shoes they were offering for

2   sale on Walmart.com, and the consent injunction has been entered by the Court.

3   ECF No. 25.  As a result, three of the shoes accused by Vans in the complaint ("Doll

4   Maker" Slip-On Shoe; "Doll Maker Skate Shoe"; and "WISPR" Toddler Shoes) and

5   for which they seek an injunction are already enjoined and off sale.  Consequently,

6   Vans will not suffer irreparable harm with respect to shoes sold on the Walmart

7   marketplace.

8          **C.**    **Balance Of Equities Overwhelmingly Favors Walmart**

9          Even if the Court were to find that Vans is likely to be irreparably harmed, the

10  balance of equities overwhelmingly favors denial of the motion.  The accused shoes

11  are sold in thousands of Walmart stores throughout the United States, and Walmart

12  has approximately ▮▮▮▮▮ pairs of shoes in inventory. Carroll Decl. ¶ 8.

13  Removal of the shoes from sale would entail not only removal of the shoes from

14  more than 3,500 stores, but also would entail warehousing and destruction, i.e.,

15  incineration, of the removed shoes as well as all existing inventory.  Carroll Decl. ¶

16  6-7.  (Destruction of the shoes would be necessary due to product quality

17  deterioration caused by mold and the aging of materials which would occur if the

18  shoes are warehoused for too long a period of time.  Carroll Decl. ¶ 7.)  The costs

19  associated with removal and warehousing of the accused shoes would be

20  approximately **$1.4 million**, not including the costs associated with destruction.

21  Carroll Decl. ¶ 7.

22         In addition to the costs of removing the shoes from sale and destroying them,

23  Walmart would also lose all revenue from sales of the shoes.  Such lost sales are

24  projected to be ▮▮▮▮▮.  Carroll Decl. ¶ 8.  It is appropriate for the Court to

25  weigh this tremendous loss of business in determining the balance of the equities.

26  *Wahoo Int'l, Inc. v. Phix Dr., Inc.*, 2014 U.S. Dist. LEXIS 74927 (S.D. Cal. May 20,

27  2014).

28         Vans, on the other hand, has not proffered (and cannot proffer) any evidence

1  that sales are being diverted from Vans to Walmart.  The alleged "potential harm to

2  Vans' brand and reputation" (Vans Br. 24) is totally speculative and not sufficient to

3  tip the balance of equities in Vans' favor. Since Walmart's shoes have been sold

4  since 2020, any harm to Vans, at this point, should be tangible and measurable. Yet

5  Vans has provided no such evidence.  The harm to Walmart of a preliminary

6  injunction clearly outweighs any speculative, and unsupported, harm that Vans

7  could suffer from maintaining the status quo.  Vans' failure to meaningfully address

8  this element, let alone carry its heavy burden on it, compels that the injunction be

9  denied.

10  **VI.**   **VANS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS**

11     **A.**   **Vans' Will Not Prevail on its Trade Dress Infringement Claims**

12     Vans' alleged trade dress has not been registered with the United States

13  Patent and Trademark Office.  Consequently, it is not entitled to the presumption of

14  validity that such registration affords.  In making this motion, Vans is essentially

15  seeking to circumvent the rigorous application and registration process and have this

16  Court validate the trade dress without sufficient fact-finding.  However, Vans faces

17  a heavy burden to show, for this motion, that it is likely to succeed on its

18  unregistered trade dress claims.

19     To prove infringement of its unregistered trade dress, Vans must demonstrate

20  that "(1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary

21  meaning, and (3) there is a substantial likelihood of confusion between the

22  plaintiff's and defendant's products." *Adidas*, 890 F. 3d at 754 (internal citation

23  omitted).

24     In evaluating the elements of a trade dress claim, "it is crucial that [courts]

25  focus not on the individual elements, but rather on the overall visual impression that

26  the combination and arrangement of those elements create." *Clicks Billiards, Inc. v.*

27  *Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001); *Puma SE v. Forever 21, Inc.*,

28  2017 U.S. Dist. LEXIS 211140 at *11 (C.D. Cal. June 29, 2017).

1   Vans' alleged trade dress, which incorporates elements and overall design that

2   are prevalent in the industry, has not acquired secondary meaning.  Therefore, Vans

3   cannot succeed on its trade dress infringement claims.

4   **Vans' Trade Dress Has Not Acquired Secondary Meaning**

5   "[S]econdary meaning . . . occurs when, in the minds of the public, the

6   primary significance of a [mark] is to identify the source of the product rather than

7   the product itself."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211

8   (2000)(internal quotation omitted; alteration in original). Secondary meaning is

9   assessed by looking to factors such as: (1) whether actual purchasers associate the

10  dress with the source; (2) the degree and manner of advertising by the party seeking

11  protection; (3) the length and manner of use of the dress, and (4) **whether the use**

12  **by the party seeking protection has been exclusive**. *Skechers U.S.A., Inc. v. Vans,*

13  *Inc.*, 2007 U.S. Dist. LEXIS 88635 at *8 (C.D. Cal. Nov. 20, 2007)(emphasis

14  added); citing *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989).

15  In the crowded field of similar looking sneakers, it is unlikely that consumers

16  will associate the common elements and common overall look of Vans' purported

17  trade dress with Vans.  Vans purported "Old Skool" trade dress consists of the

18  following elements, apart from its trademark, the Side Stripe Mark: a rubberized

19  sidewall with a consistent height around the perimeter of the shoe; the uppermost

20  portion of the sidewall having a three-tiered or grooved appearance; a textured toe

21  box outer around the front of the sidewall; and visible stitching. (An additional

22  element, "the placement and proportion of these elements in relation to one

23  another," is so vague as to be essentially meaningless.)  Numerous shoes in the

24  marketplace have these elements.  *See* page 2, *supra;* Butler Decl. Ex. D; Acosta

25  Decl. Ex. 1.  Use of the purported trade dress by Vans has been far from exclusive,

26  and Vans will not be able to prove that purchasers associate the trade dress

27  exclusively with Vans.

28  The secondary meaning surveys conducted by Mr. Sowers are biased and

16

1  should not be given credence in the Court's analysis.  As addressed above, the

2  surveys improperly limited the universe of respondents to "skate shoe" purchasers

3  and introduced significant demand effect bias into the substance of the survey by

4  constantly referring to the tested sneakers as "skate shoes."  To make matters worse,

5  the surveys did not include any open-ended questions asking why respondents

6  believed the "skate shoe" was made by Vans.  Consequently, there is no way to

7  evaluate the extent to which the responses were generated as a result of the biased

8  questions.  And finally, the Control shoe used by Mr. Sowers was a running shoe.

9  Thus, the control was ineffective.

10       Because Vans is unlikely to establish at trial (or summary judgment) that it

11  owns a valid, protectable trade dress, the motion for preliminary injunction must

12  fail.

13       **B.      Vans Cannot Establish A Likelihood Of Confusion**

14       To prove its claims of trademark infringement, Vans must establish that

15  Walmart is using a mark that is confusingly similar to Vans' Side Stripe Mark.[6]  In

16  determining whether Walmart's mark is confusingly similar, courts in the Ninth

17  Circuit look to the *Sleekcraft* factors, set forth in *AMF, Inc. v. Sleekcraft Boats,* 599

18  F. 2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v.*

19  *Walking Mountain Prods.,* 353 F. 3d 792 (9th Cir. 2003).

20       The list of factors is "neither exhaustive nor exclusive."  *E. & J. Gallo Winery*

21  *v. Gallo Cattle Co*., 967 F.2d 1280, 1290 (9th Cir. 1992). Instead, "the factors are

22  intended to guide the court in assessing the basic question of likelihood of

23  confusion." *Id*. (citing *Eclipse Assoc. Ltd. v. Data General Corp*., 894 F.2d 1114,

24

25       [6] In its motion papers, Vans lumped together the likelihood of confusion
26  analysis for both its trademark and trade dress infringement claims.  Since Vans'
    alleged trade dress consists of common elements and is not protectable, and the only
27  arguably distinctive aspect is the Side Stripe Mark – which also is the basis for
    Vans' trademark infringement claims – the likelihood of confusion analysis here
28  will focus on the Side Stripe Mark as compared to Walmart's side design.

1118 (9th Cir. 1990)). "The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *Id*. The factors should be considered together to determine, under the totality of the circumstances, whether a likelihood of confusion exists. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002)). *See also Ironhawk Techs., Inc. v. Dropbox, Inc.*, 994 F.3d 1107, 1118 (9th Cir. 2021).

This eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036 (9th Cir. 1999). Although some factors - such as the similarity of the marks and whether the two companies are direct competitors - will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors. *Id.* at 1054 (citing *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1130-32 (9th Cir. 1998)).

In this case, where the sneaker market is saturated with well-known, competing brands all selling shoes that look similar, Walmart submits that the similarity (or, in this case, the dissimilarity) of the marks at issue should be of paramount importance.

        1.   <u>Similarity of the Marks</u>

The first *Sleekcraft* factor is of considerable importance to the likelihood of confusion analysis, given that "the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Adidas,* 890 F.3d at 755, quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199,1206 (9th Cir. 2000).

In this case, the Vans Side Stripe Mark looks nothing like Walmart's side design. The designs are different shapes and give completely different commercial impressions. *See* page 2, *supra*.

In addition to the very different logo designs used by the parties, Walmart's

1  labeling also serves to differentiate the parties' shoes.  Prominent labeling bearing a

2  distinguishing brand name, such as that used by Walmart, serves to dispel a

3  likelihood of confusion. *Spark Indus., LLC v. Kretek Int'l, Inc*., 2014 U.S. Dist.

4  LEXIS 125538 at *47-51 (C.D. Cal. Aug. 28, 2014).

5       Numerous cases cited by the *Spark* court confirm that distinctive labeling is

6  sufficient to avoid a likelihood of confusion, even if trade dress may be similar.  For

7  example, in *First Brands Corp. v. Fred Meyer, Inc*., the Ninth Circuit affirmed

8  denial of a preliminary injunction based, in part, on finding that products were not

9  likely to be confused where they looked similar but carried distinctive labels.  *First*

10  *Brands Corp. v. Fred Meyer, Inc*., 809 F.2d 1378, 1384 (9th Cir. 1987).

11       In *Aurora World, Inc. v. Ty Inc*., the court considered the defendant's use of

12  its well-known logo on labeling and stated that "[t]he presence of such a prominent

13  tag bearing [the defendant's] logo negates a claim of confusion."  *Aurora World,*

14  *Inc. v. Ty Inc*., 719 F.Supp.2d 1115, 1163 (C.D. Cal. 2009).  Similarly, in *Walter v.*

15  *Mattel, Inc*., the court stated that "Otherwise similar marks are not likely to be

16  confused where used in conjunction with the clearly displayed name and/or logo of

17  the manufacturer."  *Walter v. Mattel, Inc*., 31 F.Supp.2d 751, 760 (C.D. Cal. 1998)

18  *aff'd*, 210 F.3d 1108 (9th Cir. 2000).

19       In this case, the accused shoes are sold at Walmart stores, with Walmart

20  signage and labeling.  In addition to the Walmart brand name, the shoes are sold

21  with labeling of Walmart's in-house apparel brands, Time and Tru, No Boundaries,

22  and Wonder Nation.  The in-house brand name also appears on the inside soles of

23  the shoes and on the bottom outer soles of the shoes.  Carroll Decl. ¶ 10, Ex. 1.

24  Each of these in-house brands is a federally-registered trademark.  Acosta Decl. ¶ 9;

25  Ex. 2.  This factor weighs strongly against a finding of likelihood of confusion.

26            2.    Proximity of the Goods

27       Although the parties are not competitors and exist in very different marketing

28  and distribution channels and at very different price points, Walmart does not

19

1   contest that, under current case law, the parties' shoes are in proximity to each other.

2            3.   <u>Strength</u>

3       The "[c]ommercial strength" of a mark "is based on actual marketplace

4   recognition. . ." *Groupion*, 826 F.Supp.2d at 1165.  Vans provided no persuasive

5   evidence of such marketplace recognition of the Side Stripe Mark.  None of Vans'

6   surveys were directed to the Side Stripe Mark, and no other evidence focused on the

7   purported strength of the mark.  Consequently, this factor does not weigh in favor of

8   a likelihood of confusion.

9            4.   <u>Actual Confusion</u>

10       Vans has not proffered competent, admissible evidence of actual confusion.

11   As discussed in detail above and in the declaration of Sarah Butler, the confusion

12   surveys conducted by Brian Sowers were biased and deeply flawed, leading to

13   skewed results.  In addition, they focused only on confusion relating to Vans'

14   alleged trade dress rather than the Side Stripe Mark.  Thus, Vans has not proffered

15   any evidence of actual confusion regarding the Side Stripe Mark.  Nevertheless,

16   statements from several of the respondents belie Mr. Sowers' conclusion of actual

17   confusion, and in fact these statements demonstrate that the respondents were not

18   confused due to the different side design on Walmart's shoes:

19        •  "They look like Vans but are not Vans. The logo on the side is different
20           from regular Vans."
        •  "[the shoe is] a Vans knock off.  The stripe is different and it is not the
21           LaKai logo either."
        •  "This looks very similar to a pair of Vans shoes.  The style looks similar to
22           a classic Vans, but the side logo is different."
        •  "They appear to be fake vans.  They have the shape and design of Vans
23           but the logo is wrong."
        •  "They look like vans but I'm not sure if they are and the logo/design has
24           been altered to not give away the answer so easily."
25        •  "They kind of look like vans.  The logo is similar but not the same so they
26           aren't vans."

27

28       Thus, Mr. Sowers' survey shows that not only are consumers not confused,

1  but they are not confused (at least in part) due to the difference between Vans' Side

2  Stripe Mark and Walmart's side design.

3      The only other evidence of actual confusion offered by Vans consists of

4  unauthenticated, hearsay social media and internet posts, all of which lack

5  foundation and are inadmissible.  (ECF No. 21-39, Hoffman Decl. ¶ 8, Ex. 6.)

6      As attested to by Tineke Carroll, Walmart's Director of Product Development

7  for its private brands, she is not aware of any incident in which any customer of

8  Walmart confused the accused Walmart shoes with Vans' shoes.  Carroll Decl. ¶ 16.

9  This factor weighs against a finding of likelihood of confusion.

10          5.    <u>Marketing and Distribution Channels</u>

11      The parties' products and services are distributed through entirely distinct

12  channels, which weighs against a finding of a likelihood of confusion.  *Safeworks,*

13  *LLC v. Spydercrane.com, LLC*, 2009 WL 4730821 (W.D. Wash. Dec. 7, 2009).

14      As stated by Vans' declarant, Daniel Callahan, Vans are sold at department

15  stores and retailers such as Nordstrom, Journeys, Tillys, Urban Outfitters, PacSun,

16  Famous Footwear, Foot Locker and Dick's Sporting Goods, as well as more than

17  450 Vans retail stores and on its website, www.vans.com. Callahan Decl. ¶ 20.

18  Walmart's accused shoes are sold at **none** of these outlets and are only sold at

19  Walmart stores and on Walmart.com.  Carroll Decl. ¶¶ 6, 15.  Vans shoes are not

20  sold at Walmart brick and mortar stores; and sales of Vans shoes on Walmart.com,

21  if any, are by third-party sellers only, not by Walmart.  Carroll Decl. ¶ 15.

22      In addition, the marketing and advertising channels of the parties' products

23  are totally different.  Advertising of Walmart's shoes is limited.  They are advertised

24  primarily in Walmart's circulars and other printed materials targeted to Walmart's

25  customers, and on Walmart's website as a part of the collections of the respective

26  Walmart private brands, together with clothing and other accessories.  Carroll Decl.

27  ¶ 14.  Vans does not advertise in Walmart's printed materials or on Walmart's

28  website.

1    Furthermore, the retail pricing of the parties' shoes is vastly different.  The

2    average retail prices of the accused Walmart shoes are $13.94 for Time and Tru

3    shoes, $17.23 for No Boundaries shoes, and $9.70 for Wonder Nation shoes.  None

4    of the Walmart shoes were sold at a retail price of more than $20.   Carroll Decl. ¶

5    11.   Vans' "Old Skool" shoes are sold at $60 or higher, and "Sk8-Hi" shoes are sold

6    at $70 or higher.  *See* Vans' official website,  https://www.vans.com/.

7    No consumer is likely to see the parties' products offered for sale side-by-side

8    on a retail shelf.  Moreover, Vans has not presented any evidence that Walmart

9    targets the same group of consumers as Vans.  This factor weighs against a finding

10   of a likelihood of confusion.

11              6.   Degree Of Care

12   The parties -- and relevant authorities -- disagree about how much care

13   consumers put into purchases of casual shoes. Compare *L.A. Gear, Inc. v. Thom*

14   *McAn Shoe Co.* , 988 F.2d 1117, 1134 (Fed. Cir. 1993) (holding that purchasers of

15   athletic shoes are not unsophisticated and casual in their purchases) to *K-Swiss, Inc.*

16   *v. USA Aisiqi Shoes, Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (holding that

17   consumers exhibit a low degree of care in purchasing athletic shoes). "Even if

18   consumers exert a 'low' amount of care, however, the purchase of shoes is not such

19   an impulse buy that consumers would not notice the brand markings that would

20   prevent confusion." *Skechers,* 2007 U.S. Dist. LEXIS 88635 at **21-22.

21   "[P]urchasers tend to use such ordinary caution as is reasonable with respect to

22   inexpensive, disposable goods." *Id.,* quoting *Lindy Pen Co. v. Bic Pen Corp.*, 725

23   F.2d 1240, 1246 (9th Cir. 1984).

24   Walmart's prominent labeling and marking of its brands on the accused shoes

25   reduces the likelihood of any confusion.  Even "[w]here marketing channels

26   overlap, consumers will be able to differentiate between the brands based on

27   conspicuous brand markings." *Skechers*, 2007 U.S. Dist. LEXIS 88635 at *22.

28   This factor weighs against a finding of likelihood of confusion.

1                7.     <u>Walmart's intent in selecting the mark</u>

2       An accused infringer's adoption of a mark with knowledge of the trademark

3  holder supports an inference of confusion <u>only</u> where the infringer selected the mark

4  to trade off the plaintiff's goodwill.  *See Jewelers Vigilance Comm., Inc. v.*

5  *Ullenberg Corp.*, 853 F.2d 888, 891 (Fed. Cir. 1988) ("[P]roof of intent to trade on

6  another's goodwill, [is] persuasive evidence of likelihood of confusion.");

7  *Entrepreneur*, 279 F.3d at 1148 ("intent to deceive is strong evidence of a likelihood

8  of confusion.").

9       The clear labeling of the accused shoes with Walmart's brand names and the

10  significant difference between the Walmart design and Vans Side Stripe Mark

11  negates any inference of intent to trade on Vans' mark. *See Aromatique, Inc. v. Gold*

12  *Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994). Moreover, Walmart's communications

13  with Vans in March and April 2021 reflects Walmart's good faith belief that its

14  shoes are not infringing.

15       Even assuming, *arguendo,* that Walmart intended to copy the look of Vans

16  shoes, it is the intent to profit by confusing customers that is actionable under

17  trademark law, not the intent to copy. *See Skechers,* 2007 U.S. Dist. LEXIS 88635 at

18  *22 *(*citation omitted*).

19       Vans provided no evidence of bad intent on the part of Walmart.  It argued

20  that Walmart continued selling its shoes after receiving notice of alleged

21  infringement from Vans in March 2021.  (ECF No. 21-1, Vans Br. 21.)  However,

22  Vans ignored the fact that Walmart refuted Vans' allegations.  After that response

23  from Walmart in April 2021, Walmart did not hear from Vans again until the

24  complaint was filed.  Walmart has operated believing its shoes are non-infringing.

25       This factor weighs against a finding of likelihood of confusion.

26             8.     <u>Likelihood of expansion</u>

27       Vans has not provided any evidence that Walmart may expand into its market.

28  Walmart goods are sold at Walmart and on Walmart.com only.  There is no

1  evidence that Vans and Walmart pursue the same customers, or that Walmart is

2  likely to expand to pursue Vans' customers.  This factor weighs against finding a

3  likelihood of confusion.

4  **VII.   <u>NO INJUNCTION COULD ISSUE ABSENT A VERY LARGE BOND</u>**

5       The motion for preliminary injunction should be denied. But if the Court is

6  inclined to grant the motion, a very significant bond must be posted.  "The court

7  may issue a preliminary injunction . . . only if the movant gives security in an

8  amount that the court considers proper to pay the costs and damages sustained by

9  any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P.

10  65(c).  "The purpose of the bond is to provide a source of compensation for the

11  enjoined party for all costs and damages sustained as a result of the injunction if it is

12  later determined that the injunction should not have issued." *First Interstate Bank of*

13  *Oregon, N.A. v. Nat'l Bank & Trust Co. of Norwich, N.A.*, 1991 WL 27442 (D. Or.

14  Feb. 22, 1991).  To cover the tremendous losses Walmart will suffer if it is

15  wrongfully enjoined from selling the accused shoes, Walmart requests that no

16  injunction issue absent a bond in the amount of $30 million.

17

18  DATED: January 24, 2022       KINSELLA WEITZMAN ISER

19                   KUMP & ALDISERT LLP

20

21         By:      /s/ Lawrence Y. Iser

22               Lawrence Y. Iser

23               Attorneys for Defendant WALMART INC.

24

25

26

27

28