KINSELLA WEITZMAN ISER KUMP HOLLEY LLP
LAWRENCE Y. ISER (SBN 094611)
  liser@kwikhlaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikhlaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

AMSTER, ROTHSTEIN & EBENSTEIN LLP
ANTHONY F. LO CICERO (*Pro Hac Vice*)
  alocicero@arelaw.com
MARC JASON (*Pro Hac Vice*)
  mjason@arelaw.com
90 Park Avenue
New York, NY 10016
Telephone: 212.336.8000
Facsimile: 212.336.8001

Attorneys for WALMART INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| VANS, INC.; and VF OUTDOOR, LLC,,<br><br>Plaintiffs,<br><br>vs.<br><br>WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC,,<br><br>Defendants. | Case No. 8:21-cv-01876<br><br>[Hon. David O. Carter]<br><br>**DECLARATION OF SARAH BUTLER IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: February 14, 2022<br>Time: 8:30 a.m.<br>Court: 9D<br><br>Complaint Filed: November 15, 2021 |

DECLARATION OF SARAH BUTLER

**DECLARATION OF SARAH BUTLER**

I, SARAH BUTLER, declare as follows:

1. I make this Declaration in opposition to the motion for preliminary injunction of Plaintiffs Vans, Inc. and VF Outdoor, LLC. ("Vans" collectively).

2. I am Managing Director at NERA Economic Consulting and the Chair of NERA's Survey and Statistical Sampling Practice. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of trademark and trade dress confusion, secondary meaning, false and misleading advertising, as well as in antitrust and employment-related litigation. I have authored articles on proper survey design, including an article on Secondary Meaning Surveys published in the Trademark Reporter. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA). I have submitted expert reports, been deposed, and testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

3. I was asked to review the surveys and report submitted in this matter by Mr. Brian Sowers.[1] Mr. Sowers designed and conducted four surveys – two Secondary Meaning Surveys and two Post-Sale Confusion surveys. Based on my initial review and work in this matter, I find Mr. Sowers' surveys to be biased and unreliable. Specifically:

**Mr. Sowers' Secondary Meaning Surveys are made unreliable by demand effects and an inadequate control.**

- Mr. Sowers' Secondary Meaning Surveys prime respondents by making

---

[1] A list of the documents I reviewed is attached as **Exhibit B**.

1
DECLARATION OF SARAH BUTLER

repeated references to "skate shoes." The repeated references to "skate shoes" create demand effects, encouraging respondents to simply name the top of mind brand selling skateboarding style shoes.

- The Control sneaker used by Mr. Sowers does not contain the typical elements of a "skate shoe" and therefore cannot control for the suggestiveness of his survey questions. There are numerous other brands selling "skate shoes" that have many of the common elements found in the Van's sneakers tested. Despite his awareness that there is a style of shoe associated with skateboarding, Mr. Sowers uses a running style shoe for his Control.

- Mr. Sowers does not include any open-ended questions asking why respondents believed the "skate shoe" was made by Vans and thus there is no way to evaluate the extent to which responses are generated as a result of the biased question.

**Mr. Sowers' Post-Sale Likelihood of Confusion Surveys are similarly flawed and unreliable.**

- Mr. Sowers also inappropriately limits his population of purchasers to those who would buy "skate shoes" costing $30 or more. This would exclude many Walmart purchasers. The exclusion of qualified respondents renders Mr. Sower's result unrepresentative and unreliable.

- Further, as in the Secondary Meaning Surveys, Mr. Sowers repeatedly primes respondents in his post-sale confusion studies to think about brands of "skate shoes." This priming is even more problematic in the confusion studies, as aside from one version of a child's shoe, Walmart does not describe the at-issue sneakers as "skate shoes."

- Mr. Sowers' uses the same flawed Control sneakers in his Post-Sale Confusion studies. As such, it is impossible to estimate the extent to which mentions of Vans are simply an artefact of being asked to name a top of mind "skate shoe."

- Unlike his Secondary Meaning Surveys, Mr. Sowers does include open-ended questions in his Post-Sale Confusion surveys. A number of these responses demonstrate results attributable to "noise" (*i.e.,* guessing and/or demand effects). Some verbatim responses from the Control group provide evidence that the Control sneaker is inappropriate.
- Finally, even if the studies were reliable (which they are not), Mr. Sowers' results are limited to potential confusion only in a particular post-sale environment. There is no evidence that any consumer would be confused when considering a purchase.

**Demand Effects Render Mr. Sowers Secondary Meaning Surveys Unreliable**

4.  Mr. Sowers creates demand effects by repeatedly referencing "skate shoes" in his survey. Demand effects occur when the survey questions, the response categories, the survey format, and/or irrelevant aspects of the stimuli "demand" or encourage respondents to answer in ways they would not otherwise absent these effects.[2] In this case, Mr. Sowers' repeated instruction to think of and limit answers to "skate shoes" increased the likelihood that his respondents were simply naming a well-known, top of mind brand of "skate shoes."[3]

5.  Given the repeated references to "skate shoes" in the screening questions and at every key secondary meaning question, it would be essential for Mr. Sowers to have a robust and reliable way to parse source identification answers solely attributable to the at-issue design effects, from those simply naming a known

---

[2] Kivetz, R. and Simonson, I. (2002) "Demand Effects in Likelihood of Confusion Surveys," Trademark and Deceptive Advertising Surveys Law, Science, and Design; edited by Diamond, Shari, S. and Swann, Jerre, B., pp. 249-252.

[3] Expert Report of Brian M. Sowers, dated December 27, 2021 (hereinafter *Sowers Report*), pp. 7-23; Appendix B.

brand. As detailed below, his survey does not include any reliable way to distinguish the meaningful answers from those generated by demand effects.

6. Unlike the procedures Mr. Sowers followed in his likelihood of confusion surveys, he elected to omit open ended questions in the secondary meaning surveys to understand why they believed the product came from one company. Using open-ended "why" questions are an appropriate and common methodology[4] due to their ability to help the researcher both identify poor quality respondents, and determine which of the specific design elements, if any, caused an identification of the product with a single source. Mr. Sowers did not include this type of open-ended question and therefore there is no way to establish how many of his Test Group respondents were actually identifying elements articulated by Vans as part of their trade dress.

7. Without an open-ended question to facilitate the interpretation of his data, Mr. Sowers has to rely solely on his Control group to parse responses resulting from demand effects and those legitimately associated with the set of elements claimed to be source identifying. Yet, Mr. Sowers' Control sneaker is inadequate and cannot be used to determine the share of responses related to the demand effects.

**Mr. Sowers' Control Sneaker is Inappropriate and Insufficient**

8. In his Secondary Meaning Survey, Mr. Sowers defines skate shoes for respondents as "**shoes designed for skateboarding** but also used for everyday casual wear."[5] Throughout his four surveys, Mr. Sowers repeatedly distinguishes "skate shoes" from other shoes and sneakers. While Mr. Sowers does not articulate

---

[4] Jacoby, J. (2013) "The Strength and Frailty of Verbal Report Data," *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*; by Jacoby, J, Chapter 8, p. 592.

[5] *Sowers Report,* Appendix D. page 70. *Emphasis added.*

4
DECLARATION OF SARAH BUTLER

which design elements make a shoe appropriate for skateboarding, there are sources that clearly describe the characteristics of a skateboarding shoe.

9. For example, a number of articles indicate that "skate shoes" have characteristics that differentiate them from running shoes or other types of sneakers.[6] Skate shoes typically have wide, stiff rubber midsoles which allow the wearer to scrape the shoe along the board's grip tape.[7] Skate shoes also have little to no tread and flat wide bottoms to allow for better "feel" and control on the board.[8] Further, skate shoes have reinforced seams to combat the wear and tear on the upper material.[9]

10. Mr. Sowers Control sneaker diverges markedly from the basic characteristics of a "skate shoe." In fact, Mr. Sowers plainly states that he removed the reinforced toe box and the stitching[10] - two characteristics that are general, functional aspects of a skate shoe. Further, the design elements selected by Mr. Sowers for his Control shoe are far closer to a running style sneaker and include a

---

[6] "Skateboarding shoes are very different from the normal shoes. They are particularly designed to assist you on the skateboard – not while running or walking or sprinting." https://www.myproscooter.com/what-are-skate-shoes/, last accessed January 20, 2022 (additional articles and sources referenced are included as **Exhibit C**).

[7] https://www.myproscooter.com/what-are-skate-shoes/, last accessed January 20, 2022.

[8] "The most important aspect of skate shoes is that they have flat soles which allow the skater to have better board control." https://en.wikipedia.org/wiki/Skate_shoe, last accessed January 18, 2022.

[9] "Skate shoes are characterized by the fact that the seams in the more vulnerable areas of the shoes are specifically reinforced and thus significantly reduce wear and tear," https://www.skatedeluxe.com/blog/en/everything-about-skate-shoes/, last accessed January 18, 2022.

[10] *Sowers Report,* ¶32.

tapered toe and angled "sidewall." This style contrasts from the flat, wide style of a skate shoe. In fact, at least one source specifically notes that a tapered sole can be dangerous for skateboarders since an elevated heel may cause instability.[11]

11. Aside from articles describing the characteristics of "skate shoes," Mr. Sowers could have easily examined a multitude of other skate shoe brands to understand the characteristics common to the general category.[12] A few examples of these shoes are shown below Figure 1 and additional examples are in **Exhibit D**.

**Figure 1.**





---

[11] "Running shoes have heel raised soles that puts the skater in danger of twisting/rolling their ankle when stepping off their skateboard. Simple moves such as pushing, stopping, or jumping off the board in emergency situations can cause an ankle sprain. Additionally, shoes on an angle will make it harder to balance when riding, increasing the probability of the skater jumping off and twisting their ankle." https://www.skatethefoundry.com/ufaqs/can-i-wear-running-shoes-to-skateboard/, last accessed January 20, 2022.

[12] Other than describing the changes he made, Mr. Sowers provides no evidence or reasoning for the design elements he selected for his Control sneaker.

6
DECLARATION OF SARAH BUTLER

12. As shown in Figure 1 and **Exhibit D**, a wide range of skate shoes from other brands have flat wide soles, flat midsoles/ "sidewalls," reinforced rubber around the toe, and stitching. Mr. Sowers' Control sneaker does not retain any of these elements commonly found in other brands of skate shoes.

13. Furthermore, as the shoes in Figure 1 and Exhibit D plainly demonstrate, other patterns of lines and stripes are used by other companies. Rather than use any kind of lines in his Control sneaker, Mr. Sowers used a pattern of little stars.

14. Mr. Sowers' Control sneaker does not retain the common elements of a skate shoe and therefore is an inappropriate control to measure the extent to which a respondent shown a generic skate shoe would guess and identify it with the well-known brand, Vans. As a consequence, he cannot determine that the specific design elements claimed (as opposed to general elements of "skate shoes") have acquired secondary meaning.

**Universe for Sowers Post Sale Confusion is Incorrectly Narrow Rendering Results Unrepresentative and Unreliable**

15. In a standard forward likelihood of confusion survey, the relevant population is the junior (*i.e.,* Walmart's) user's population.[13] In his report, Mr. Sowers correctly indicates that "[t]o measure likelihood of post-sale confusion, the appropriate universe is potential customers of both the junior user and the senior

---

[13] "There has been general agreement that "In a traditional case claiming 'forward' confusion … the proper universe to survey is the potential buyers of the junior user's good or services."" Jacoby, J. (2013) "The Universe," *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*; by Jacoby, J, p.285.

user."[14] However, Mr. Sowers then limits his survey population to only those who would purchase "skate shoes" and would be willing to pay $30 or more.[15] Since Walmart does not generally characterize the at issue sneakers as "skate shoes" and prices its shoes for less than $30,[16] Mr. Sowers has incorrectly narrowed the population. An underinclusive survey population is problematic and renders the results unreliable as there is no way to determine how those excluded would have responded.[17]

**Demand Effects Render Mr. Sowers' Post-Sale Confusion Surveys Unreliable**

16. As in his Secondary Meaning Surveys, Mr. Sowers creates demand effects by repeatedly referencing "skate shoes" in his Post-Sale Confusion surveys. The repeated use of the instruction to think of "skate shoes," (referenced 23 times in his confusion surveys) encouraged respondents to simply identify a well-known, top of mind brand of "skate shoes."

17. A number of respondents indicated that the reason they identified Vans

---

[14] *Sowers*, ¶69.

[15] *Sowers,* ¶81.

[16] Declaration of Tineke Carroll in Opposition to Motion for Preliminary Injunction, *Vans, Inc.; and VF Outdoor, LLC vs. Walmart, Inc.; The Doll Maker, LLC; and Trendy Trading, LLC*, United States District Court, Central District of California, Southern Division, Case No. 8:21-cv-01876, dated January 20, 2022 (hereinafter, *Carroll Declaration)*, ¶9.

[17] "If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded." Diamond, 379. Additionally, in a previous case "the court considered the universe flawed because it was limited to Advil [senior] users instead of the full range of potential users of ibuprofen." Jacoby, J. (2013) "The Universe," *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*; by Jacoby, J, p. 293.

8
DECLARATION OF SARAH BUTLER

was because it was a well-known, top of mind brand, making skate shoes. For example, Respondent 3095 stated "Vans makes some skater shoes so I associate skater shoes with them most," and Respondent 2859 explained, "skater shoes are typically made by vans." Respondent 1716 said "vans is the leader in skate shoes," and Respondent 2204 explained, "thats really the only brand of skate shoes that i know of and these are kind of low cut like the style that vans would be." These responses do not reference the specific design elements alleged to be at issue but instead reflect the fact that Vans is a well-known skate shoe brand.

18.     The demand effects in Mr. Sowers' questionnaires are particularly troubling in his confusion studies as Walmart does not, but for one version of a child's shoe, characterize the at issue shoes as "skate shoes."[18]

**Mr. Sowers' Control Sneaker is Insufficient**

19.     As described above, Mr. Sowers' Control sneaker is inappropriate and cannot be used to reliably estimate the demand effects and other types of survey noise in his Test groups. There is an indication from some respondents in his Control Groups that the sneaker shown is somewhat unusual for a "skate shoe." Respondent ID# 1661, for example, said "The shoes don't look like normal skate shoes." at Q2. Respondent ID# 2062 indicated in Q1 that they believed the company that made the control shoe must also make running shoes ("Vans or some skate shoes company that also makes running shoes."). This same respondent also indicated multiple times that the shoes reminded them of a pair of running shoes they owned, ("I have a pair of running shoes from another brand that looks similar to this one." (Q2); "I have a pair of running shoes from Nike that look similar to this

---

[18] *Carroll Declaration,* ¶11; also: https://www.walmart.com/search?q=skate+shoes&facet=brand%3AWonder+Nation%7C%7Cbrand%3ANo+Boundaries, last accessed January 18, 2022. As shown in the search results, the only shoes that have the words "skate shoe" in the title are baby or toddler shoes.

9
DECLARATION OF SARAH BUTLER

one." (Q4)). Additionally, Respondent ID #1284 indicated that they would expect this company or brand to also make "[s]ome type of all terrain (sic) running shoe that are waterproof." (Q4).

### Mr. Sowers' Results are Limited to Post-Sale, Shoes Tested

20. Even if Mr. Sowers' results were reliable (which they are not), his surveys are limited to testing post-sale confusion of only two of the accused shoes.

21. Mr. Sowers has no evidence and cannot offer an opinion of the extent to which, if at all, any consumer shopping at Walmart would see the shoes with the Walmart branding and be confused. I understand that the at issue shoes are visibly labeled with Walmart's branding.[19]

22. For the numerous reasons above, I find Mr. Sowers' surveys unreliable and insufficient for demonstrating secondary meaning and potential consumer confusion.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: January 21, 2022

[Sarah Butler]

---

[19] Declaration of Kristopher Buckner in Support of Motion for Preliminary Injunction, *Vans, Inc.; and VF Outdoor, LLC vs. Walmart, Inc.; The Doll Maker, LLC; and Trendy Trading, LLC*, United States District Court, Central District of California, Case No. 8:23-cv-01876-DOC-KES, dated December 27, 2021, Exhibit 49.