# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| **VANS, INC. and VF OUTDOOR, LLC,** | **Case No. 8:21-cv-01876-DOC-KES** |
| **Plaintiffs,** | |
| **vs.** | |
| **WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC,** | **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [21]** |
| **Defendants.** | |

Before the Court is a Motion for Preliminary Injunction ("Application" or "App.") (Dkt. 21) filed by Plaintiffs Vans, Inc. and VF Outdoor, LLC (collectively, "Vans" or "Plaintiff") against Defendant Walmart, Inc. ("Walmart"). Vans asks the court to prevent Walmart from selling shoes which Vans claims are confusingly similar to Vans' registered trademarks and protectable trade dress. The Court heard oral argument on February 28, 2022. Having reviewed the parties' papers and arguments, the Court **GRANTS** Plaintiff's Motion.

## I.    BACKGROUND

### A. Facts

Since its founding in Southern California in 1966, Vans has grown into a global shoe and apparel company. Declaration of Kia Wimmer ("Wimmer Decl.") (Dkt. 21-4) ¶¶ 4-6; Declaration of Justin Regan ("Regan Decl.") (Dkt. 21-21) ¶ 6. Vans has focused on a few iconic shoe lines and has built a reputation for lasting, durable, and stylish footwear. Wimmer Decl. ¶ 6. Vans began using a distinctive side stripe logo ("Side Stripe Mark") on its shoes in the 1970s, and the mark has since become one of Vans' most recognizable pieces of branding. Regan Decl. ¶ 13. An example of a Vans shoe bearing the Side Stripe Mark is depicted below:



Wimmer Decl. ¶ 7. Vans holds trademark registrations for the Side Stripe Mark. *Id.* ¶ 8. Vans has spent tens of millions of dollars advertising and promoting footwear bearing the Side Stripe

Mark, including sponsoring athletes such as skateboarder Tony Hawk and pop culture events such as the Vans Warped Tour concert series. *Id.* ¶¶ 14-16. As a result, the Side Stripe Mark has become a highly recognizable trademark. Regan Decl. ¶ 17.

In 1977, Vans introduced a new skate shoe that it subsequently dubbed the "Old Skool," a low-top shoe bearing the Side Stripe Mark on the shoe upper, a high sidewall with a groove running through it, textured rubber around the toe area of the sidewall, and distinctive visible stitching. Declaration of Rian Pozzebon ("Pozzebon Decl.") (Dkt. 21-35) ¶¶ 5-7. The shoes also feature two parallel lines stitched across the toe cap; a design feature that Vans has registered as a trademark ("Stitching Mark"). Wimmer Decl. ¶¶ 43-44. Vans has continuously manufactured, sold, and promoted the Old Skool since 1977. *Id.* ¶ 14. In the decades since the Old Skool's debut, Vans has released over 1,000 different versions of the sneaker and spent tens of millions of dollars promoting the line. Pozzebon Decl. ¶ 11; Regan Decl. ¶ 20. The sneaker has become a fashion and pop culture icon and has been worn and popularized by an array of athletes, musicians, artists, and celebrities including Justin Bieber, Russell Westbrook, Julia Roberts, and Gwen Stefani. Regan Decl. ¶ 22-24. The Old Skool has also made appearances on the feet of characters on television shows such as Modern Family and Ted Lasso. *Id.* ¶ 26. Media pieces have named the Old Skool "the go-to shoe for members of every fashion tribe" and "an icon in its own right." *Id.* ¶ 22. Vans claims to have sold over 200 million pairs of Old Skool shoes in the Unites States alone since its introduction, generating over $10 billion in revenue. Declaration of Daniel Callahan ("Callahan Decl.") (Dkt. 21-2) ¶ 7.

In 1978, Vans introduced a high-top sneaker that later became known as the "SK8-Hi." Pozzebon Decl. ¶ 17. The SK8-Hi shares many of the Old Skool's identifying elements, including the Side Stripe Mark on the upper and the high uniform sidewall. *Id.* ¶ 18. The SK8-Hi design also includes a ribbed ankle collar formation and distinctive visible stitching. *Id.* Vans has continuously manufactured, sold, and promoted the SK8-Hi since 1978. Wimmer Decl. ¶ 24. Like the Old Skool, Vans has released numerous versions of the SK8-Hi and has spent tens of millions of dollars promoting the SK8-Hi line. Pozzebon Decl. ¶¶ 21-22; Regan Decl. ¶¶ 30-31. The shoe has become similarly iconic, being described in media as "one of the

more perfect sneakers ever created" and being donned by Kanye West, David Beckham, and Kylie Jenner, among other celebrities. Regan Decl. ¶¶ 32-33. Vans claims to have sold over 100 million pairs of SK8-Hi shoes in the United States, generating over $6 billion in revenue. Callahan Decl. ¶ 11.

Finally, approximately 15 years ago Vans began selling a toddler version of the Old Skool sneaker ("Old Skool Toddler"). *Id.* ¶ 8. The shoe is nearly identical to the Old Skool (and is indeed part of the same franchise), but it features hook and loop straps instead of laces and, due to its smaller size, has a slightly different stitching pattern. Pozzebon Decl. ¶ 14; Regan Decl. ¶ 29. Vans has continuously manufactured, sold, and promoted its Old Skool Toddler since the shoe's release and has produced the shoe in dozens of colorways. Pozzebon Decl. ¶ 15. Vans has advertised the Old Skool Toddler in a variety of advertising media and, due to its similarity with the Old Skool, the shoe trades off Vans' promotion of the Old Skool. Regan Decl. ¶ 29. Vans claims to have sold over 7 million pairs of Old Skool Toddler shoes in the United States, and these sales have generated over $245 million in revenue. Callahan Decl. ¶ 9.

Walmart is one of the nation's best-known retailers. Through its more than 3,500 brick and mortar stores and its website Walmart.com, Walmart sells among many other things adults' and children's shoes. Declaration of Tineke Carroll ("Carroll Decl.") (Dkt. 40-6) ¶ 6. Included in Walmart's offerings are shoes sold under its private brands Time and Tru (women's shoes), No Boundaries (men's and women's shoes), and Wonder Nation (children's shoes). *Id.* ¶ 3.

### 1. The Alleged Infringements

Vans claims that in March 2021 it discovered Walmart was selling a women's shoe under its Time and Tru private brand that allegedly infringed on Vans' protected marks. Wimmer Decl. ¶ 48. Vans contacted Walmart's counsel regarding the alleged infringement on March 11, 2021, and followed up on March 12, 2021 with a cease-and-desist email. *Id.* ¶ 49; Declaration of Danica Acosta ("Acosta Decl.") (Dkt. 40-1) ¶¶ 4-5. In April 2021, Walmart responded to Vans via email refuting Vans' allegations of infringement. Acosta Decl. ¶ 6. In or around June 2021, Vans learned that Walmart was selling several additional allegedly infringing shoes under its Wonder Nation private brand. Wimmer Decl. ¶ 51. In July or August

2021, Vans learned that Walmart had released six additional allegedly infringing shoes under its No Boundaries private label. *Id.* ¶ 51. Vans learned of another ten allegedly infringing private brand shoes being sold by Walmart in September 2021, and a further five in December 2021, a month after Vans had filed its Complaint in this action. *Id.* ¶¶ 53, 55. In total, Vans alleges that Walmart is selling or has sold at least 30 different shoes under three of its private brands that infringe on Vans' protected marks. Plaintiff's Amended Reply in Support of Motion for Preliminary Injunction ("Reply") (Dkt. 47) at 19.

Vans first alleges that each of Walmart's infringing shoes uses a "knockoff" of Vans' registered Side Stripe Mark. Wimmer Decl. ¶ 57. A comparison between Vans' trademark registration for the Side Stripe Mark and one of Walmart's shoes bearing the alleged knockoff mark is depicted below:

 

*U.S. Trademark Reg. No. 2,177,772*          *Walmart Time and Tru low-top*

*Id.*

Second, Vans alleges that each of Walmart's infringing low-top shoes copies Vans' registered Stitching Mark. *Id.* ¶¶ 59-60. A comparison between Vans' trademark registration for the Stitching Mark and one of Walmart's low-top Time and Tru sneakers is depicted below:



*U.S. Trademark Reg. No. 5320348*                 *Walmart Time and Tru low-top*

*Id*. ¶ 60.

Third, Vans alleges that Walmart is selling over a dozen knockoff versions of Vans' Old Skool shoes that each imitate every element of the Old Skool trade dress, which Vans claims consists of the following: the Side Stripe Mark on the shoe upper; a rubberized sidewall with a consistent height around the perimeter of the shoe; the uppermost portion of the sidewall having a three-tiered or grooved appearance; a textured toe box outer around the front of the sidewall; visible stitching, including where the eyestay meets the vamp; and the relative placement and proportion of the elements. Complaint ("Compl.") (Dkt. 1) ¶ 150. One of Walmart's No Boundaries low-top shoes is depicted below alongside Vans' Old Skool shoe:

 

*Vans Old Skool*                             *Walmart No Boundaries low-top*

Wimmer Decl. ¶ 58.

Fourth, Vans alleges that Walmart's high-top knockoff shoes imitate every element of the SK8-Hi trade dress, which Vans claims consists of the following: the Side Stripe Mark on the shoe upper; a rubberized sidewall with a consistent height around the perimeter of the shoe; the uppermost portion of the sidewall having a three-tiered or grooved appearance; a textured toe box outer around the front of the sidewall; a ribbed collar formation that encircles the uppermost part of the shoe; visible stitching, including separating the individual ankle collar corrugations; and the relative placement and proportion of the elements. Compl. ¶ 154. One of Walmart's No Boundaries high-top shoes is depicted below alongside Vans' SK8-Hi shoe:

 

*Vans SK8-Hi*                                   *Walmart No Boundaries*

*Id.*

Finally, Vans alleges that Walmart's Wonder Nation toddler shoe imitates every element of the Old Skool Toddler trade dress, which it claims consists of the following: the Side Stripe Mark on the shoe upper; a rubberized sidewall with a consistent height around the perimeter of the shoe; the uppermost portion of the sidewall having a three-tiered or grooved appearance; a textured toe box outer around the front of the sidewall; visible stitching; and the relative placement and proportion of the elements. Compl. ¶ 156. An allegedly infringing Walmart Wonder Nation toddler shoe is depicted below alongside Vans' Old Skool Toddler:



*Vans Old Skool Toddler*                *Walmart Wonder Nation toddler*

*Id.*

### B. Procedural History

Plaintiff filed its Complaint on November 15, 2021. Plaintiff brings five claims against Walmart: (1) infringement of a federally-registered trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) federal unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) contributory trademark infringement, unfair competition, and false designation of origin; (4) unfair competition in violation of California Business & Professions Code § 17200 *et seq.* ("UCL"); and (5) trademark infringement and unfair competition in violation of California common law. *See generally* Compl.

Vans filed the instant Application on December 27, 2021. Defendant opposed on January 24, 2022 ("Opposition" or "Opp'n.") (Dkt. 40). Plaintiff replied on January 31, 2022. The Court heard oral arguments on February 28, 2022.

### II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" that requires courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

Alternatively, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

To succeed in its Application for preliminary injunction, Vans must demonstrate a likelihood of success on the merits of its claims. Vans alleges that Walmart is selling shoes under its own Walmart brands with marks confusingly similar to two of Vans' registered trademarks – the Side Stripe Mark and the Stitching Mark – as well as marks confusingly similar to three of Vans' protectable trade dresses – the Old Skool trade dress, the Old Skool Toddler trade dress, and the SK8-Hi trade dress. *See generally* Compl.

Vans' Complaint alleges trademark infringement in violation of 15 U.S.C. § 1114 (Section 32 of the Lanham Act) and unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act). *Id.* Section 32 of the Lanham Act "provides the registered owner of a trademark with an action against anyone who without consent uses a 'reproduction, counterfeit, copy, or colorable imitation' of the mark in such a way that 'is likely to cause confusion or to cause mistake, or to deceive.'" *Enesco Corp v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998) (quoting U.S.C. § 1114(1)). To establish a trademark infringement claim under Section 32 of the Lanham Act, the plaintiff "must establish that [the defendant] is using a mark confusingly similar to a valid, protectable

trademark of [the plaintiff's]." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999). Section 43(a) of the Lanham Act protects both trademarks and trade dress from infringement. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998). To prove trade dress infringement under Section 43(a), "a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) (citation omitted).

The Court thus considers first whether Vans' trademark and trade dress rights are valid and protectable, and then whether there is a substantial likelihood of confusion between Vans' shoes and Walmart's shoes.

### 2.   Whether Vans Holds Valid and Protectable Marks

#### a.   Side Stripe Mark

A mark registered under Section 2 of the Lanham Act is presumed valid and the holder of a registered mark is presumed to have the exclusive right to use it in commerce. *Applied Info Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). Walmart does not dispute that Vans holds incontestable United States trademark registrations for its Side Stripe Mark and its Stitching Mark. Accordingly, the Court finds that both the Side Stripe Mark and the Stitching Mark are valid and enforceable trademarks and moves on to consider whether Vans' unregistered trade dress rights are valid and enforceable under the Lanham Act.

#### b.   Trade Dress

"Trade dress protection applies to a combination of any elements in which a product is presented to a buyer, including the shape and design of the product." *Art Attacks Ink*, 581 F.3d at 1145 (9th Cir. 2009) (internal quotation omitted). To succeed in an action for infringement of trade dress based on product design, the plaintiff must show that the design has attained secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216. A trade dress "has acquired secondary meaning when consumers associate the design features with a particular producer." *adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir.

2018). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Art Attacks Ink*, 581 F.3d at 1145 (internal quotation omitted).

Vans is likely to succeed in showing that the Old Skool, Old Skool Toddler, and SK8-Hi trade dresses have acquired secondary meaning. Vans presented evidence of extensive and longstanding use of the designs, significant expenditures to advertise the shoes, and considerable sales and revenues of the shoes. Vans provided testimony asserting that it has continuously and exclusively used the Old Skool trade dress since 1977, the SK8-Hi trade dress since 1978, and the Old Skool Toddler trade dress for over a decade. Pozzebon Decl. ¶¶ 5-6, 14, 17, 19; App. at 15. Vans showed that all three designs have been used extensively: the Old Skool has been produced in over one thousand different colorways, the Old Skool Toddler in dozens of colorways, and the SK8-Hi in many versions designed through numerous collaborations with designers, companies, and celebrities. Pozzebon Decl. ¶¶ 11, 15, 22. Vans has spent tens of millions of dollars advertising the shoes in both traditional and online media. Regan Decl. ¶¶ 20, 31. Vans also engages in extensive social media campaigns to promote both shoes, and it sponsors athletes like skateboarder Tony Hawk to endorse the shoes. *Id.* ¶¶ 15, 21. Vans provided evidence that in the U.S. alone, it has sold over 200 million pairs of Old Skool shoes, over 100 million pairs of SK8-Hi shoes, and over 7 million pairs of Old Skool Toddler shoes. Callahan Decl. ¶¶ 7, 9, 11. These sales have generated revenues of more than $16 billion. *Id.* Vans' considerable promotional expenditures, sales, and revenues are evidence of the secondary meaning of the Old Skool, Old Skool Toddler, and SK8-Hi trade dresses. *See adidas America*, 890 F.3d at 754 (finding "ample evidence" of secondary meaning where adidas had used trade dress exclusively for several decades and expended considerable capital to promote the shoe); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (finding evidence of sales, promotional efforts, and duration of exclusive use indicative of secondary meaning).

The Old Skool, SK8-Hi, and Old Skool Toddler's established place in the market also contribute to finding secondary meaning. Vans provided evidence of the Old Skool and SK8-Hi's appearances in television shows, movies and music videos. Regan Decl. ¶¶ 22-26, 32-34. For example, actor Vin Diesel wore Old Skool shoes as Xander Cage in the 2002 film xXx, and singer Chris Brown danced in SK8-Hi shoes in the 2015 music video for his song "Anyway." *Id*. ¶¶ 25, 34. Vans also submitted unsolicited media articles as evidence of the iconic nature of the Old Skool and SK8-Hi shoes. One article from 2018 named the Old Skool "the most popular shoe of the summer." *Id*. ¶ 22. Another, appearing in *GQ*, remarked that the Old-Skool had become "the go-to shoe for members of every fashion tribe." *Id*. Another *GQ* article from 2017 described the SK8-Hi shoes "instantly recognizable," and a shoe that has "been around for so long that it transcends the hamster wheel of the sneaker game, meaning they'll look cool today, tomorrow, and basically forever." *Id.* ¶ 32. Vans notes that the Old Skool Toddler benefits from Vans' promotion because it shares many of the same elements with the adult Old Skool shoes, and Vans provides evidence of the Toddler version receiving unsolicited media attention in its own right after being seen on the feet of Kourtney Kardashian's daughter. *Id.* ¶¶ 28-29. These media appearances and cultural references indicate the shoes' iconic status and thereby further support the conclusion that the Old Skool, Old Skool Toddler, and SK8-Hi trade dresses have acquired secondary meaning. *See adidas America,* 890 F.3d at 754 ("Also indicative of secondary meaning is the considerable amount of unsolicited media coverage praising the Stan Smith's influence and iconic status as one of the most famous sneakers of all time.").

In addition, Vans provided expert survey evidence showing that purchasers associate the Old Skool and SK8-Hi designs with Vans. Expert Report of Brian Sowers ("Sowers Report") (Dkt. 21-36). Survey evidence is a contributing factor in determining secondary meaning. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) ("An expert survey of purchasers can provide the most persuasive evidence on secondary meaning." (citations omitted)). Sowers conducted secondary meaning surveys for the Old Skool and the SK8-Hi, finding a net secondary meaning level of 39.4% for each of the designs. Sowers Report ¶ 17.

This finding falls within the range that courts have found to be sufficient to support secondary meaning. *See* 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:190 (5th ed. 2017) (noting that figures of 46%, 48%, and 37% have been found sufficient to prove secondary meaning). When combined with the other evidence of secondary meaning provided by Vans, the survey evidence corroborates Vans' argument.

Walmart argues that Vans' use of its trade dress has not been exclusive, and that Vans will therefore be unable to prove that purchasers associate the trade dress exclusively with Vans. Opp'n at 16. Addressing only the Old Skool in its argument, Walmart asserts that the Old Skool trade dress is comprised of a set of common elements that are shared by "[n]umerous shoes in the marketplace." *Id.* To support its argument, Walmart provides evidence of third-party shoes that allegedly use Vans' trade dress. Acosta Decl. Ex. 1 (Dkt. 40-2) at 10-35. However, the majority of the example shoes offered by Walmart exhibit only one or two features of the Old Skool trade dress, not the overall combination of elements that constitutes trade dress, and this evidence thus fails to prove that Vans' trade dress is not exclusive. In addition, Walmart provides no evidence to indicate the extent of any of the alleged third-party uses of Vans' claimed trade dress, and courts have held that merely providing a list of third-party uses is not sufficient to establish a lack of secondary meaning. *adidas America*, 149 F. Supp. 3d at 1236-37 (asserting that, in the context of evaluating exclusive use, "standing alone, a list of third party shoes that use parts of the Stan Smith trade dress are not sufficient to undermine adidas's trademark rights"). Moreover, Vans provides evidence that it has already taken action against two of the most similar example shoes offered by Walmart, the Airwalk and the Air Speed sneakers, and that as a result those products are no longer on the market. Reply at 12.

Walmart also argues that Vans' secondary meaning surveys are unreliable because the screening questions improperly excluded relevant consumers, the wording of survey questions created demand effects, and the survey's control was poorly chosen. Opp'n at 6-7. Walmart did not commission a survey to rebut the results of Sowers' studies, instead offering the declaration of an expert who attempts to refute the methodology and results of Sowers' surveys. *See*

1  Declaration of Sarah Butler ("Butler Decl.") (Dkt. 40-4). Given that Walmart has not offered its

2  own survey evidence to contradict Sowers' findings, and that Vans' survey findings merely

3  supplement other evidence showing secondary meaning, the Court is not persuaded that

4  Walmart's argument tips the scales away from the Court's conclusion that Vans' Old Skool,

5  SK8-Hi, and Old Skool Toddler trade dresses have acquired secondary meaning.

### 3. Whether Walmart's Use of the Marks Creates a Likelihood of Confusion

7  Having determined that Vans is likely to succeed in showing that its trademarks and

8  trade dresses are valid and protectable, the Court turns next to the likelihood of confusion

9  between the shoes. "The test for likelihood of confusion is whether a 'reasonably prudent

10  consumer' in the marketplace is likely to be confused about the origin of the good or service

11  bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127,

12  1129 (9th Cir. 1998). Confusion may occur in a variety of contexts, including not only at the

13  point of sale but in the post-sale context. *See Karl Storz Endoscopy America, Inc. v. Surgical

14  Technologies, Inc.*, 285 F.3d 848, 854 (9th Cir. 2002) ("The law in the Ninth Circuit is clear

15  that 'post-purchase confusion,' *i.e.*, confusion on the part of someone other than the purchaser

16  who, for example, simply sees the item after it has been purchased, can establish the required

17  likelihood of confusion under the Lanham Act." (citations omitted)).

18  For both registered trademarks and unregistered trade dress, and regardless of whether

19  the alleged confusion is point-of-sale or post-sale, likelihood of confusion is evaluated using the

20  same set of factors (commonly referred to as the *Sleekcraft* factors) for non-exhaustive

21  guidance. *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir. 2002).

22  Those factors are: (1) the similarity of the marks; (2) the relatedness or proximity of the two

23  companies' products or services; (3) the strength of the registered mark; (4) the marketing

24  channels used; (5) the degree of care likely to be exercised by the purchaser in selecting goods;

25  (6) the accused infringers' intent in selecting its mark; (7) evidence of actual confusion; and (8)

26  the likelihood of expansion in product lines. *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d

27  341, 346 (9th Cir. 1979)). This eight-factor test is pliant, and some factors are more important

28  than others. *Brookfield Comm., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir.

1999). As such, "it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of factors." *Id.* Three of the factors – the similarity of the marks, the relatedness or proximity of the two companies' products or services, and the marketing channels used – constitute "the most crucial body of the *Sleekcraft* analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). As the parties raised all eight of the *Sleekcraft* factors, we discuss each of them here.

### a. Similarity of the Marks

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." *Id.* at 1205. "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id.* at 1206. The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and 3) Similarities weigh more heavily than differences." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). In trade dress cases, courts have cautioned that "the mark must be examined as a whole, not by its individual constituent parts." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001).

Vans alleges that Walmart is selling an "entire slate of Vans knockoffs." App. at 50. Vans' arguments center on three fundamental allegations: that Walmart's low-top shoes under the Time and Tru, No Boundaries, and Wonder Nation brands copy Vans' Old Skool trade dress and its Side Stripe and Stitching marks; that Walmart's high-top shoes under the No Boundaries and Wonder Nation brands copy Vans' SK8-Hi trade dress and its Side Stripe Mark; and that Walmart's Wonder Nation toddler shoe copies Vans' Old Skool Toddler trade dress and its Side Stripe Mark. Compl. ¶¶ 56-62. We begin our analysis with the Old Skool allegation.

Walmart's Time and Tru, No Boundaries, and Wonder Nation low-top shoes clearly bear striking similarities to Vans' Old Skool. The Walmart shoes have a near identical shape, the same grooved rubberized sidewall, a textured toe box around the front of the sidewall, and

visible stitching where the eyestay meets the vamp and across the toe cap. Walmart attempts to distinguish its shoes by asserting that its side design looks "nothing like" Vans' Side Stripe Mark. Opp'n at 18. However, the similarities between Walmart's side design and Vans' Side Stripe Mark are unmistakable. Walmart's stripe shares the exact sizing and placement of Vans' mark and differs only by adding a turn and an extended section progressing back towards the sole of the shoe at the end of the stripe. Moreover, given the many other strong similarities between Walmart's shoes and Vans' Old Skool besides their side stripes, the minor difference in the side stripe markings does not counter the overall impression of similarity between the shoes. "Considered in their entirety and as they appear in the marketplace," Walmart's Time and Tru, No Boundaries, and Wonder Nation low-top shoes are similar to Vans' Old Skool shoes. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993).

Walmart also argues that its signage and labelling of the shoes with its in-house apparel brand, including on the shoes' inside soles and bottom outer, undercuts Vans' claim of confusing similarity. Opp'n at 19. While Walmart's distinctive labelling may reduce or eliminate point-of-sale confusion, in the post-sale context "similarity of the marks or trade dress is the most important factor tending to prove confusion." *Adidas America, Inc. v. Skechers USA, Inc.*, 149 F. Supp. 3d 1222, 1240-41 (D. Or. 2016) (internal quotation omitted). In the post-sale context, where Walmart's store signage and the logos on the bottom of the shoes are not visible, the overall impression created by the shoes is one of confusing similarity.

Vans also alleges that Walmart's No Boundaries and Wonder Nation high-top shoes copy Vans' SK8-Hi trade dress and its Side Stripe Mark, and that Walmart's Wonder Nation toddler shoe copies Vans' Old Skool Toddler trade dress and its Side Stripe Mark. Compl. ¶¶ 56-57, 60-62. The analysis for each of these shoes is essentially the same as that conducted above. All of Walmart's shoes incorporate the distinctive sidewall, toe box, and visible stitching of the respective Vans shoes, and both include the side marking similar to Vans' Side Stripe Mark. Walmart's No Boundaries and Wonder Nation high-top shoes also share a ribbed collar formation with the SK8-Hi. Walmart makes no argument specifically addressing either its high-top or toddler shoes. Based on the overall impressions of the shoes, the Court finds that

Walmart's No Boundaries and Wonder Nation high-top shoes are similar to Vans' SK8-Hi shoe and that Walmart's Wonder Nation toddler shoe is similar to Vans' Old Skool Toddler shoe.

This factor thus weighs strongly in favor of Vans.

### b.  Relatedness or Proximity of the Marks

The relatedness or proximity of the marks is the second of the "controlling troika in the *Sleekcraft* analysis." *GoTo.com*, 202 F.3d at 1205. "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield*, 174 F.3d at 1056 (citations omitted). Related goods are those "products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n.10.

Walmart concedes that "the parties' shoes are in proximity to each other." Opp'n at 19-20. Accordingly, this factor weighs in Vans' favor.

### c.  Marketing Channels Used

The use of similar marketing channels is the third key factor in the *Sleekcraft* analysis. *GoTo.com*, 202 F.3d at 1207. However, courts have held that the marketing channel factor is directed toward *pre*-sale confusion and is therefore "immaterial to the issue whether actionable confusion is likely to occur *after* the marked product has entered the public arena," i.e., when the plaintiff is arguing *post*-sale confusion. *Payless Shoesource, Inc. v. Reebok Intern. Ltd.*, 998 F.2d 985, 989-90 (Fed. Cir. 1993) (emphasis in original). Given that Vans is arguing only post-sale confusion, this factor does not weigh into the analysis.

### d.  Strength of the Marks

"The more likely a mark is to be remembered and associated in the public's mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com*, 202 F.3d at 1207. A mark's strength "is evaluated in terms of its conceptual strength and commercial strength." *Id.* (citation omitted). Conceptual strength is classified "along a spectrum of increasing inherent distinctiveness. From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id.* (internal citation omitted).

Vans' marks – the Side Stripe and Stitching trademarks, and the Old Skool, Old Skool Toddler, and SK8-Hi trade dresses – are all conceptually strong because they are arbitrary. *See Adidas America,* 149 F. Supp. 3d at 1242-43 (finding that adidas' Three-Stripe mark and Stan Smith trade dress were arbitrary and therefore conceptually strong).

Walmart argues that this factor weighs against likelihood of confusion because Vans failed to present persuasive evidence of marketplace recognition of the Side Stripe Mark's commercial strength. Opp'n at 20. However, Vans has produced evidence of "tens of millions of dollars" spent promoting its trademarks and trade dress rights and billions of dollars in sales of shoes bearing its marks in the U.S. alone. Regan Decl. ¶¶ 9, 14, 20, 31; Callahan Decl. ¶¶ 7, 9, 11. These are legitimate means of demonstrating a mark's strength. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of the strength of Century 21's mark includes the fact that it has expended several millions of dollars in advertising real estate services in connection with the 'Century 21' mark, and that the mark has been used in connection with real estate sales in excess of one billion dollars."). Even if Walmart were correct that Vans had failed to produce evidence that its Side Stripe Mark is commercially strong, Walmart ignores the matter of the conceptual strength of Vans' Side Stripe Mark and its other trademark and trade dress rights, which this Court has found to be strong. This factor thus weighs in Vans' favor.

### e.  Degree of Care Likely Exercised by Purchasers

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353 (citation omitted). "A more expensive product begets a more sophisticated customer whom courts expect to exercise a higher degree of care. *Adidas America*, 149 F. Supp. 3d at 1244 (citations omitted).

Walmart argues that courts "disagree about how much care consumers put into purchases of casual shoes," citing to a Federal Circuit case, *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993) to show that courts have found purchasers of athletic shoes to be relatively sophisticated. Opp'n at 22. However, in the Ninth Circuit, courts have repeatedly held that typical purchasers of athletic shoes are "unlikely to exercise a high degree

of care in selecting shoes." *K-Swiss, Inc. v. USA AISIQI Shoes Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003); *see M'Otto Enters., Inc. v. Redsand, Inc.*, 831 F. Supp. 1491, 1502 (W.D. Wash. 1993) (typical buyers of "relatively inexpensive athletic and sportswear" are "not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods."); *Adidas America*, 149 F. Supp. 3d at 1244 (finding adidas' Stan Smith sneaker, at $75, to be an "everyday good" whose purchase does not invite careful consideration).

This factor thus weighs in favor of likelihood of confusion. Moreover, even if Walmart could show purchasers exercised a great deal of care when buying sneakers, this factor would not necessarily favor Walmart because degree of care in purchasing, like the marketing channels factor discussed above, is primarily relevant to pre-sale confusion rather than confusion in the post-sale context. *Payless Shoesource*, 998 F.2d at 989-90.

### f.  Intent in Selecting the Mark

While an intent to confuse purchasers is not required for a finding of trademark infringement, the adoption of a mark with the intent to deceive the public can give rise to an inference of confusion. *Brookfield*, 174 F.3d at 1059. "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). This factor thus "favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Id.* (citations omitted).

Walmart cannot deny that it knew of the existence of Vans' Old Skool, Sk8-Hi, and Old Skool Toddler shoes. Vans provided evidence of posts by Walmart's official Twitter account, made in years prior to Walmart's launch of the allegedly infringing shoes, responding to customer requests that Walmart sell Vans with recommendations for similar shoes stocked by Walmart. Hoffman Decl. ¶ 3. Vans also provided evidence that Walmart continued selling its allegedly infringing shoes after receiving Vans' cease and desist letter. App. at 21. *See Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1195 (C.D. Cal. 2013) (finding that defendant had actual knowledge of plaintiff's trademark rights where defendant received cease and desist letter from plaintiff). Moreover, the high degree of similarity between

Walmart's allegedly infringing shoes and the respective Vans models raises an inference of intent to confuse. *See Adidas America*, 149 F. Supp. 3d at 1244 ("given the striking similarity between the shoes, there is but one inference to draw: that Skechers knowingly adopted a mark very similar to the Stan Smith to draw off the success of adidas's iconic shoe."). This is especially true given that Walmart allegedly copied at least 30 of Vans' designs. Reply at 19.

Walmart argues that under trademark law, only the intent to profit by confusing customers is actionable, not the mere intent to copy. Opp'n at 23. But as noted above, the Ninth Circuit has clearly established that "[w]hen one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (citation omitted). This factor thus weighs in favor of Vans.

### g.  Evidence of Actual Confusion

Like intent to confuse, evidence of actual confusion is not required for a plaintiff to succeed in a trademark infringement claim. *Brookfield*, 174 F.3d at 1060. However, evidence of actual confusion "constitutes persuasive proof that future confusion is likely." *Clicks Billiards*, 251 F.3d at 1265. The Ninth Circuit has held that actual confusion may be established by survey evidence. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035 (9th Cir. 2010) (internal quotation omitted).

Vans claims that there are already examples of consumers expressing actual confusion on social media and within Walmart's online customer reviews. App. at 20. Hoffman cites three instances of actual confusion:

- An undated Instagram post by username emalyn_hill stating, "Today 3 people told me they liked my Vans … Are these Vans? No, they're from Walmart (: . . .Was I confused for a minute because I'm not much of a name brand person? Yes." Hoffman Decl. ¶ 8.

- An undated comment on a TikTok video posted by username Ayush Patel stating, "Didn't even know Walmart sells vans," to which Patel replies, "Well bro they not actually vans they just knockoffs of real vans." *Id.*

- An August 13, 2020, post on Walmart's customer review page for Time and Tru women's sneakers by username kaylee12 stating, "Saw these at Walmart mistook them for vans looked up on walmart.com saw the price and great ratings and decided to get them. The final price was $16ish – bought in store. They are great people asked me even if they were vans." *Id.*

Walmart argues that Vans' evidence is inadmissible because it is hearsay and lacks foundation. Opp'n at 26. However, courts have discretion to consider inadmissible evidence when ruling on the merits of a preliminary injunction. *Am. Hotel & Lodging Association v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015). Nonetheless, the Court finds that this limited evidence of actual confusion is not particularly persuasive given the extent of Walmart's product rollout. *Cf. Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (finding a single instance of actual confusion unpersuasive because "use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product." (emphasis in original)). However, the three examples provided do move the needle slightly in Vans' favor.

Vans also submitted evidence of actual confusion in the form of survey evidence, which shows that Walmart's No Boundaries low-top and high-top shoes create a likelihood of confusion among consumers "likely to purchase skate shoes (i.e., shoes designed for skateboarding but also used for everyday casual wear) or to have someone purchase skate shoes for them in the next 6 months." Sowers Decl. ¶¶ 17, 24. A substantial portion of prospective purchasers (23.2% for the low-tops; 29.8% for the high-tops) believed that Walmart's shoes were either made or authorized by Vans. *Id.* ¶ 17. These findings are sufficient to support a finding of actual confusion. *Cf. Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 903 (9th Cir. 2002) (27.7% consumer confusion sufficient to support actual confusion); *Exxon*

*Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% sufficient).

As noted above, Walmart does not provide its own conflicting survey evidence but presents the declaration of an expert to show that Sowers' surveys were "biased and deeply flawed." *See generally* Butler Decl. Walmart's objections to Vans' survey methodology go to the weight of the evidence, rather than its admissibility. *See Clicks Billiards*, 251 F.3d at 1263. This Court finds that Vans' survey provides evidence from which a reasonable jury could conclude that approximately one quarter of those who encounter Walmart's allegedly infringing shoes will be confused about the origin of those shoes. Walmart further argues that Vans' surveys are flawed in measuring only post-sale confusion, and not point-of-sale confusion. Opp'n at 8. However, this fact is irrelevant since Vans is alleging only that Walmart's shoes cause post-sale confusion.

This factor thus weighs in Vans' favor.

### h.  Likelihood of Product Expansion

The final *Sleekcraft* factor, likelihood of product expansion, concerns "the potential for confusion which might arise if the parties have plans to expand (or further expand) into each other's markets." *M'Otto Enters.*, 831 F. Supp. at 1504 (citation omitted).  A "'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (citation omitted).

Vans alleges that Walmart has been progressively escalating its alleged infringement on Vans' marks. Specifically, Vans contends that after it discovered Walmart's sales of one allegedly infringing shoe in March 2021, Walmart released several more allegedly infringing shoes in June 2021, six more in July or August 2021, ten more in mid-September 2021, and five more in December 2021. App. at 11-12. This evidence of Walmart's product line expansion weighs in favor of finding a likelihood of confusion. *See Sleekcraft*, 599 F.2d at 354 (evidence that the parties were diversifying their model lines weighed in favor of likelihood of confusion).

### i.   *Sleekcraft* Factors Summary

Of the eight *Sleekcraft* factors for analyzing likelihood of confusion, one (marketing channels used) is not relevant to the current case. The remaining seven all weigh in favor of Vans, including the critical factors similarity of the marks and relatedness of the goods. The Court thus finds that Vans has demonstrated it is likely to establish on the merits that the Walmart marks are likely to cause confusion.

### B.  Irreparable Harm

To succeed on a motion for injunctive relief, the plaintiff "must establish that irreparable harm is likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131.  A harm is typically irreparable where "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391. "Evidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm." *Herb Reed Enterprises, LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Under the Trademark Modernization Act of 2020, "[a] plaintiff seeking such an injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order." 15. U.S.C. § 1116(a). Because Vans established a likelihood of success on the merits, the Court begins with a presumption of irreparable harm.

Walmart presents two arguments in rebuttal of the presumption. First, Walmart argues that Vans' "unexplained delay in seeking injunctive relief" indicates a lack of urgency. Def. Mot. at 10-11. According to Walmart, after Vans made initial contact with Walmart and followed up with a cease-and-desist letter between March and April 2021, Vans waited seven months before filing its Complaint and then another month and a half before filing its Application for preliminary injunction. *Id.* at 11. Second, Walmart argues that a preliminary injunction should not be granted because Vans' evidence for showing irreparable harm is deficient for several reasons, including a failure to show that Walmart's shoes have caused

harm to Vans' goodwill or reputation and a failure to provide evidence to support Vans' allegation that Walmart's shoes are of inferior quality. *Id.* at 12-13.

Vans counters that, in addition to the presumption of irreparable harm, its evidence shows a loss of control over its distribution channels due to Walmart's flooding of the market with its shoes. App. at 22. Vans also claims that its analysis of Walmart's shoes provides evidence of the shoes' poor quality. Reply at 22. And Vans asserts that its survey evidence shows harm to its reputation based on consumer confusion. App. at 24. In addition, Vans argues that it has not unreasonably delayed seeking injunctive relief but rather "sought a preliminary injunction at exactly the right time, when the magnitude, breadth, and seriousness of Walmart's potential harm had become clear." *Id.* at 21.

The Court first concludes that Vans has not unreasonably delayed seeking injunctive relief. Although Walmart claims that delays of even a few months preclude irreparable harm, the Ninth Circuit has clearly established that "delay is but a single factor to consider in evaluating irreparable injury; courts are loath to withhold relief solely on that ground." *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (internal quotation omitted). Moreover, "tardiness is not particularly probative in the context of ongoing, worsening injuries," where "the magnitude of the potential harm becomes apparent gradually[.]" *Id.* at 990-91. As already discussed, Vans alleges that it learned of only a single infringing Walmart shoe prior to making contact with Walmart in March 2021. Between this initial contact and Vans' filing for injunctive relief, Vans alleges it became aware of an additional 29 infringing models. Given the alleged escalating nature of Walmart's infringement, Vans' delay does not negate the presumption of irreparable harm.

With regard to Walmart's argument that Vans has failed to allege evidence sufficient to show reputational harm, the court finds that in light of the presumption of irreparable harm under the Trademark Modernization Act, Vans' evidence of loss of market control, consumer confusion, and the poor quality of Walmart's shoes is sufficient to establish that Vans is likely to suffer irreparable harm absent injunctive relief.

### C.  Balance of Equities

In determining whether to grant injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. 7 at 24. "[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable compensation." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1574 (S.D. Cal. 1996), *aff'd*, 109 F.3d 1394 (9th Cir. 1997) (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988).

Vans argues that if its Motion is granted, any financial harm suffered by Walmart will consist solely of that arising from Walmart's violation of Vans' rights. Reply at 22-23. The Court agrees that based on the record it appears the only plausible hardship to Walmart if the Court issues Vans' requested preliminary injunction is lost profits from the sale of infringing goods, along with costs associated with removal of the shoes from Walmart stores. Walmart argued at the hearing that it would also suffer harm from being forced to incinerate existing inventory, because its shoes would disintegrate if kept in storage for the duration of this litigation. That result comes not from any action by Vans or this Court, but from Walmart's self-described low quality of shoes. These alleged harms are not entitled to significant weight. Walmart "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Warner Bros. Ent., Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1014-15 (quotation omitted). Further, in light of the Court's finding that Vans is likely to succeed on the merits of their trademark infringement claim, this hardship does not weigh strongly in Walmart's favor.

On the other hand, Vans has invested substantial resources in developing the goodwill and reputation associated with its trademarks and trade dress and defending its marks from infringers. Regan Decl. ¶ 49; Wimmer Decl. ¶ 47. Vans' reputation and status in the market are put at risk by infringers seeking to free ride off Vans' efforts while undermining Vans'

goodwill and reputation. Reply at 22-23. Accordingly, the Court finds that the balance of hardships weighs in favor of granting the preliminary injunction.

### D. Public Interest

"A plaintiff seeking an injunction must establish that the injunction is in the public interest." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). "In trademark cases, this factor is often addressed in terms of the public's right not to be deceived or confused." *Moroccanoil, Inc. v. Moroccan Gold, LLC.*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008).

Vans has sufficiently demonstrated that a preliminary injunction is in the public interest in this case. Vans has shown it has poured significant resources into having the public associate their products with their protected marks. *See* Regan Decl. ¶¶ 20-22, 27, 31. "By using confusingly similar marks, Defendant is depriving consumers of their ability to distinguish among the goods of competing manufacturers." *Moroccanoil*, 590 F. Supp 2d at 1282. Given the public has a right not to be deceived or confused, "the public interest and goals of the Lanham Act favor an injunction in this case." *Id.*

Based on the foregoing, the court GRANTS Vans' Motion for a preliminary injunction.

### E. Bond Amount

A preliminary injunction must be accompanied by payment of a bond "in such a sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The district court has wide discretion in setting the amount of the bond. *GoTo.com*, 202 F.3d at 1211.

Walmart requests that "no injunction issue absent a bond in the amount of $30 million" to cover the losses Walmart will suffer if wrongfully enjoined from selling its shoes. Opp'n at 24. Vans argues that a bond of $50,000 would be appropriate given that it has demonstrated a strong likelihood of success on the merits and that Walmart sells, and will be able to continue selling, numerous other shoes. Reply at 24. The Court agrees that a $50,000 bond is sufficient

under the circumstances. *See GoTo.com*, 2020 F.3d at 1211 (finding $25,000 bond adequate for injunction against Walt Disney Company, which had requested a bond of at least $20 million).

### IV. DISPOSITION

For the reasons given above, the Court **GRANTS** Vans' Motion for Preliminary Injunction. The Court hereby **ORDERS** as follows:

1. During the pendency of this litigation, Defendants, their agents, officers, employees, attorneys, and all persons who are in active concert or participation with Defendants, including but not limited to any e-commerce websites who receive actual notice of this order, are enjoined from advertising, marketing, importing, manufacturing, promoting, offering for sale, distributing, or selling the following sneakers, any other colorways of the same shoe designs, colorable imitations of the following shoes, and/or facilitating, inducing, or assisting any of the foregoing conduct:



Time and Tru Women's Low-Top Shoe



Time and Tru Women's Low-Top Shoe



Wonder Nation Boys' Low-Top Shoe



Wonder Nation Boys' Low-Top Shoe



Wonder Nation Girls' Low-Top Shoe



Wonder Nation Children's *Low-Top Shoe*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Wonder Nation Boys' Low-Top Shoe

Wonder Nation Boys' High-Top Shoe

Wonder Nation Boys' High-Top Shoe

Wonder Nation Toddler Shoe

No Boundaries Men's and Women's
Low-Top Shoe



Wonder Nation Girls' Low-Top Shoe



Wonder Nation Boys' High-Top Shoe



Wonder Nation Toddler Shoe



Wonder Nation Toddler Shoe



No Boundaries Men's Low-Top Shoe



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



No Boundaries Men's Low-Top Shoe



No Boundaries Men's Low-Top Shoe



No Boundaries Men's Low-Top Shoe



No Boundaries Men's High-Top Shoe



No Boundaries Men's High-Top Shoe



No Boundaries Men's High-Top Shoe



No Boundaries Men's High-Top Shoe



No Boundaries Men's Low-Top Shoe



No Boundaries Men's Low-Top Shoe



Wonder Nation Boys' High-Top Shoe



Wonder Nation Boys' High-Top Shoe



Wonder Nation Boys' High-Top Shoe

2. During the pendency of this litigation, Defendants, and their agents, officers, employees, attorneys, and all persons who are in active concert or participation with Defendants are enjoined from using Walmart's side stripe mark depicted on the above shoes, or any mark substantially similar thereto, on or in connection with any of Walmart's shoes or related services.

3. During the pendency of this litigation, Defendants, and their agents, officers, employees, attorneys, and all persons who are in active concert or participation with Defendants, are enjoined from using Vans' Side Stripe Mark, Old Skool trade dress, SK8-Hi trade dress, Old Skool Toddler trade dress (each as defined in Vans' Complaint in this action), or any of Vans' registered trademarks, or any trade dress or trademark that is substantially similar thereto, on or in connection with Defendants' shoes or related services.

4.  This Preliminary Injunction shall take effect immediately upon Plaintiff's filing with the Court an Injunction Bond in the amount of $50,000.

**IT IS SO ORDERED.**

      DATED: March 31, 2022

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE