# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VANS, INC.; and VF OUTDOOR, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> WALMART, INC.; THE DOLL MAKER, LLC; and TRENDY TRADING, LLC, <br><br> Defendants. | Case No. 8:21-cv-01876 |

# EXPERT REPORT OF SARAH BUTLER

Decl. of Eller, Ex. A
Page 6

# Table of Contents

I.    QUALIFICATIONS ................................................................................4

II.   DOCUMENTS REVIEWED ..................................................................5

III.  ASSIGNMENT AND SUMMARY OF OPINIONS ..............................5

IV.   BACKGROUND ..................................................................................16

V.    SUMMARY OF SOWERS' SURVEYS ..............................................18

A.    Sowers' Secondary Meaning Surveys ................................................18

B.    Sowers' Post-Sale Confusion Surveys ...............................................23

VI.   RESPONSE TO SOWERS' SECONDARY MEANING SURVEYS ......27

      A.    Demand Effects Render Sowers' Secondary Meaning Surveys Unreliable ..........28
      B.    Absence of an Open-Ended Question Limits Ability to Interpret Results ............28
      C.    Mr. Sowers' Control Sneaker is Inappropriate and Insufficient...........................29

VII.  RESPONSE TO SOWERS' LIKELIHOOD OF CONFUSION SURVEYS ...........32

      A.    Sowers' Confusion Surveys' Population is Under-Representative .......................33
      B.    Sowers' Results Lack External Validity and are Rendered Unreliable by Focalism Bias ....34
      C.    Demand Effects Render Mr. Sowers' Post-Sale Confusion Surveys Unreliable ................36
      D.    Mr. Sowers' Control Sneaker is Insufficient..........................................................37
      E.    Calson Stripe/Wonder Nation Sneaker Tested by Sowers Is Not a Real Sneaker ..........38
      F.    Universe for Calson Stripe Survey is Incorrect.....................................................38
      G.    Summary of Response to Sowers' Surveys.............................................................39

VIII. BUTLER POST-SALE CONFUSION SURVEY ...............................39

      A.    Post-Sale Survey Population ..................................................................................40
      B.    Post-Sale - Sampling of the Relevant Population...................................................40
      C.    Quality Control Measures for the Survey...............................................................41
      D.    Post-Sale Screening Questionnaire ........................................................................42
      E.    Post-Sale Main Questionnaire ...............................................................................42
      F.    Post-Sale Stimuli ...................................................................................................44
      G.    Post-Sale Survey Results........................................................................................49

IX.   BUTLER POINT-OF-SALE CONFUSION SURVEY .......................53

      A.    Point-of-Sale Survey Population ............................................................................53
      B.    Sampling of the Relevant Population......................................................................53
      C.    Quality Control Measures for the Survey...............................................................54

D.   Point-of-Sale Screening Questionnaire ....................................................... 54
E.   Point-of-Sale Main Questionnaire ............................................................... 54
F.   Point-of-Sale Stimuli ................................................................................. 59
G.   Point-of-Sale Survey Results ...................................................................... 70

**X.   BUTLER SHOE SUBSTITUTION SURVEY METHODOLOGY ............................ 78**
A.   Shoe Substitution Survey Population .......................................................... 79
B.   Sampling of the Relevant Population ........................................................... 79
C.   Quality Control Measures for the Survey .................................................... 79
D.   Shoe Substitution Screening Questionnaire ................................................ 79
E.   Shoe Substitution Main Questionnaire ....................................................... 80
F.   Shoe Substitution Stimuli ........................................................................... 82
G.   Shoe Substitution Survey Results ............................................................... 83

**XI.   CONCLUSIONS ................................................................................................ 88**

# I.    QUALIFICATIONS

1.    I am a Senior Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property and Antitrust Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2.    Among my responsibilities, I conduct survey research, market research, and sampling analysis on a wide range of topics regarding business and consumer decision making, consumer perceptions, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of trademark and trade dress confusion, secondary meaning, and false advertising, as well as in antitrust and employment-related litigation. I am a member of the American Association of Public Opinion Research, the American Statistical Society, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.    I have also worked as a market researcher conducting surveys and other forms of research, including personally conducting focus groups and in-depth interviews with consumers and professionals. I have worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

4.    I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including brand awareness, purchase

processes, product attributes, market segmentation, new product research, and advertising strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including surveys, focus groups, and in-depth interviews.

5.      I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my services in this matter at my standard rate of $775 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.    DOCUMENTS REVIEWED

7.      As part of my work, I reviewed the *Complaint* in this matter,[1] as well as the expert reports submitted by Mr. Brian Sowers.[2] A list of the specific materials I reviewed can be found in **Exhibit B**.

## III.   ASSIGNMENT AND SUMMARY OF OPINIONS

8.      I was initially retained by Defendant Walmart, Inc. ("Walmart") and later retained by Defendant ACI International (collectively, "Defendants"), to review and respond to the reports

---

[1] Complaint, *Vans, Inc.; and VF Outdoor, LLC vs. Walmart, Inc.; The Doll Maker, LLC; and Trendy Trading, LLC*, United States District Court for the Central District of California, Case No. 8:21-cv-01876, dated November 15, 2021 (hereinafter, "*Complaint*"); First Amended Complaint, *Vans, Inc.; and VF Outdoor, LLC vs. Walmart, Inc.; The Doll Maker, LLC; and Trendy Trading, LLC; and ACI International,* United States District Court for the Central District of California, Case No. 8:21-cv-01876, dated November 8, 2022 (hereinafter, "*First Amended Complaint*").

[2] Expert Report of Brian M. Sowers, and accompanying exhibits and materials, dated December 23, 2021 (hereinafter, "*Sowers Report*"); Expert Report of Brian M. Sowers, and accompanying exhibits and materials, dated April 26, 2023 (hereinafter, "*Sowers Second Report*").

submitted by Mr. Brian Sowers and to provide data responsive to the associated allegations related to consumer confusion and purchasing.

9.      Mr. Sowers conducted five surveys in total; two to evaluate whether the claimed design elements of Vans' Old Skool and Sk8-Hi adult sneakers have acquired secondary meaning ("Sowers' Secondary Meaning Surveys"), and three surveys to purportedly measure post-sale confusion between accused Walmart sneakers and Vans ("Sowers' Post-Sale Confusion Surveys").[3] Based on his surveys, Mr. Sowers opines that the adult Old Skool and Sk8-Hi sneakers have acquired secondary meaning and concludes that the accused Walmart shoes he tested are likely to cause confusion with Vans in a post-sale environment.

10.      Based on my review of Mr. Sowers' research, I conclude the following:

**Sowers' Secondary Meaning Surveys are Unreliable and Marred by Demand Effects**

- When testing for likelihood of confusion, the researcher must be careful to ensure that the results are specific to the set of elements being tested and are not generalized responses attributable to consumers' tendency to name or identify well-known brands when asked questions. In this case, associations that consumers have with Vans generally as a "skate shoe" brand (prompting Mr. Sowers uses repeatedly throughout his survey) are not a measure of the specific association between the brand and the articulated set of claimed trade dress elements of the Vans shoes in this case. To attain an accurate measure of a specified set of design elements on a shoe are source identifying for consumers, generalized associations between Vans as a "skate shoe" brand must be eliminated from the estimate. But, given his flawed

---

[3] Mr. Sowers has tested three separate Walmart brand shoes for post-sale confusion: a high-top sneaker, a low-top sneaker, and the "Calson stripe" sneaker. However, as I will discuss in more detail below, the Calson stripe sneaker does not actually exist in the marketplace as tested by Mr. Sowers.

design, a determination of secondary meaning that is attributable to the claimed design elements is not possible with Mr. Sowers' survey.

- First, Mr. Sowers does not include any open-ended questions asking why respondents believed the "skate shoe" was made by Vans. Therefore, there is no way to identify or measure what elements or design features, if any, influenced respondents' answers and no means by which to evaluate the extent to which individual responses are driven by a general association between Vans and "skate shoes."

- The absence of any open-ended data to address why respondents provided their answer means that Mr. Sowers must rely on his control to eliminate irrelevant responses. But, the Control shoe designed by Mr. Sowers does not contain typical "skate shoe" elements, and therefore it cannot address respondents' tendency to identify Vans as a top-of-mind brand when repeatedly told to think of a "skate shoe." Instead of a "skate shoe", Mr. Sowers uses a running style shoe decorated with stars or flowers. The use of such a control incorrectly assumes that any element of a "skate style" shoe (such as a flat sole and wide toe box) is unique to Vans and should be counted as part of the claimed trade dress. Of course, there are many shoes that have side stripes, flat bases, *etc.* and Mr. Sowers' surveys do not take this information into consideration.

- Mr. Sowers' Secondary Meaning Surveys are further unreliable as a result of demand effects. Respondents in Mr. Sowers' Secondary Meaning Surveys are primed by repeated references to "skate shoes." The constant reference to "skate shoes" encourages respondents to simply name the top-of-mind skateboard shoe

brand, thereby inflating the association with Vans in the Test Group. Again, because Mr. Sowers' control shoe is a running style sneaker, it cannot account for the impact of repeated reference to "skate shoes."

### Sowers' Likelihood of Post-Sale Confusion Surveys are Made Unreliable by an Under-Representative Population, Demand Effects, an Inadequate Control, and Focalism Bias

- While Mr. Sowers acknowledges that the appropriate population for a post-sale survey is one which includes consumers of both Plaintiff's and Defendants' products,[4] he inappropriately and inexplicably limits his confusion surveys to only those who would buy "skate shoes" costing $30 or more. This screening criteria necessarily excludes Walmart purchasers who would not spend $30 or more on casual sneakers (or who would not see themselves as purchasers of "skate shoes"). As my own research demonstrates, consumers who purchase sneakers at Walmart emphasize price as an important feature, far more so than the claimed design elements.[5] The exclusion of qualified respondents renders Mr. Sowers' results unrepresentative and unreliable.

- Mr. Sowers' post-sale confusion surveys are further unreliable as the stimuli he has tested are unrealistic and unlikely to represent actual post-sale exposure. Respondents in Mr. Sowers' surveys are shown close-up images of a leg and sneaker, without the upper body of the wearer. There is no reason to believe this depiction represents a typical or reasonable post-sale exposure to the accused shoes. In a real-world environment, consumers are likely to see a whole person and are likely to see multiple brands, labels, and styles, and may, or may not, register the

---

[4] *Sowers Report*, ¶ 69.

[5] See paragraphs 137-140 of this report.

design or brand of any single item worn by any single individual.[6] The unrealistic presentation of the accused shoe in Mr. Sowers' surveys creates focalism bias which occurs when survey respondents attend to the survey stimulus more so than, or in a manner that differs from, how they would attend to the item in the real world.[7]

- The focalism bias undermining the reliability of Mr. Sowers' surveys is exacerbated by the demand effects caused by his repeated use of "skate shoe" prompts. As with his secondary meaning studies, Mr. Sowers encourages respondents to call to mind the brand they associate with skateboarding. Here again, Mr. Sowers uses the same flawed Control sneakers (*i.e.*, a running style shoe with flowers on the side). As such, it is impossible to estimate the extent to which mentions of Vans in response to the accused shoes are simply a result of being asked to name a brand associated with a skateboarding style sneaker.

## Sowers' Wonder Nation Low-Top Survey Appears to Test a Fabricated Adult Shoe

11.    Mr. Sowers most recent post-sale survey replicates the flawed design of his first two post-sale surveys. Furthermore, the images of what Mr. Sowers identifies as Walmart's Wonder Nation Low-Top ("Calson Stripe") sneakers do not represent any actual sneaker sold by Walmart, and instead appear to be Mr. Sowers' fabrication of a product not sold by Walmart. It is my understanding that the Calson Stripe/Wonder Nation Low-Top sneaker was only sold as a toddler/child's shoe. The image tested by Mr. Sowers appears to be of an adult male wearing this

---

[6] In fact, as shown by my post-sale study, allowing respondents to see a full person (as opposed to a disembodied leg and shoe) yields a confusion rate half of that which was estimated by Mr. Sowers. See paragraphs 80-85 of this report.

[7] "Focalism (sometimes called the focusing illusion) is the tendency for people to give too much weight to one particular piece of information when making judgements and predictions. By focusing too much on one thing (the focal event or hypothesis), people tend to neglect other important considerations and end up making inaccurate judgements as a result." Hanko, K. (2007). "Focalism," *Encyclopedia of Social Psychology 1*; edited by Baumeister, R. F. and Vohs, K. D., p. 352.

shoe.[8] Additionally, because the Wonder Nation shoe is only sold in children's sizes, Mr. Sowers' population of teenagers and adults who have purchased a "skate shoe" *for themselves* renders his survey population for this particular accused product entirely incorrect. His survey does not test an actual sneaker that was sold by Walmart and does not survey the population of consumers who would purchase sneakers for toddlers or children.

**Sowers' Does Not Evaluate Likelihood of Confusion at the Point of Sale**

12.     Even if Mr. Sowers' post-sale confusion surveys were reliable (which they are not), his data can offer no evidence of the extent to which any consumer would be confused at the point of purchase. Mr. Sowers has not tested whether any consumer purchasing sneakers at Walmart would believe that the accused sneakers were made by, affiliated with, or were licensed by Vans. I am unaware of any survey(s) conducted by Plaintiff evaluating point-of-sale confusion.

**Responsive Surveys**

13.     As part of my work in this matter, I designed and conducted two confusion surveys. My post-sale confusion survey is directly responsive to the confusion studies conducted by Mr. Sowers and provides empirical evidence that his method is biased and flawed. I was also asked to conduct a point-of-sale confusion survey,[9] which included questions to establish the extent to which potential purchasers of Walmart's accused sneakers would be interested in purchasing the shoes as a result of the specific design elements alleged to be infringing. Finally, I designed a third survey to estimate the rate at which Walmart consumers, likely to purchase an accused shoe, would purchase Vans if the at-issue shoe were no longer available. The post-sale confusion study I designed demonstrates that testing a more realistic post-sale exposure to one of the accused shoes

---

[8] While not described in Mr. Sowers' report, I assume that the image used in his prior studies was simply altered to appear as though the Calson Stripe shoe could be worn by an adult male.

[9] While Mr. Sowers has not tested for point-of-sale confusion, I understand that Plaintiff has claimed that Walmart has sold accused shoes in an attempt to confuse consumers. See, *First Amended Complaint,* ¶¶ 6, 152, 166.

yields a confusion rate half of what Mr. Sowers estimates. Additionally, my research demonstrates that Walmart consumers are influenced primarily by the price of the product and are not particularly influenced by the at-issue design elements on the accused shoe. My further research demonstrates that respondents would be most likely to purchase a non-accused Walmart brand shoe alternative if the accused shoe were unavailable. Specifically, my research demonstrates the following:

**A More Realistic Post-Sale Survey Demonstrates Mr. Sowers' Results are Biased**

14.    I conducted a Post-Sale Confusion Survey, in which 454 sneaker purchasers were shown a video of a person walking by wearing a pair of Defendants' allegedly infringing shoes. In the Test Group, respondents were shown the No Boundaries Men's/Women's Shoe.[10] The video depicts a man slowly walking by wearing the accused shoes. There are no other people in the video and none of the clothing worn by the model in the video contains any branding or labeling. After viewing the video, respondents were asked to identify the shoe and clothing brands worn by the person in the video. The results of this study are as follows:

- When asked whether they recognized any of the shoe or clothing brands worn by the person in the video, 72.2 percent of respondents in the Test Group did not. These results demonstrate that forcing respondents to focus only on the accused shoes (as Mr. Sowers does in his surveys) assumes an attentiveness to the shoe and brand that would not exist for many in the real world.

- A total of 12.3 percent of respondents in the Test Group indicated that they did observe a brand and identified Vans. A total of 2.2 percent of respondents in the Control Group identified Vans. Using the rate in the Control Group to net out noise,

---

[10] *Complaint*, ¶ 7 (top of p. 6).

such as guessing, or top of mind brand responses, I estimate a net 10.1 percent of respondents would be confused and would associate the accused shoe with Vans.

- To be conservative, I also provided respondents with a list of possible brands they may have seen in the video in a follow up question. When presented with a list, 15.9 percent of respondents in the Test Group selected Vans.[11] In the Control Group, 4.4 percent of respondents selected Vans from the list.

- Across the open-ended question and the list of brands, a total of 15.9 percent of respondents in the Test Group mentioned or selected Vans, and 4.4 percent of respondents in the Control also mentioned or selected Vans yielding a net rate of confusion of 11.5 percent.

- The estimated confusion rate between 10 and 11 percent compares to Mr. Sowers' rates of 23.2 percent, 23.7 percent, and 29.8 percent. In other words, using a more realistic, albeit conservative, exposure to the accused sneaker reduces the estimated post-sale confusion by 50 percent.

## **Walmart Consumers Not Confused at Point-of-Sale and Not Influenced by Accused Design Elements**

15.    My Point-of-Sale Survey was designed to evaluate whether consumers would be likely to associate Defendants' products with Plaintiffs' products at the time of purchase. As part of this survey, I also asked consumers why they purchase shoes at Walmart and what features are important to their purchasing decision. The survey included 259 consumers who have or would be likely to purchase adult/teenagers sneakers at Walmart and 143 consumers would have or would be likely to purchase toddler/children's sneakers at Walmart.[12] Respondents were shown either the

---

[11] Three additional respondents in the Test Cell selected Vans and at least one other shoe brand, indicating they were likely guessing.

[12] There was a total of 402 respondents. Any respondent who indicated they had purchased or would be likely to purchase a sneaker from Walmart for a toddler or child were shown the accused children's shoe. Of the 143 respondents who indicated they had or

accused No Boundaries low-top sneakers, the accused No Boundaries high-top sneakers, or the accused Wonder Nation toddler sneaker (or a corresponding control shoe), and were asked to identify the brand or company that makes the shoe, and whether they think the shoe was associated with, or licensed by, some other brand or company. These questions follow the standard Eveready format (comparable to the questions used by Mr. Sowers). I also asked respondents to indicate their likelihood of purchasing the shoe and to indicate which sneaker features would influence their decision to purchase. The results of this survey demonstrate that:

- When asked who makes or puts out the shoes they were shown, the majority of respondents in both the Test and Control Group indicated Walmart, or a Walmart brand (*i.e.*, Time and Tru, Wonder Nation, *etc*.) Only 2.5 percent of respondents in the Test Group and 1.0 percent of respondents in the Control Group said "Vans."

- When asked what other products are made by the company that makes these shoes, 1.0 percent of respondents in the Test Group said Vans, and no respondents in the Control Group mentioned Vans.

- A total of 4.5 percent of Test Group respondents thought the shoes were associated with Vans. The comparable percent in the Control Group was 0.5 percent.

- When asked whether these shoes were licensed or approved by some other company or brand, 2.0 percent of Test Group respondents named Vans. An equal percentage of respondents in the Control Group (2.0 percent) also named Vans.

---

were likely to purchase children's sneakers from Walmart, 121 also indicated they had or were likely to purchase sneakers for adults (and/or teenagers) from Walmart.

- In total, 6.0 percent of respondents in the Test Group indicated that Vans makes, is associated with, or provided approval for the sneakers tested. The comparable percent of total mentions of Vans in the Control Group was 3.5 percent.

- Using the Control Group estimate to net out sources of noise yields an overall net confusion estimate of 2.5 percent.

- When asked what features of the shoe would influence their willingness to purchase the sneaker shown, respondents in both the Test and Control Groups indicated that comfort, price, casual style, color, and quality were top reasons for purchase.

- When asked to assign a point value (out of 100) to the features respondents deemed important, price received the highest average (23.1 points in the Test Group and 23.7 in the Control Group), and "look comfortable" received the second highest (21.2 points in the Test Group and 20.3 points in the Control Group).

- By contrast, the elements of the allegedly infringing design (i.e., the side stripe, white rubber sidewall/sole, padded collar, and visible stitching) received just 3.0 points, or less, on average.

- Finally, when asked why they have purchased sneakers at Walmart, the most common responses were price, the shoes are comfortable, convenience, and/or because they were already at Walmart making another purchase. These response themes were consistent across shoes purchased for adults and children.

16. The results of my Point-of-Sale Survey demonstrate that when seeing the sneakers in a Walmart store, consumers do not believe that Defendants' shoes are associated with Plaintiff. Further, consumers who purchase shoes from Walmart indicate that features such as price, a comfortable shoe, and convenience were the main reasons for interest in purchasing this shoe or for

purchasing shoes at Walmart in general. In contrast, respondents placed little to no importance on the allegedly infringing elements of the shoe as part of their purchasing decision.

**Consumers Likely to Purchase the Accused Walmart Sneaker are Twice as Likely to Substitute Alternative Walmart Sneaker Compared to Vans**

17.    I understand that another one of Plaintiff's experts, Dr. Erich Joachimsthaler, is relying on a survey to inform his estimate of the number of Walmart customers who "would most likely have bought Vans, had the infringing shoes not been available in the market."[13] I was asked, as part of my assignment, to design a survey to determine the rate at which likely purchasers of an accused Walmart sneaker would purchase Vans or some other sneaker.

18.    I surveyed a total of 610 consumers who have previously purchased sneakers at Walmart within the past twelve months. Qualified respondents were shown an accused shoe and price[14] and asked how likely they would be to purchase the sneaker shown. Next, respondents were asked to assume that the sneaker was no longer available and were then asked to indicate which sneaker, from an array of alternatives, they would purchase instead. The array of shoes included an alternative, non-accused Walmart sneaker, a Vans sneaker, and three other brands. Each of the alternative sneakers shown included a price. Respondents were asked to select an alternative sneaker from a different array six times. Each of the six arrays always included the non-accused Walmart brand and the Vans sneaker and respondents could indicate that they would not select any of the sneakers shown. The results of this survey demonstrate the following:

---

[13] Expert Report of Erich Joachimsthaler, Ph.D., and accompanying exhibits and materials, dated May 12, 2023, ¶ 142. I am not offering a review of or opinions addressing this survey or other aspects of Dr. Joachimsthaler's report. I understand Walmart has other experts who are directly responding to Dr. Joachimsthaler.

[14] As discussed in greater detail below, I used the price of $14.97.

- Not all consumers who purchase sneakers at Walmart would be interested in the accused sneaker. Approximately 17 percent of Walmart sneaker purchasers indicated that they would not be likely to purchase the accused shoe.

- Respondents who were interested in purchasing the accused Walmart sneaker were far more likely to substitute a non-accused Walmart sneaker as compared to a Vans' sneaker. Across choices, likely purchasers of the Walmart sneaker selected the Vans sneaker as a substitute only 15.7 percent of the time. In contrast, these same respondents selected the Walmart No Boundaries (non-accused sneaker) 40.0 percent of the time.[15]

19.     The remainder of this report includes a discussion of my general understanding of the background in this matter, my response to Mr. Sowers' surveys, and the details and results of the surveys I conducted.

## IV.   BACKGROUND

20.     Plaintiff Vans, Inc. ("Vans" or "Plaintiff") alleges it is a "world-famous footwear and apparel company that was founded in Southern California."[16] Plaintiff asserts that their Old Skool, Sk8-Hi, and Checkerboard Slip-On shoes are "instantly recognizable and associated with Vans and its considerable goodwill."[17]

21.     Defendant Walmart is a corporation with a principal place of business in Bentonville, Arkansas.[18] Walmart is a multinational retail chain, distributing a variety of products

---

[15] The remainder of the selections were for other brands of sneakers or no sneaker. The detailed results are discussed below in paragraphs 149-153.

[16] *Complaint*, ¶ 1.

[17] *Complaint*, ¶ 3.

[18] *Complaint*, ¶ 15.

through its retail stores and their online website.[19] Walmart sells various products under their in-house fashion labels "Time and Tru," "Wonder Nation," and "No Boundaries."[20]

22.     Defendant ACI International ("ACI") is a corporation with a principal place of business in Los Angeles, California.[21] ACI has been a leading manufacturer, distributor, and marketer of men's, women's, and children's footwear brands for over thirty years.[22] ACI produces certain shoes sold by Walmart under Walmart's in-house fashion labels "Time and Tru," "Wonder Nation," and "No Boundaries."[23]

23.     I understand that in its original Complaint, Plaintiff described its trade dress for the Old Skool shoe as follows:

> "Vans' 'OLD SKOOL Trade Dress' consists of a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching, including where the eyestay meets the vamp; and (6) the placement and proportion of these elements in relation to one another."[24]

24.     The Vans Old Skool Toddler Trade Dress allegedly contains all of these same elements, with the exception that the toddler shoe contains Velcro straps and does not have an eyestay.[25]

25.     The Vans Sk8-Hi Trade Dress for their high top shoe allegedly consists of each of the six elements mentioned previously but modifies the visible stitching to "including separating

---

[19] *Complaint*, ¶ 131.

[20] *Complaint*, ¶¶ 132-133.

[21] *First Amended Complaint*, ¶ 29.

[22] *First Amended Complaint*, ¶¶ 156-157.

[23] *First Amended Complaint*, ¶¶ 158-160.

[24] *Complaint*, ¶ 50.

[25] *Complaint*, ¶ 66.

the individual ankle collar corrugations" and additionally incorporates a seventh element: "a ribbed collar formation that encircles the uppermost part of the shoe."[26]

26.    Similarly, the Vans Sk8-Mid Toddler Trade Dress allegedly contains all of the same elements of the Sk8-Hi Trade Dress.[27]

27.    Plaintiff filed its First Amended Complaint on November 8, 2022. In this Complaint, Plaintiff has claimed that Walmart is aware of the alleged value associated with Vans trade dress, including for shoppers at Walmart[28] and further has asserted that Walmart has sold "copycat shoes in a direct effort to confuse consumers, [and] unlawfully siphon sales from Vans."[29]

28.    To support its assertions of acquired distinctiveness and likelihood of confusion, Vans hired Mr. Sowers.

## V.    SUMMARY OF SOWERS' SURVEYS

### A. Sowers' Secondary Meaning Surveys

27.    Mr. Sowers indicates that he conducted two secondary meaning surveys to test "whether the asserted trademark and trade dress for the Vans Old Skool [and Sk8-Hi] skate shoe[s] ha[ve] acquired secondary meaning."[30] In order to qualify for his secondary meaning surveys, respondents had to be U.S. residents, aged 13 and older, and also had to indicate that they were likely to purchase "skate shoes" or have someone purchase "skate shoes" for them in the next six months.[31]

---

[26] *Complaint,* ¶ 73.

[27] *Complaint,* ¶ 85.

[28] *First Amended Complaint,* ¶ 4.

[29] *First Amended Complaint,* ¶¶ 6, 152, 166.

[30] *Sowers Report,* ¶¶ 11-12.

[31] *Sowers Report,* ¶ 24.

28.     Once qualified for the survey, respondents were instructed that they would be shown images of a "skate shoe" and were then shown the Vans Old Skool or Sk8-Hi sneaker or a corresponding control shoe. Images of the stimuli used are shown below in **Figures 1 and 2**.

**Figure 1. Sowers' Secondary Meaning Test Stimuli**

### Vans Old Skool Shoe (Test Stimulus)



### Vans Sk8-Hi Shoe (Test Stimulus)



### Figure 2. Sowers' Secondary Meaning Control Stimuli

| Low-Top Shoe (Control Stimulus) |
|---|

Please look at the image displayed below as you normally would if you saw it while shopping for skate shoes. Please scroll to the bottom of the page and select the "NEXT" button when you are ready to continue.



| High-Top Shoe (Control Stimulus) |
|---|

Please look at the image displayed below as you normally would if you saw it while shopping for skate shoes. Please scroll to the bottom of the page and select the "NEXT" button when you are ready to continue.



29.     Respondents saw the following instruction above the images:[32]

Please look at the image displayed below as you normally would if you saw it while shopping for skate shoes. Please scroll to the bottom of the page and select the "NEXT" button when you are ready to continue.

30.     After confirming that they were able to view the "skate shoes" clearly, respondents were asked to indicate whether they associate "skate shoes" with this design and appearance with one company, more than one company, no particular company, or they don't know or are unsure.[33] Respondents who selected one company were next asked "With what one company do you associate the design and appearance of this skate shoe?" Respondents were able to enter their response or choose a "Don't know/unsure" check box.[34]

31.     Following this, respondents were thanked for their time and the survey was completed.[35]

32.     Mr. Sowers reported that 46.7 percent of respondents in the Old Skool Test Group associated the shoe with one company and named Vans as that company, compared to 7.3 percent of respondents in the Control Group. Based on these results, Mr. Sowers concluded that the Vans Old Skool trade dress has a net secondary meaning of 39.4 percent.[36]

33.     Mr. Sowers also reported that 47.3 percent of respondents in the Sk8-Hi Test Group associated the shoe with one company and named Vans as that company, compared to 7.9 percent of respondents in the Control Group. Mr. Sowers concluded that this results in a net secondary meaning level of 39.4 percent for the Vans Sk8-Hi trade dress.

---

[32] *Sowers Report,* Appendix D, p. 7.

[33] *Sowers Report,* Appendix D, pp. 9-10.

[34] *Sowers Report,* Appendix D, p. 18.

[35] *Sowers Report,* Appendix D, p. 18.

[36] *Sowers Report,* ¶ 54.

34.     Based on these results, Mr. Sowers opines that "[t]he asserted trademarks and trade dress for the Vans OLD SKOOL and SK8-Hi skate shoes have acquired secondary meaning."[37]

## B. Sowers' Post-Sale Confusion Surveys

35.     As part of his assignment, Mr. Sowers indicated that he was also asked to test for the likelihood of post-sale confusion.  He was not asked, nor did he conduct any point-of-sale studies. In his initial post-sale studies,[38] Mr. Sowers tested two shoes, the No Boundaries Low-Top sneaker and the No Boundaries High-Top sneaker. He later conducted a post-sale confusion survey with what he states is the Calson Stripe (Wonder Nation) Low-Top sneaker. All three post-sale surveys used the same screening criteria and survey questions (described below) and differed only in the images of the shoes shown to respondents.

36.     Respondents in Mr. Sowers' Post-Sale Confusion surveys were U.S. residents, aged 13 or older, who indicated they were likely to purchase "skate shoes" or have someone purchase "skate shoes" for them in the next six months. Respondents also had to indicate they would consider spending more than $30 for "skate shoes." Once qualified, respondents were shown still, close up images of a sneaker. Images of the shoes shown for each survey are shown below in **Figures 3 and 4**.

---

[37] *Sowers Report,* ¶ 17.

[38] Conducted in December 2021, *Sowers Report*, Appendices L and M.

## Figure 3. Sowers' Post-Sale Confusion Test Stimuli

### Low-Top Shoe (Test Stimulus)



### High-Top Shoe (Test Stimulus)



## Calson Stripe Shoe (Test Stimulus)



## Figure 4. Sowers' Post-Sale Confusion Control Stimuli

## Low-Top Shoe (Control Stimulus)



## High-Top Shoe (Control Stimulus)

Now, please take a look at the skate shoes this person is wearing. Afterward you will be asked some questions about what you have seen. Scroll to the bottom of the page and select the "NEXT" button when you are ready to continue.


OUTSIDE


INSIDE


FRONT


BACK



## Calson Stripe Shoe (Control Stimulus)

Now, please take a look at the skate shoes this person is wearing. Afterward, you will be asked some questions about what you have seen. Scroll to the bottom of the page and select the "NEXT" button when you are ready to continue.


OUTSIDE


INSIDE


FRONT


BACK



37.     While viewing the still close-up image of the side of the shoe, respondents were asked who or what company they believed made the "skate shoes" shown, what other brands or products are made by the company that makes the "skate shoes" shown, whether the company that makes the "skate shoes" shown has a business affiliation or connection with any other company, and whether the company that makes the "skate shoes" shown needed permission or approval from any other company.[39]

38.     Based on these questions, Mr. Sowers concludes there is a net rate of 23.2 percent post-sale confusion between the accused low-top Walmart shoe and Vans and a net rate of 29.8 percent net post-sale confusion between the accused high-top Walmart sneaker and Vans. Ultimately, Mr. Sowers opines that "Defendant's No Boundaries Low-Top and No Boundaries High-Top skate shoes are likely to cause post-sale confusion with Vans."[40]

39.     Mr. Sowers' additional post-sale confusion survey tests an image of an adult male wearing what Mr. Sowers indicates is the Calson stripe sneaker. The same survey protocol and questions as described above were implemented in this survey. Based on the result of this survey, Mr. Sowers estimated a net 23.7 percent rate of post-sale confusion and opined that "consumers are likely to confuse Defendant's Wonder Nation Low-Top skate shoes with Vans."[41]

## VI.    RESPONSE TO SOWERS' SECONDARY MEANING SURVEYS

40.     Mr. Sowers' Secondary Meaning surveys suffer from a number of flaws that render his results unreliable. Mr. Sowers' surveys are rife with demand effects due to his repeated

---

[39] *Sowers Report*, Appendix I, pp. 14-23 and 47-56; *Sowers Second Report*, Appendix D, pp. 14-23 (emphasis in original).

[40] *Sowers Report*, ¶ 17.

[41] *Sowers Second Report*, ¶ 12. Mr. Sowers' surveys are post-sale surveys and I do not see any indication in either of his reports that he intends his results to address potential point-of-sale confusion.

references to "skate shoes," he lacks an open-ended question which would allow for an evaluation of the extent to which claimed elements influenced perceptions, and his results are dependent on an inappropriate control stimulus.

## A. Demand Effects Render Sowers' Secondary Meaning Surveys Unreliable

41.     Mr. Sowers creates demand effects by repeatedly referencing "skate shoes" in his secondary meaning surveys. Demand effects occur when the survey questions, the response categories, or the survey format, and/or irrelevant aspects of the stimuli "demand" or encourage respondents to answer in ways they would not otherwise absent these cues.[42] In this case, Mr. Sowers' repeated instruction to think of and limit answers to "skate shoes" increased the likelihood that his respondents were simply naming a well-known, top of mind brand of "skate shoes."[43]

42.     Given the repeated references to "skate shoes" in the screening questions and at every key secondary meaning question, it would be essential for Mr. Sowers to have a robust and reliable way to parse source identification answers solely attributable to the claimed design elements from those simply naming a known brand associated with a style of shoe. As detailed below, his survey does not include any reliable way to distinguish the meaningful answers from those generated by demand effects.

## B. Absence of an Open-Ended Question Limits Ability to Interpret Results

43.     Unlike the procedures Mr. Sowers followed in his likelihood of confusion surveys (discussed below), Mr. Sowers does not ask respondents in his secondary meaning surveys to explain why they believed the product came from one company. Using open-ended "why"

---

[42] Simonson, I. & Kivetz, R. (2012). "Demand Effects in Likelihood of Confusion Surveys," *Trademark and Deceptive Advertising Surveys Law, Science, and Design*; edited by Diamond, S. S. and Swann, J.B., (hereinafter, "*Simonson & Kivetz*") pp. 249-252.

[43] *Sowers Report,* Appendix D, pp. 6-11; 24-29.

questions are an appropriate and common methodology due to their ability to help the researcher both identify poor quality respondents, and evaluate which of the specific design elements, if any, caused an identification of the product with a single source.[44] Mr. Sowers did not include this type of open-ended question and as a consequence there is no way to establish how many of his Test Group respondents were actually identifying elements articulated by Vans as part of their trade dress, and how many were simply naming Vans as a top-of-mind "skate shoe" brand.

44.    Without an open-ended question to facilitate the interpretation of his data, Mr. Sowers has to rely solely on the responses from his Control group to parse responses resulting from demand effects from those associated with the set of claimed elements. Yet, as discussed below, Mr. Sowers' Control sneaker is inadequate and cannot be used to determine the share of responses related to the demand effects.

## C.  Mr. Sowers' Control Sneaker is Inappropriate and Insufficient

45.    In his Secondary Meaning Survey, Mr. Sowers defines "skate shoes" for respondents as "**shoes designed for skateboarding** but also used for everyday casual wear."[45] Throughout his four surveys, Mr. Sowers repeatedly distinguishes "skate shoes" from other casual shoes and sneakers. While Mr. Sowers does not articulate which design elements make a shoe appropriate for skateboarding, there are sources that clearly describe the characteristics of a skateboarding shoe.

46.    For example, a number of articles indicate that "skate shoes" have characteristics that differentiate them from running shoes or other types of sneakers.[46] "Skate shoes" typically

---

[44] Jacoby, J. (2013) "The Questionnaire," *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys,* Chicago, IL: ABA Publishing, p. 592.

[45] *Sowers Report,* Appendix D, pp. 4, 14, 22, 32. *Emphasis added.*

[46] "Skateboarding shoes are very different from the normal shoes. They are particularly designed to assist you on the skateboard – not while running or walking or sprinting." https://www.myproscooter.com/what-are-skate-shoes/, last accessed July 12, 2023 (additional articles and sources referenced are included as **Exhibit C**).

have wide, stiff rubber midsoles which allow the wearer to scrape the shoe along the board's grip tape.[47] "Skate shoes" also have little to no tread and flat wide bottoms to allow for better "feel" and control on the board.[48] Further, "skate shoes" have reinforced seams to combat the wear and tear on the upper material.[49]

47.    In his deposition, Plaintiff's Vice President of Product Development, Mr. Callahan, noted that "skate shoes" possess features like an ollie patch, intended to be rubber reinforcement to "increase board feel when a rider is trying to do a trick and also increase the abrasion resistance and durability. "[50] He also described a foxing grip used on "skate shoes" which provides skaters "an external amount of grip" to a skateboard when doing a skating trick called an ollie. Mr. Callahan noted that other skate brands like Element make shoes that possess foxing, in addition to Vans' skate shoes.[51] Another general feature of "skate shoes" mentioned by Mr. Callahan were toe bumpers, which give a skater better grip to a skateboard when performing tricks.[52]

48.    Mr. Sowers' Control sneaker diverges markedly from the basic characteristics of a "skate shoe." In fact, Mr. Sowers plainly states that he removed the consistent height of the sidewall and all visible stitching[53] - two characteristics that are common elements of skate shoes and are not unique to Vans.

49.    Further, the design elements selected by Mr. Sowers for his Control shoe are far closer to a running style sneaker. For example, Mr. Sowers' Control shoe contains a tapered toe

---

[47] https://www.myproscooter.com/what-are-skate-shoes/, last accessed July 12, 2023.

[48] "The most important aspect of skate shoes is that they have flat soles which allow the skater to have better board control." https://en.wikipedia.org/wiki/Skate_shoe, last accessed July 12, 2023.

[49] "Single stitches will be destroyed in an instance. Look for double or even triple stitches especially on the spots most likely to wear down," https://www.skateboardershq.com/how-to-choose-skateboard-shoes/, last accessed July 13, 2023.

[50] Deposition of Daniel Callahan, dated January 28, 2023 (hereinafter, "*Callahan Deposition*"), 143:16-18.

[51] *Callahan Deposition*, pp. 127:13-128:5.

[52]  *Callahan Deposition*, p. 190:10-25.

[53] *Sowers Report,* ¶32.

and angled "sidewall." In fact, at least one source specifically notes that a tapered sole can be dangerous for skateboarders since an elevated heel may cause instability.[54] This style of Mr. Sowers' Control shoe contrasts from the flat, wide style of a "skate shoe."

50.    Aside from articles describing the characteristics of "skate shoes," and deposition testimony from Plaintiff's own representatives, Mr. Sowers could have easily examined a multitude of other "skate shoe" brands to understand the characteristics common to the general category. A few examples of these shoes are shown below **Figure 5** and additional examples are in **Exhibit D**.

**Figure 5.  Examples of Skate Shoes Not Alleged to be Infringing**





---

[54] "Running shoes have heel raised soles that puts the skater in danger of twisting/rolling their ankle when stepping off their skateboard. Simple moves such as pushing, stopping, or jumping off the board in emergency situations can cause an ankle sprain. Additionally, shoes on an angle will make it harder to balance when riding, increasing the probability of the skater jumping off and twisting their ankle." https://www.skatethefoundry.com/ufaqs/can-i-wear-running-shoes-to-skateboard/, last accessed July 12, 2023.

51.     As shown above in Figure 5 and **Exhibit D**, a wide range of skateboarding style shoes from other brands have flat wide soles, flat midsoles / "sidewalls," reinforced rubber around the toe, and visible stitching. Mr. Sowers' Control sneaker does not retain any of these elements commonly found in other brands of "skate shoes."

52.     Furthermore, as the shoes in **Figure 5** and **Exhibit D** plainly demonstrate, other companies and brands use lines or stripes on their skate style shoes. Rather than use any kind of lines in his Control sneaker, Mr. Sowers used a pattern of flowers or little stars, a design that does not represent alternative designs that are used by other "skate shoe" brands in the marketplace.

53.     Mr. Sowers' Control sneaker does not retain the common elements of a "skate shoe" that are not the specific elements claimed by Vans. As such, the running shoe with flowers is an inappropriate control and cannot measure the extent to which a respondent shown a generic "skate shoe" (and repeatedly told to think of a "skate shoe") would guess and identify it with the well-known brand, Vans. As a consequence, Mr. Sowers cannot determine that the specific design elements claimed (as opposed to general elements of "skate shoes") have acquired secondary meaning.

## VII.  RESPONSE TO SOWERS' LIKELIHOOD OF CONFUSION SURVEYS

54.     Mr. Sowers' Post-Sale Confusion surveys are similarly unreliable, hindered by demand effects, an inappropriate control, and are further limited by an under-representative population and a survey stimulus which does not replicate a real-world exposure and creates focalism bias.

## A.  Sowers' Confusion Surveys' Population is Under-Representative

55.      In his report, Mr. Sowers indicates that "[t]o measure likelihood of post-sale confusion, the appropriate universe is potential customers of both the junior user and the senior user."[55] However, this is not the population Mr. Sowers has studied. Instead, Mr. Sowers limits his survey population to only those who would purchase "skate shoes" and who would be willing to pay $30 or more for "skate shoes."[56] Since Walmart does not generally characterize or describe the accused shoes as "skate shoes" and the accused shoes are priced at less than $30,[57] Mr. Sowers has incorrectly narrowed the population.

56.      An underinclusive survey population is problematic and renders the results unreliable as there is no way to determine how excluded consumers would have responded. As noted in S. Diamond's Reference Guide on Survey Research, "If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded."[58] In this case, Mr. Sowers can offer no evidence that consumers who would purchase casual sneakers for less than $30, or who would purchase something other than "skate shoes," would respond similarly to the respondents he included in his survey.

---

[55] *Sowers Report*, ¶ 69.

[56] *Sowers Report,* ¶ 81.

[57] Declaration of Tineke Carroll in Opposition to Motion for Preliminary Injunction, *Vans, Inc.; and VF Outdoor, LLC vs. Walmart, Inc.; The Doll Maker, LLC; and Trendy Trading, LLC*, United States District Court, Central District of California, Southern Division, Case No. 8:21-cv-01876, dated January 20, 2022 (hereinafter, "*Carroll Declaration*"*),* ¶ 9. I understand the highest price point for any of the accused shoes was $18.64, the price for the adult No Boundaries high-top sneaker. *First Amended Complaint,* ¶ 152. I also do not understand that Vans sells its Old Skool or Sk8-Hi shoes for $30 and Mr. Sowers has not provided any reason or documentation to support his decision to limit his sample this way.

[58] Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council (hereinafter, "*Diamond*"), p. 379. Additionally, in a previous case "the court considered the universe flawed because it was limited to Advil [senior] users instead of the full range of potential users of ibuprofen." Jacoby, J. (2013). "The Universe," *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, Chicago, IL: ABA Publishing,, p. 293.

57.     Further, by screening for "skate shoe" purchasers, Mr. Sowers biases the results by limiting the population to those who would be more likely to be aware of Vans and are more likely to guess this brand when shown and told they are viewing a "skate shoe."[59]

## B.  Sowers' Results Lack External Validity and are Rendered Unreliable by Focalism Bias

58.     Mr. Sowers' Post-Sale confusion surveys present respondents with a series of up-close images of a sneaker and a man's leg from the calf down. Mr. Sowers does not explain how or why these images are a fair representation of a typical or reasonable post-sale exposure.[60]

59.     In the real world, consumers are surrounded with images, branding, and labels that may serve to influence their perception of a particular product or, may distract from attending to the product to start. Mr. Sowers has done nothing to establish that his survey, which simply asks respondents to focus on one view of the accused sneaker on a leg while answering questions, can in any way represent a real-world exposure. The presentation of the sneaker within the survey matters, of course, because Mr. Sowers and Vans presumably intend to rely on his results to suggest that confusion is likely in the real world, not just within the confines of the constructed survey environment.

60.     It is important to note that one of the key elements in designing a valid likelihood of confusion study is ensuring that the survey fairly represents and reflects marketplace conditions.[61] To the extent that the presentation of the stimulus does not represent the real world,

---

[59] As discussed below in paragraph 151, more than half of the Walmart sneaker purchasers I surveyed never selected the Vans sneaker shown as an alternative. This suggests that purchasers of "skate shoes" for more than $30 are not representative of the Walmart sneaker purchasing population.

[60] It is also worth noting that Mr. Sowers has no record of the extent to which respondents, if any, clicked to see any of the other images. In other words, while Mr. Sowers appears to have intended his survey stimulus to reflect different angles of a person walking by, it is entirely possible that respondents simply looked at the first still image.

[61] "…in cases alleging forward confusion, what is at issue is whether the junior user's mark is likely to confuse consumers. In order to fairly test that issue, one must look at those consumers likely to encounter the junior user's mark in the marketplace." Barber,

the survey can be excluded or given little weight. Numerous authors emphasize the importance of ensuring that surveys fairly represent marketplace conditions.[62] As one author notes, "[w]hile the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue."[63] And, as Professor J. Thomas McCarthy explains, "the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has."[64] Surveys that do not properly replicate marketplace conditions, or those that distort the stimulus being tested, are subject to exclusion.

61.    While the literature on replicating marketplace conditions is focused on point-of-sale confusion surveys, there is no methodological reason that an articulation of how and why the presentation of the stimulus fairly represents the post-sale world should not also be necessary. In fact, absent this information, it is quite possible that even a perfectly designed post-sale survey may be entirely without external validity. That is, even a survey that identifies the proper universe, does not create demand effects, and has a proper control may still not yield valid results as to the likelihood of post-sale confusion in the real world because it has simply tested an artificial scenario that cannot be said to be representative.

62.    Mr. Sowers has elected to provide respondents with a close-up view of the sneaker that is shown as a still image above each key confusion question. Such a scenario suggests that, at best, his findings are limited to a post-sale environment in which the observer is close in proximity

---

W. G. & Yaquinto, G.E. (2022). "The Universe," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., p. 33.

[62] See e.g., *Simonson & Kivetz,* pp. 243-259.

[63] Edwards, G. K. (2022). "The *Daubert* Revolution and Lanham Act Surveys," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., (hereinafter, "*Edwards*"), p. 354.

[64] *McCarthy on Trademarks and Unfair Competition,* (5th ed.), (hereinafter, "*McCarthy*"), § 32:163.

to the wearer, sees only a portion of the person wearing the shoe, is exposed to no other persons, and sees no other labels or branding that would potentially influence or distract from the sneaker in view. There is no discussion or evidence from Mr. Sowers that such a construct represents a typical post-sale exposure.

63.    In addition to relying on a test of an artificial exposure, Mr. Sowers' selected stimuli create focalism bias. Focalism bias occurs when survey respondents attend to or focus on information provided in a survey that they might not otherwise attend to in the real world. In this case, Mr. Sowers assumes 100 percent of consumers in a post-sale environment would focus on and examine the shoes worn by others. Without evidence, this is not a reliable assumption.

## C.  Demand Effects Render Mr. Sowers' Post-Sale Confusion Surveys Unreliable

64.    As with his Secondary Meaning Surveys, Mr. Sowers creates demand effects in his Post-Sale Confusion Surveys by again repeatedly referencing, and additionally, by emphasizing "skate shoes" (with the use of underlining). The repeated use of "skate shoes," (referenced 23 times in his confusion surveys)[65]  encourages respondents to simply identify a well-known, top of mind brand of "skate shoes."

65.    A number of respondents indicated that this was the reason they identified Vans, i.e., because it was a well-known, top of mind brand, making skate shoes. For example, Respondent 3095 stated "Vans makes some skater shoes so I associate skater shoes with them most," and Respondent 2859 explained, "skater shoes are typically made by vans." Respondent 1716 said "vans is the leader in skate shoes," and Respondent 2204 explained, "thats really the only brand

---

[65] It is my understanding that but for one child's sneaker, Walmart did not characterize its accused shoes as "skate shoes." *Carroll Declaration,* ¶ 11; also:
https://www.walmart.com/search?q=skate+shoes&facet=brand%3AWonder+Nation%7C%7Cbrand%3ANo+Boundaries, last accessed July 12, 2023. As shown in the search results, the only shoes that have the words "skate shoe" in the title are baby or toddler shoes.

of skate shoes that i know of and these are kind of low cut like the style that vans would be." These responses do not reference the specific design elements alleged to be at issue in this matter, but instead reflect the fact that Vans is a well-known skate shoe brand. Absent a robust control, there is no way to determine what share of respondents (such as these and others), were simply naming a well-known brand of shoe associated with skateboarding.

## D.  Mr. Sowers' Control Sneaker is Insufficient

66.    As described in the discussion of Mr. Sowers' Secondary Meaning Surveys, Mr. Sowers' Control sneaker image is inappropriate and cannot be used to reliably estimate the demand effects created by repeated references to "skate shoes." In fact, there is some evidence from the respondents in his confusion Control Group that the image of the sneaker shown is not a "skate shoe." For example, Respondent 1661 explains "The shoes don't look like normal skate shoes." Respondent 2062 indicated in Q1 that they believed the company that made the control shoe must also make running shoes ("Vans or some skate shoes company that also makes running shoes"). This same respondent also indicated multiple times that the shoes reminded them of a pair of running shoes they owned, ("I have a pair of running shoes from another brand that looks similar to this one." (Q2); "I have a pair of running shoes from Nike that look similar to this one." (Q4)). Additionally, Respondent 1284 indicated that they would expect this company or brand to also make "[s]ome type of all terrain (sic) running shoe that are waterproof." (Q4).[66]

---

[66] Examples in Sowers' Calson Stripe survey also indicate that the Control Shoe shown was not seen as a "skate shoe." For example, Respondent 5347 indicates, "It looks like somethign people would wear, but not for skating… because they look like running shoes." Respondent 2851 states, "They look way too girly for me personally. Not like real skate shoes." And Respondent 2428 indicates "They do not look like skate shoe brands I am aware of, such as Vans. They look somewhat cheaper, and more generic." Further, several respondents in the Control Group indicated Nike, a brand known for running and basketball shoes,[66] or "Converse" due to Sowers' use of a star design.

### E.  Calson Stripe/Wonder Nation Sneaker Tested by Sowers Is Not a Real Sneaker

67.    Mr. Sowers submitted an additional survey with his April 26, 2023 report. In this survey, Mr. Sowers asserts that he has tested the Calson Stripe shoe, put out by Wonder Nation. It is my understanding that Wonder Nation is Walmart's in-house **children's** brand, and the sneaker Mr. Sowers purportedly tested was only ever sold in children's sizing. Despite this, Mr. Sowers appears to have tested an adult sneaker and has placed the Calson Stripe shoe on an adult male.[67] Thus, Mr. Sowers' survey tests a stimulus that has never actually existed in the real world. If correct, his survey does not test an actual sneaker sold, does not represent the typical ways in which this design appeared (e.g., on a smaller shoe, often with a Velcro closure), and cannot, therefore, offer any probative evidence as to the true likelihood of confusion in the real world.

### F.  Universe for Calson Stripe Survey is Incorrect

68.    Because the Wonder Nation brand shoe with the "Calson" stripe was only sold as a toddler/child shoe, the relevant population for this survey would have been adults who would purchase children's sneakers. This is not the population Mr. Sowers studied (again, he surveys only those who would purchase "skate shoes" and would be willing to pay $30 or more). In his most recent survey, Mr. Sowers has thus tested a sneaker not sold by Walmart with a population of misidentified and incorrectly defined respondents. None of the results from this survey can meaningfully represent how parents or caregivers might view the actual child's shoe in the real post-sale environment.

---

[67] Not only does the toddler/kids Calson Stripe shoe differ in terms of sizing, but the toddler version of the shoe was sold with Velcro enclosures rather than laces. *First Amended Complaint,* p. 80.

## G. Summary of Response to Sowers' Surveys

69.     The reliability of Mr. Sowers' Secondary Meaning and Confusion studies are undermined by demand effects generated by repeated references to and emphasis on "skate shoes" which cannot be eliminated by his poorly designed Control. Further, Mr. Sowers provides no evidence that his post-sale surveys fairly represent any real-world exposure. Instead, respondents are forced to contemplate a still side view of just the sneaker, absent any other information or content. These post-sale confusion surveys are also rendered unreliable by an under-representative population more likely to guess "Vans" when shown and asked about a shoe with skateboard styling. Finally, Mr. Sowers' most recent survey, testing the Calson Stripe, appears to test a fabricated sneaker that Walmart never sold with an inappropriate consumer population.

# VIII. BUTLER POST-SALE CONFUSION SURVEY

70.     In response to Mr. Sowers, I have designed two surveys to examine the extent to which, if any, consumers would be confused. I conducted a post-sale confusion survey and a point-of-sale confusion survey.

71.     The design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.[68] In general, the design of a reliable survey requires careful attention to the following key areas:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli shown to respondents; and

---

[68] *Diamond*, pp. 359-423.

- The protocol for calculating the results from the survey.[69]

72. The discussion of the surveys I conducted is organized around each of the key areas.

## A. Post-Sale Survey Population

73. The relevant population for this matter is comprised of U.S. consumers, ages 18 and older, who have purchased or would consider purchasing sneakers. As is appropriate, this population includes consumers who may be in the market to purchase either Vans' or Walmart's sneakers.

## B. Post-Sale - Sampling of the Relevant Population

74. Potential survey respondents were contacted by Veridata Insights ("Veridata"), an online panel and data collection services company.[70] Veridata is an independent data collection company that I have prior experience working with, and that is not associated with NERA in any way. Veridata uses a variety of quality control measures to ensure the reliability and integrity of the respondents and the responses they provide. Veridata complies with the standards and ethics for online survey data panels set forth by the Insights Association.[71] Veridata's standard quality control measures were applied in this study.

75. A total of 454 respondents in the relevant population qualified for and completed the survey. The survey invitation is provided in **Exhibit E-1**, the complete questionnaire is

---

[69] The Federal Judicial Center's (2004) *Manual for Complex Litigation, Fourth Edition*, §11.493, p. 103 phrases these key areas as such:
 • the population was properly chosen and defined;
 • the sample chosen was representative of that population;
 • the data gathered were accurately reported; and
 • the data were analyzed in accordance with accepted statistical principles.

[70] Additional information about Veridata Insights is available on their website at https://veridatainsights.com, last accessed July 12, 2023.

[71] The Insights Association is an organization representing the industry and profession of market research and analytics (https://www.insightsassociation.org/About-Us, last accessed July 12, 2023).

provided in **Exhibit E-2**, screenshots of the survey as it appeared to respondents are included as **Exhibit E-3**, and survey stimuli are provided in **Exhibit E-4**.

76.    Data for the survey were collected between September 20, 2022 and March 29, 2023.

## C.  Quality Control Measures for the Survey

77.    To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by Veridata:

    a.   As is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at Veridata nor any of the respondents were aware of the survey sponsor or the ultimate intention of the survey.[72]

    b.   Respondents were able to take the survey either on a desktop, laptop, or tablet computer, or on their mobile phone or cell phone. The survey program was tested separately on both a computer and mobile phone or cell phone in order to ensure that the survey questions and stimuli appeared correctly on the different device types.

    a.   Respondents had to correctly answer a Google reCAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey.[73]

    c.   Respondents were also required to enter their state of residence and zip code, and if these data conflicted with one another, the respondent was excluded.

    d.   Respondents who indicated that they did not understand or were unwilling to adhere to the survey instructions were also screened out of the survey.

---

[72] *Diamond*, pp. 410-411.

[73] "reCAPTCHA protects your website from fraud and abuse without creating friction. reCAPTCHA uses an advanced risk analysis engine and adaptive challenges to keep malicious software from engaging in abusive activities on your website." https://www.google.com/recaptcha/about, last accessed July 12, 2023.

a.  Respondents who work for or have a household member who works for a company that makes, manufactures, or sells shoes, a market research or advertising company, or indicated they did not know or were unsure, were screened out.[74]

b.  Respondents who had previously completed a survey about shoes in the past three months,[75] or who indicated that they did not understand or were unwilling to adhere to the survey instructions, were also screened out of the survey.

## D.  Post-Sale Screening Questionnaire

78.    To ensure that panel respondents were part of the relevant population, a series of screening questions was asked. Only respondents who met these qualifying conditions continued with the main survey. To qualify for the survey, respondents had to live in the United States and be 18 years old or older. Respondents also had to indicate they had purchased sneakers in the past twelve months or were likely to purchase sneakers within the next six months.

79.    Once qualified for the study, respondents were taken to the main questionnaire.

## E.  Post-Sale Main Questionnaire

80.    In the main portion of the questionnaire, all qualified respondents were provided with the following instruction:

> Next, you will see a video of a person you might pass by while walking. Please watch the video carefully. When you are ready, click the arrow to start the video. Once the video is complete, you may watch it again. If you are finished watching the video, please click "Continue" to advance the survey. ***Please note the video does not have sound. If you wear contact lenses or eyeglasses, please put them on now.***

---

[74] This is a standard research approach to avoid including respondents who are likely to have specialized knowledge about the survey topic or the survey methodology.

[75] Respondents who indicated "Don't know / unsure" to this question were also screened out.

81.    Unlike the still images shown in Mr. Sowers' survey (that were described as "a person you might see while walking along the street"),[76] respondents in my survey were shown an actual video.

82.    Respondents were then randomly assigned to a Test Group or Control Group and shown a video of a person walking by wearing a pair of allegedly infringing shoes.

83.    After confirming that they could see the video clearly, respondents were asked if they recognized any of the shoe or clothing brands worn by the person in the video. Specifically, the question read, "Please think back to what the person in the video was wearing. Did you recognize any of the shoe or clothing brands worn by the person in the video?" with response options "Yes," "No," and "Don't know / unsure." This is an important filter question,[77] as in the real world, it is possible and likely that not all consumers observe the brands worn by others.[78]

84.    Those who indicated that they did recognize brands worn by the person in the video were asked, "What brand(s) did you notice?" and were provided with five textboxes to enter their responses. Following this, respondents were asked a closed-ended question regarding brand(s) they recognized in the video. The question read:

> Q. You may have already mentioned this, but which of the following brands, if any, was the person in the video wearing? *(Select all that apply.)*[79]
> 1. Adidas
> 2. Vans
> 3. Converse
> 4. Etnies
> 5. Wrangler

---

[76] *Sowers Report*, Appendix I.

[77] Filter questions are a standard technique used to reduce survey respondent guessing. "In general, … a survey that uses neither full filters nor quasi-filters may overestimate the number of respondents with opinions, if some respondents offering opinions are guessing." *Diamond*, pp. 389-391.

[78] Again, Mr. Sowers' methodology assumes that all consumers would observe the sneakers, and only the sneakers, worn by an individual passing by. There is no foundation for such an assumption. Unlike a point of purchase survey where we specifically target individuals in the market for purchasing the product we are testing, we cannot assume that all sneaker purchasers, even those who have purchased recently or plan to purchase in the near future, are attending to the sneakers worn by others.

[79] Response options 1-10 were randomized to guard against order effects.

    6.  Levi's
    7.  Gap
    8.  Columbia
    9.  Champion
    10. The North Face
    11. Some other brand *(Please specify)*
    12. None of these
    13. Don't know/ no opinion

85.    Respondents were then asked, "Why do you say that?"[80]

86.    Respondents were asked one final question regarding which stores they regularly shop at. The question read:

> Q. Which of the following stores, if any, do you regularly shop at? *(Select all that apply)*[81]
> 1.  Walmart
> 2.  Target
> 3.  Kohl's
> 4.  Nordstrom
> 5.  Marshalls
> 6.  Macy's
> 7.  None of these
> 8.  Don't know / no opinion

87.    After this question, the survey ended, and respondents were thanked for their time.

## F.  Post-Sale Stimuli

88.    To determine whether consumers would confuse Defendants' shoes with Plaintiff in a post-sale environment, respondents in the Test Group were shown a video of a person wearing Defendants' No Boundaries brand black and white sneaker, along with a dark jacket and a pair of jeans. The stimulus is conservative in the sense that no other brands were present in the video and therefore to the extent that any brands would make an impression on the observer, it would be that

---

[80] Those who answered "None of these" or "Don't know/ no opinion" at the prior question were not asked this question.

[81] Response options 1-6 were randomized to guard against order effects.

associated with the accused shoe. In the real world, consumers are inundated with other brands and known designs (including visible brands or design elements on sunglasses, a jacket, pants, a purse or backpack, *etc.*) all of which may compete for attention. My survey did not include any of this additional distracting information. A still image of the shoes from the video shown to respondents in the Test Group is shown below in **Figure 6**.

**Figure 6. Still Image from Test Video Stimulus**



89.     A survey designed to test whether consumers mistakenly associate Defendants'

shoes with Plaintiff may also inadvertently include survey "noise," and may elicit guessing or may

generate responses unrelated to the specific element being tested.[82] Responses unrelated to the specific set of claimed trade dress elements must be eliminated from the final estimation of recognition. To measure the extent to which such responses are affecting the estimate, it is standard practice to measure the associations of a separate group of respondents using a control stimulus which does not include the at issue trade dress elements.[83]

90.    As is standard and proper research practice, I have included a Control Group as part of my research. Respondents in the Control Group were shown the same video of a person walking while wearing the shoes, absent the claimed trade dress elements. The pair of shoes shown in the Control Group was modified in the following ways: 1) the side stripe was removed, 2) the toe bumper was removed, 3) the three-tiered design on the side wall was removed, and 4) any instance of double stitching was removed. A still image of the shoes from the video shown to respondents in the Control Group is below in **Figure 7**.

---

[82] "The limitation of any recognition survey is that some respondents may claim awareness they do not have, simply as a result of guessing or in an effort to appear knowledgeable." Diamond, S. S. (2022). "Surveys in Dilution Cases," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., p. 165.

[83] *Diamond, 2011,* pp. 397-401. Diamond writes that "[c]ontrol groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question," p. 401. More specifically, Diamond also writes that when it comes to trade dress, "the control stimulus should ***retain*** as many non-infringing characteristics of the test stimulus as possible." (emphasis added) Diamond, S. S. (2022). "Control Foundations: Rationales and Approaches," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Diamond, S. S., and Swann, J. B., p. 250.

**Figure 7. Still Image from Control Video Stimulus**



## G. Post-Sale Survey Results[84]

91.     Rather than survey a biased population and rely on demand effects, I surveyed individuals who would be in the market for either Plaintiff's or Defendants' products. Moreover, my survey provides an estimate (albeit a conservative one) of the extent to which consumers in a more realistic environment would even attend to the sneakers worn by others. Even with no other brands, labels or distractions, these adjustments reduce the rate of measured confusion in half compared to Mr. Sowers' findings.

92.     A total of 454 respondents qualified for and completed the survey. Respondents in my Post-Sale Survey were consumers who have purchased sneakers in the past twelve months or would purchase sneakers in the next six months. As shown in **Table 1** below, this survey sample is balanced in terms of age and gender. Respondents were geographically distributed across the U.S. as is representative of the broader U.S. population (**Table 2** on next page).

### Table 1. Post-Sale Survey - Age and Gender Breakdown

| Age Group | Male | | Female | | Overall | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 48 | 23.3% | 83 | 33.9% | 133 | 29.3% |
| 35-54 | 62 | 30.1% | 85 | 34.7% | 148 | 32.6% |
| 55+ | 96 | 46.6% | 77 | 31.4% | 173 | 38.1% |
| **Total Respondents** | **206** | **100.0%** | **245** | **100.0%** | **454** | **100.0%** |

Note: Two respondents in the age group 18-34 selected "Non-binary" and one respondent in the age group 35-54 selected "Prefer not to answer."

Source: NERA Post-Sale Shoe Survey, September 2022, March 2023

---

[84] The data are included as **Exhibit E-5.**

**Table 2. Post-Sale Survey - Regional Distribution**

| Region | Count | Percent |
|--------|-------|---------|
| Northeast | 85 | 18.7% |
| Midwest | 102 | 22.5% |
| South | 176 | 38.8% |
| West | 91 | 20.0% |
| **Total Respondents** | **454** | **100.0%** |

Source: NERA Post-Sale Survey, September 2022, March 2023

93.    After confirming they could see the video clearly, I asked respondents whether they recognized any of the shoe or clothing brands worn by the person in the video. A total of 63 Test Group respondents (27.8 percent) indicated they recognized one or more brands from the video, and 38 respondents in the Control Group (16.7 percent) indicated the same.

94.    When asked what brand or brands they noticed, 28 respondents in the Test Group (12.3 percent) answered, "Vans," and 5 respondents (2.2 percent) in the Control Group also said "Vans." As shown in **Table 3**, this results in a net rate of 10.1 percent. A total of 26 respondents in the Test Group (11.5 percent) mentioned other brands of shoes, such as Nike, Converse, and Skechers.

**Table 3. Brands Respondents Noticed in Video**

| Response | Test Count | Test Percent | Control Count | Control Percent | Net Percent |
|----------|------------|--------------|---------------|-----------------|-------------|
| Vans | 28 | 12.3% | 5 | 2.2% | 10.1% |
| Other shoe brands (*i.e.*, Nike, Adidas) | 26 | 11.5% | 18 | 7.9% | -- |
| Clothing brands (*i.e.*, Columbia, Levi's) | 3 | 1.3% | 3 | 1.3% | -- |
| Descriptive responses (*i.e.*, black jacket, jeans) | 4 | 1.8% | 6 | 2.6% | -- |
| Don't know / no opinion | 2 | 0.9% | 6 | 2.6% | -- |
| Not asked[2] | 164 | 72.2% | 189 | 83.3% | -- |
| **Total Respondents** | **227** | **100.0%** | **227** | **100.0%** | |

*Q3. What brand(s) did you notice?*

Notes: [1] Respondents who gave more than one response were assigned one code, prioritizing mentions of Vans or skate-related shoes or items.
[2] Respondents who responded "No" or "Don't know / unsure" in Q2 were not asked Q3.

Source: NERA Post-Sale Survey, September 2022, March 2023

95.     Respondents were then presented with a closed-ended list of clothing and shoe brands and were asked which, if any, the person in the video was wearing. As shown in **Table 4** below, 36 respondents in the Test Group (15.9 percent) indicated that they noticed the "Vans" brand and did not select any other shoe brands from the list.[85] Ten respondents (4.4 percent) in the Control Group also selected Vans and no other shoe brand, resulting in a net rate of 11.5 percent.

**Table 4. Brands Respondents Noticed in Video (From Closed-Ended List)**

| Response | Test | | Control | | Net Percent |
|---|---|---|---|---|---|
| | Count | Percent[1] | Count | Percent[1] | |
| Vans (only)[2] | 36 | 15.9% | 10 | 4.4% | 11.5% |
| Outerwear Brands (*i.e.,* TNF, Columbia, Champion) | 25 | 11.0% | 18 | 7.9% | -- |
| Other Shoe Brands (*i.e.,* Adidas, Converse, Etnies) | 13 | 5.7% | 16 | 7.0% | -- |
| Jean Brands (*i.e.,* Levi's, Wrangler, Gap) | 12 | 5.3% | 17 | 7.5% | -- |
| Some other brand | 1 | 0.4% | 1 | 0.4% | -- |
| None of these | 2 | 0.9% | 1 | 0.4% | -- |
| Don't know/ no opinion | 5 | 2.2% | 4 | 1.8% | -- |
| Not asked[3] | 164 | 72.2% | 189 | 83.3% | -- |
| **Total Respondents** | **227** | | **227** | | |

*Q4. You may have already mentioned this, but which of the following brands, if any, was the person in the video wearing?*

Notes: [1] Percentages do not add to 100 because respondents could select multiple response options.
[2] Three additional respondents in the Test Cell selected Vans and at least one other shoe brand.
[3] Respondents who responded "No" or "Don't know / no opinion" in Q2 were not asked Q4.

Source: NERA Post-Sale Survey, September 2022, March 2023

96.     By combining the results of both the open-ended and closed-ended questions described above, I can calculate the net rate of overall confusion between the Walmart shoe shown in the video, and a Vans shoe. Overall, 36 respondents in the Test Group (15.9 percent) either typed in "Vans" in response to the open-ended question or selected it from the list of brands provided at the close-ended question. In the Control Group, 10 respondents (4.4 percent) also mentioned "Vans" or selected it from the list of brands, resulting in a net confusion rate of 11.5

---

[85] This is the appropriate way to measure genuine recognition/confusion, as a respondent selecting multiple shoe brands from the list is likely guessing, or unsure, which brand of shoe it is.

percent. This is the rate accounting for multiple opportunities to name/ identify Vans. These results are shown below in **Table 5**.

### Table 5. Overall Mentions of Vans (Post-Sale)

| Response | Test | | Control | | Net Percent |
|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | |
| Mentioned/Selected Vans | 36 | 15.9% | 10 | 4.4% | 11.5% |
| Total Respondents | 227 | | 227 | | |

*Q3. What brand(s) did you notice?*
*Q4. You may have already mentioned this, but which of the following brands, if any, was the person in the video wearing?*

Source: NERA Post-Sale Survey, September 2022, March 2023

97.     I also asked respondents one final question regarding their shopping behaviors. A total of 173 respondents in the Test Group (76.2 percent) indicated that they regularly shop at Walmart. In the Control Group, 177 respondents (78.0 percent) indicated that they regularly shop at Walmart. I can examine overall confusion for only those who indicated that they shop at Walmart. In doing so, a net 10.5 percent of respondents were confused, as shown below in **Table 6**.

### Table 6. Overall Mentions of Vans – Among Walmart Shoppers

| Response | Test | | Control | | Net Percent |
|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | |
| Mentioned/Selected Vans | 27 | 15.6% | 9 | 5.1% | 10.5% |
| Total Respondents | 173 | | 177 | | |

*Q3. What brand(s) did you notice?*
*Q4. You may have already mentioned this, but which of the following brands, if any, was the person in the video wearing?*
*Q5. Which of the following stores, if any, do you regularly shop at?*

Source: NERA Post-Sale Survey, September 2022, March 2023

98.    The results of my Post-Sale Confusion survey demonstrate that, at most, 11.5 percent of consumers would see Defendants' allegedly infringing shoes and associate them with a pair of Vans. When unprompted, a net of 10.1 percent of respondents indicated "Vans." Moreover, my survey stimuli were conservative in that they did not show any other brands and minimized other types of distractions a consumer might attend to in the real-world and as such, these results represent the likely upper bounds of potential post-sale confusion.

# IX.    BUTLER POINT-OF-SALE CONFUSION SURVEY

99.    Mr. Sowers did not test, nor has he presented any evidence to address any potential confusion at the point of purchase. In contrast, I also conducted a survey of Walmart shoppers to evaluate the potential for point-of-sale confusion. My point-of-sale survey additionally measures which shoe features are most important to Walmart consumers when purchasing adult or children's sneakers.

## A.    Point-of-Sale Survey Population

100.    The relevant population for this matter is comprised of U.S. adult consumers who have purchased or would consider purchasing sneakers from Walmart, either for themselves, another adult, a teenager, or toddler or child.

## B.    Sampling of the Relevant Population

101.    As with the Post-Sale survey, potential survey respondents in this survey were contacted by Veridata Insights, an online panel and data collection services company.[86]

102.    A total of 402 respondents qualified for and completed the survey. The survey invitation is included as **Exhibit F-1**, the complete questionnaire is provided in **Exhibit F-2**,

---

[86] See paragraph 74 above for description of Veridata.

screenshots of the survey as it appeared to respondents are included as **Exhibit F-3**, and survey stimuli are provided in **Exhibit F-4**.

103.    Data for the survey were collected between September 20 and November 3, 2022.

## C.  Quality Control Measures for the Survey

104.    To ensure that my data are of the highest quality, I implemented the same quality control measures listed above in paragraph 74.

## D.  Point-of-Sale Screening Questionnaire

105.    To ensure that panel respondents were part of the relevant population, a series of screening questions were asked. Only respondents who met these qualifying conditions continued with the main survey. To qualify for the survey, respondents had to live in the United States and be 18 years of age or older. Respondents also had to indicate that, in the past twelve months, they had purchased sneakers from Walmart, or that they would consider purchasing sneakers from Walmart within the next six months, for themselves, another adult, a teenager, or toddler or child.

106.    Once qualified for the study, respondents were taken to the main questionnaire.

## E.  Point-of-Sale Main Questionnaire

107.    In the main portion of the questionnaire, all qualified respondents were provided with the following instruction:

> Thank you for participating in today's survey. If you do not know or do not have an opinion about any of the questions, please select "Don't know / unsure." Please do not guess. Click "Continue" to proceed.

108.    Following this instruction, respondents were randomly assigned to either a Test or Control Group. My survey tested three shoes – Defendants' No Boundaries Low-Top shoe, No Boundaries High-Top shoe, and the Wonder Nation Children's shoe. Each respondent was

assigned to one of these three groups based on their selections in the screener,[87] and saw either the Test or Control version of the shoe. After being assigned to a survey group, respondents were instructed:

> Imagine you were shopping for sneakers at Walmart and you came across the following product. Please review this product as you normally would if you were considering purchasing it.

109.    After confirming that they could see the shoes clearly, respondents were asked, "If you have an opinion, who do you think makes or puts out these shoes?"[88] Respondents were then asked, "Do you think the company/brand that makes this shoe makes any other products?" with response options "Yes," "No," and "Don't know / no opinion."

110.    Those who answered "Yes" were subsequently asked "What other products are made by this company/brand?" and were able to enter their responses into five textboxes or select a "Don't know / no opinion" checkbox. For each answer entered into the textboxes, respondents were asked, "What makes you say [**ENTER RESPONSE**]?"

111.    Respondents were then asked whether or not they believed the shoes were associated with some other company(ies) or brand(s). Specifically, the question read:

> Q. Do you think the shoes shown…?[89]
>    1.    Are associated or affiliated with some other company(ies) or brand(s)
>    2.    Are not associated or affiliated with any other company(ies) or brand(s)
>    3.    Don't know / no opinion

112.    Those who indicated that the shoes were associated or affiliated with some other company(ies) or brand(s) were asked, "What other company(ies) or brand(s) is/are affiliated or

---

[87] If a respondent indicated they had, or were likely to, purchase sneakers for a toddler or child they were shown the child shoe. Those who indicated that they had, or were likely to, purchase sneakers for an adult or teenager were randomized to one of the adult shoes. Those who indicated both a toddler/child and teenager/adult were assigned to a stimulus based on the least filled cell.

[88] Respondents could enter a response or select a "Don't know / unsure" check box.

[89] Response options 1 and 2 were randomized.

associated with the company/brand of the product shown?" and were able to enter responses in up to five textboxes.[90] For each response entered into the textboxes, respondents were asked, "What makes you say [**ENTER RESPONSE**]?"

113.    All respondents were then asked whether they believed the company making the shoes was licensed by or received permission from some other company(ies) or brand(s). Specifically, the question read:

> Q. Do you think that the company making the shoes shown…?[91]
> 1.    <u>Are</u> licensed by or received permission from some other company(ies) or brand(s)
> 2.    Are <u>not</u> licensed by and has <u>not</u> received permission from any other company(ies) or brand(s)
> 3.    Don't know / no opinion

114.    Those who indicated that the company making the shoes was licensed by or received permission from some other company(ies) or brand(s) were asked, "What other company(ies) or brand(s) has/have licensed or provided permission to the company making these shoes?" and were able to enter responses into five textboxes.[92] For each response entered into the textboxes, respondents were asked, "What makes you say [**ENTER RESPONSE**]?"

115.    Respondents were next asked about their willingness to purchase the shoes shown based on the design and look of the sneaker. The question read:[93] [94]

> Q. Looking at the design and overall look of this shoe, how likely would you be to purchase it? (Please assume it is available in the correct size.) ***(Select one.)***
> 1.    Very likely
> 2.    Somewhat likely
> 3.    Neither likely nor unlikely
> 4.    Somewhat unlikely
> 5.    Very unlikely

---

[90] Respondents could also select a checkbox for "Don't know / no opinion."

[91] Response options 1 and 2 were randomized.

[92] Respondents could also select a checkbox for "Don't know / no opinion."

[93] Ends of the scale were rotated to guard against order effects.

[94] Those who selected "Don't know / unsure" were taken to the final question series.

6.  Don't know / unsure

116.    All respondents were then asked, "What makes you say you would be [**INSERT RESPONSE**] to purchase these shoes?"

117.    Respondents who indicated they were 'Very likely' or 'Somewhat likely' to purchase these shoes were then asked a closed-ended question regarding reasons that would make them likely to purchase the shoes. The question read:[95]

> Q. You may have already mentioned these, but which of the following, if any, are reasons why you say you would be [**very/somewhat**] likely to purchase these shoes? (***Select all that apply.***)[96]
>    1.  Price
>    2.  Look comfortable
>    3.  Canvas material
>    4.  Lace-ups
>    5.  Color of sneaker
>    6.  Casual style
>    7.  Side stripe
>    8.  Visible stitching
>    9.  White rubber sidewall/sole
>    10. Quality
>    11. Brand
>    12. Padded collar
>    13. Other (***Please specify***)
>    14. None of these
>    15. Don't know / unsure

118.    Respondents who indicated they would be "very" or "somewhat" likely to purchase the shoes were then asked to allocate points to the reasons previously selected. Respondents were presented with the following instructions, with the items selected in the prior question appearing below the prompt:

> Please again think about the reasons you indicated would make you [**very/somewhat**] likely to purchase these shoes. Of the items you listed (shown below), please allocate 100

---

[95] Response options 1-12 were randomized to guard against order effects.

[96] Those who selected "None of these" or "Don't know / unsure" were taken to the final question series.

points, such that items that are the most important have the greatest number of points and items that are less important have a smaller number of points.

You must use all the points so the total is 100. An item can receive all the points, or you can allocate none of the points to an item if you wish by entering a value of zero ("0"). Please enter values as whole numbers only.

119.    Respondents who indicated in the screening portion of the survey that they had previously purchased sneakers from Walmart were asked an additional series of questions. First, they were asked, "You indicated that you have purchased sneakers at Walmart in the past twelve months. Why did you purchase sneakers at Walmart?" followed by "Are there any other reasons?" Then, respondents were presented with a list and were asked to select which, if any, were reasons they purchased sneakers at Walmart. The question read:

> Q. You may have already mentioned this, but which of the following, if any, are reasons why you have purchased sneakers at Walmart? (**Please select all that apply.**)[97]
>    1. Price
>    2. They were on sale
>    3. Convenience
>    4. Comfortable
>    5. Liked the design
>    6. Color of sneaker
>    7. The laces
>    8. They had Velcro
>    9. Good quality
>    10. Durable
>    11. They had the right size
>    12. Selection
>    13. Easy to clean
>    14. Was already at Walmart making another purchase
>    15. **[if teenager or toddler/child selected in screener]** Inexpensive for growing feet
>    16. Other (**Please specify**)
>    17. None of these
>    18. Don't know / unsure

---

[97] Response options 1-15 were randomized.

120.    All respondents were then asked one final question, regarding the type of sneakers, whether an in-house brand or independent brand, they typically purchase at Walmart. The question read:

> Q. When purchasing sneakers at Walmart, [do/would] you typically purchase…? *(Select all that apply.)*[98]
>   1. Walmart brand sneakers (e.g., Time and Tru, No Boundaries, Wonder Nation)
>   2. An independent brand of sneakers (e.g., Nike, Skechers, etc.)
>   3. Don't know / unsure

121.    Following this, respondents were thanked for their time, and the survey ended.

## F.  Point-of-Sale Stimuli

122.    To determine whether consumers would confuse Defendants' shoes with Plaintiff at the point-of-sale, I tested three sets of shoes as they would appear for sale in a Walmart store.[99] **Figures 8-10** below show the images presented to each survey group.[100]

---

[98] Response options 1 and 2 were randomized.

[99] I understand the majority of Walmart shoe sales are made in store.

[100] Full size images can be found in **Exhibit F-4**.

**Figure 8. Adult High Top Shoe Test Stimuli**





**Figure 9. Adult Low Top Shoe Test Stimuli**





**Figure 10. Child Shoe Test Stimuli**



123.    Similar to my Post-Sale Survey, I have included a Control Group as a part of my Point-of-Sale Survey. Respondents in the Control Groups were shown the same shoe (either adult low top, adult high top, or child shoe), absent the claimed trade dress elements. The shoes shown in the Control Groups were modified in the following ways: 1) the side stripe was removed, 2) the toe bumper was removed, 3) the three-tiered design on the side wall was removed, 4) any instance of double stitching was removed, and for the high top shoe 5) the ribbing along the neck of the shoe was modified from three ribs into two. The images of the shoes shown to respondents in the Control Groups are below in **Figures 11-13**.



**Figure 11. Adult High Top Shoe Control Stimuli**





**Figure 12. Adult Low Top Shoe Control Stimuli**



## Figure 13. Child Shoe Control Stimuli



## G. Point-of-Sale Survey Results[101]

124.    A total of 402 respondents qualified for and completed the survey. Respondents in my Point-of-Sale Survey were consumers who have or would purchase sneakers at Walmart. As shown in **Table 7** below, slightly more women were in the survey and the ages are distributed across the age groups with the majority of the sample being between 18 and 54 years of age. Respondents were geographically distributed across the U.S. (shown in **Table 8**).

### Table 7. Point-of-Sale Survey - Age and Gender Breakdown

| Age Group | Male | | Female | | Overall | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 63 | 33.9% | 81 | 38.0% | 146 | 36.3% |
| 35-54 | 70 | 37.6% | 89 | 41.8% | 160 | 39.8% |
| 55+ | 53 | 28.5% | 43 | 20.2% | 96 | 23.9% |
| **Total Respondents** | **186** | **100.0%** | **213** | **100.0%** | **402** | **100.0%** |

Note: Two additional respondents in age group 18-34 and one respondent in age group 35-54 identified as non-binary.

Source: NERA Point-of-Sale Shoe Survey, September - November 2022

### Table 8. Point-of-Sale Survey - Regional Distribution

| Region | Count | Percent |
|---|---|---|
| Northeast | 67 | 16.7% |
| Midwest | 95 | 23.6% |
| South | 179 | 44.5% |
| West | 61 | 15.2% |
| **Total Respondents** | **402** | **100.0%** |

Source: NERA Point-of-Sale Shoe Survey, September - November 2022

125.    Respondents were shown several product images. Those who indicated that they have or were likely to purchase sneakers for themselves, another adult, or a teenager were shown

---

[101] The data are included as **Exhibit F-5**.

either the Adult High Top or Adult Low Top shoe. Respondents who indicated that they have or were likely to purchase sneakers for a child or toddler were shown the Child/Toddler Shoe.

126.    After confirming they could see the images clearly, respondents were then asked to indicate who they think makes or puts out these shoes. Responses to this open-ended question were coded, and these results are shown below in **Table 9**.

**Table 9. Respondents' Thoughts on Who Makes or Puts Out These Shoes**

| Response[1] | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Vans | 5 | 2.5% | 2 | 1.0% |
| Walmart (or a Walmart brand) | 112 | 55.7% | 120 | 59.7% |
| Other shoe brands (*i.e.,* And1, Puma) | 24 | 11.9% | 16 | 8.0% |
| Other responses | 20 | 10.0% | 24 | 11.9% |
| Don't know / unsure | 40 | 19.9% | 39 | 19.4% |
| **Total Respondents** | **201** | **100.0%** | **201** | **100.0%** |

*Q2. If you have an opinion, who do you think makes or puts out these shoes?*

Note: [1] Respondents who gave more than one response were assigned one code, prioritizing mentions of Vans or skate-related shoes or items.

Source: NERA Point-of-Sale Shoe Survey, September - November 2022

127.    The majority of respondents in both the Test and Control groups indicated that Walmart, or a Walmart brand (e.g., No Boundaries, Wonder Nation) makes or puts out the shoes shown (55.7 percent and 59.7 percent, respectively). In the Test Group, five respondents (2.5 percent) indicated that the shoes were put out by Vans. In the Control Group, two respondents (1.0 percent) also indicated that the shoes were put out by Vans.

128.    When asked whether they think the company that makes these shoes makes any other products, the majority of respondents in both the Test Group (68.2 percent) and Control Group (71.6 percent) said "Yes." These results are shown below in **Table 10**.

**Table 10. Whether the Company that Makes these Shoes Makes any Other Products**

| Response | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| Yes | 137 | 68.2% | 144 | 71.6% |
| No | 13 | 6.5% | 8 | 4.0% |
| Don't know / no opinion | 51 | 25.4% | 49 | 24.4% |
| **Total Respondents** | **201** | **100.0%** | **201** | **100.0%** |

*Q3. Do you think the company/brand that makes this shoe makes any other products?*

Source: NERA Point-of-Sale Survey, September - November 2022

129.    When asked what other products were made by the company that makes the shoes, the most common response among respondents in both the Test and Control Groups (44.3 percent and 50.2 percent, respectively) was "clothes," or mentions of particular articles of clothing (i.e., shirts, pants, etc.), and accessories. Only two respondents in the Test Group mentioned Vans. No respondents indicated "skate shoes" or other skate related paraphernalia.

130.    When asked whether the shoes were associated or affiliated with any other companies, 43.8 percent of respondents in the Test Group and 34.8 percent of respondents in the Control Group indicated "Yes." These results can be found below in **Table 11**.

**Table 11. Respondents' Thoughts on Whether the Shoes are Associated or Affiliated with Other Companies**

| Response | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| <u>Are</u> associated or affiliated with some other company(ies) or brand(s) | 88 | 43.8% | 70 | 34.8% |
| Are <u>not</u> associated or affiliated with any other company(ies) or brand(s) | 57 | 28.4% | 61 | 30.3% |
| Don't know / no opinion | 56 | 27.9% | 70 | 34.8% |
| **Total Respondents** | **201** | **100.0%** | **201** | **100.0%** |

*Q4. Do you think the shoes shown…?*

Source: NERA Point-of-Sale Survey, September - November 2022

131.    When asked to identify which company or brand has an association or affiliation with these shoes, nine respondents in the Test Group (4.5 percent) and one respondent in the Control Group (0.5 percent) named Vans. The majority of other responses were "Walmart."

132.    Next, when asked about licensing and approval, 47.8 percent of respondents in the Test Group and 46.8 percent of respondents in the Control Group indicated that they believed the shoes had been licensed or approved by some other company or brand. These results can be found below in **Table 12**.

### Table 12. Respondents' Thoughts on Licensing and Permission

| Response | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| <u>Are</u> licensed by or received permission from some other company(ies) or brand(s) | 96 | 47.8% | 94 | 46.8% |
| Are <u>not</u> licensed by and has not received permission from any other company(ies) or brand(s) | 32 | 15.9% | 39 | 19.4% |
| Don't know / no opinion | 73 | 36.3% | 68 | 33.8% |
| **Total Respondents** | **201** | **100.0%** | **201** | **100.0%** |

*Q5. Do you think that the company making the shoes shown…?*

Source: NERA Point-of-Sale Survey, September - November 2022

133.    When asked to identify which other company or brand provided licensing and/or approval, four respondents in the Test Group (2.0 percent) and four respondents in the Control Group (2.0 percent) mentioned Vans.

134.    To estimate overall confusion, I tabulated the number of unique mentions of Vans across the source, association/affiliation, and permission questions. A total of twelve respondents (6.0 percent) in the Test Group identified Vans and seven respondents (3.5 percent) in the Control Group mentioned Vans. When I use the Control to net out survey noise from the Test Group, the

overall net estimate of point-of-sale confusion is 2.5 percent. The overall estimate is shown below in **Table 13**.

**Table 13. Overall Mentions of Vans (Point-of-Sale)**

| Response | Test | | Control | | Net Percent |
|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | |
| Mentioned Vans | 12 | 6.0% | 7 | 3.5% | 2.5% |
| **Total Respondents** | **201** | | **201** | | |

*Q2. If you have an opinion, who do you think makes or puts out these shoes?*
*Q3a. What other products are made by this company/brand?*
*Q4a. What other company(ies) or brand(s) is/are affiliated or associated with the company/brand of the product shown?*
*Q5a. What other company(ies) or brand(s) has/have licensed or provided permission to the company making these shoes?*

Source: NERA Point-of-Sale Survey, September - November 2022

135.    These results demonstrate that consumers are highly unlikely to believe the accused Walmart shoes are put out by, are associated with, or are licensed by Vans. Even without the Control, across four separate questions, only twelve respondents viewing an accused sneaker mentioned Vans.

136.    The point-of-sale survey next asked respondents how likely they would be to purchase the shoe shown. The majority of consumers in both the Test and Control Group (65.7 percent and 60.7 percent, respectively) indicated they would be either "Very" or "Somewhat" likely to purchase the shoe shown. These results demonstrate that absent the elements of the allegedly infringing design (i.e., the white stripe, the double-stitching, three-tiered side wall, toe bumper, and ribbed padded collar on the high-top shoe), consumers would be just as likely to purchase the shoe.[102]

---

[102] The distribution of likely purchasing between the Test and Control Group is not statistically significantly different. Pearson Chi-Square: 5.72; *p*-value: 0.33.

137.    Respondents who indicated that they were "Very" or "Somewhat" likely to purchase the shoe shown were next asked what reasons, from a list of items, would make them likely to purchase the shoes shown. The top reasons selected among respondents in the Test Group, but also in the Control Group, were that the shoes look comfortable (49.3 percent in the Test Group, 46.3 Control Group), the price (43.8 percent Test, 39.8 Control Group), and the casual style (42.8 percent Test Group, 37.8 Control Group).[103] In contrast, among the least selected reasons selected for purchasing the shoe in the Test Group were the white rubber sidewall (15.9 percent), the side stripe (12.9 percent), the padded collar (12.4 percent) and the visible stitching (10.9 percent). In fact, a number of respondents in the Control Group also identified these same design elements (for example, 4.0 percent indicated that the side stripe was an element on the Control sneaker that would make them likely to purchase) indicating that these respondents were guessing or simply selecting items from the list. The survey noise observed in the Control Group related to the accused design elements suggests that some proportion of respondents in the Test Group were also simply guessing or selecting these design elements randomly from the provided list.

---

[103] Respondents who were asked about the toddler/child shoe were more likely to indicate that price was the number one reason for being interested in purchasing the child's shoe shown.

**Table 14. Reasons Why Respondents Would be Likely to Purchase Shoe Shown**

| Response | Test | | Control | |
|---|---|---|---|---|
| | Count | Percent[1] | Count | Percent[1] |
| Look comfortable | 99 | 49.3% | 93 | 46.3% |
| Price | 88 | 43.8% | 80 | 39.8% |
| Casual style | 86 | 42.8% | 76 | 37.8% |
| Color of sneaker | 72 | 35.8% | 47 | 23.4% |
| Quality | 57 | 28.4% | 61 | 30.3% |
| Canvas material | 39 | 19.4% | 37 | 18.4% |
| Lace-ups | 32 | 15.9% | 26 | 12.9% |
| White rubber sidewall/sole | 32 | 15.9% | 25 | 12.4% |
| Side stripe | 26 | 12.9% | 8 | 4.0% |
| Brand | 25 | 12.4% | 29 | 14.4% |
| Padded collar | 25 | 12.4% | 17 | 8.5% |
| Visible stitching | 22 | 10.9% | 12 | 6.0% |
| Other | 5 | 2.5% | 4 | 2.0% |
| None of these | 1 | 0.5% | 0 | 0.0% |
| Don't know / unsure | 1 | 0.5% | 0 | 0.0% |
| Not asked[2] | 69 | 34.3% | 79 | 39.3% |
| **Total Respondents** | **201** | | **201** | |

*Q8. You may have already mentioned these, but which of the following, if any, are reasons why you say you would be [very/somewhat] likely to purchase these shoes?*

Notes: [1] Percentages do not add to 100 because respondents could select multiple response options.

[2] Respondents who responded "Neither likely or unlikely," "Somewhat unlikely," "Very unlikely," or "Don't know / no opinion" in Q6 were not asked Q8.

Source: NERA Point-of-Sale Survey, September - November 2022

138.    Respondents who indicated they were likely to purchase the shoe shown were next asked to allocate a total of 100 points to the reasons they selected from the list at the prior question, such that the most important reasons received the most points. As shown below in **Table 15**, the items that received the most points, on average, across both the Test and Control Groups were again price, that the shoes look comfortable, and the casual style.[104] The items receiving the lowest

---

[104] For those who were shown the toddler/child shoe, price received the largest share of points when asked about reasons for being interested in purchasing the shoes shown.

number of points, on average, (besides responses provided for 'Other') were again, the side stripe, the white rubber sidewall, the padded collar, and the visible stitching.

**Table 15. Average Allocation of Points Among Reasons for Purchase**

| Response | Test Average Points | Control Average Points |
|---|---|---|
| Price | 23.1 | 23.7 |
| Look comfortable | 21.2 | 20.3 |
| Casual style | 12.2 | 15.6 |
| Quality | 11.1 | 12.6 |
| Color of sneaker | 8.7 | 7.2 |
| Canvas material | 4.8 | 4.9 |
| Brand | 4.2 | 5.0 |
| Lace-ups | 3.1 | 3.4 |
| Side stripe | 3.0 | 1.2 |
| White rubber sidewall/sole | 2.9 | 2.6 |
| Padded collar | 1.8 | 1.4 |
| Visible stitching | 1.7 | 1.1 |
| Other | 2.2 | 1.0 |

*Q9. Please again think about the reasons you indicated would make you [very/somewhat] likely to purchase these shoes. Of the items you listed (shown below), please allocate 100 points, such that items that are the most important have the greatest number of points and items that are less important have a smaller number of points.*

*You must use all the points so the total is 100. An item can receive all the points, or you can allocate none of the points to an item if you wish by entering a value of zero ("0"). Please enter values as whole numbers only.*

Source: NERA Point-of-Sale Survey, September - November 2022

139.    The survey asked respondents who indicated that they had previously purchased sneakers from Walmart were asked why they purchased sneakers at Walmart. Common responses mentioned the low price of shoes at Walmart and the convenience. For example, Respondent 4270 indicated they were "Just looking for casual, low budget, kick-around footwear," and followed on to say "Convenient location.  Prefer to shop in-store for footwear, as sizes differ depending on maker.  Also great for one stop shop." Respondent 2559 indicated "price and convience (sic)", and

Respondent 682 stated, "Good price good quality and it is convenient." Price and convenience were also common themes among consumers purchasing shoes for children. For example, Respondent 98 indicated "their cheap and convenient" and Respondent 3202 similarly stated "convenient and low price." Respondent 635 states "Because I dont like to spend a lot of money on things like shoes especially for multiple children and the shoes at walmart are cheap with a good selection and good quality," and followed on to say, "Walmart is where I do most of my shopping." Respondent 291 explained "We purchase my child's shoes because they are cheap and she out grows them quickly" and followed on with "Walmart is a close location with sizes usually in stock."

140.    Finally, I again asked respondents why they purchased sneakers from Walmart and provided them with a list. Among those asked, the most common reasons for purchasing sneakers at Walmart included price (76.0 percent), convenience (53.0 percent), the shoes are comfortable (47.6 percent), and because they were already at Walmart making another purchase (40.6 percent).

141.    The results from my Point-of-Sale Survey demonstrate that consumers can readily distinguish Walmart's products from those of Vans and are unlikely to confuse the allegedly infringing shoe sold by Walmart with Vans when making a purchase. Further, Walmart shoppers indicated they would be just as likely to purchase the shoes shown without the allegedly infringing design elements as the shoes with these elements, and that the accused elements are not important purchase drivers for the shoes shown.

## X.    BUTLER SHOE SUBSTITUTION SURVEY METHODOLOGY

142.    I also conducted an additional survey intended to measure the extent to which a Walmart sneaker purchaser, in particular one who would be likely to purchase an accused shoe,

would substitute a Vans shoe if the accused shoe was no longer available. I understand this is relevant because Dr. Joachimsthaler has created estimates based on his assumptions as to 1) what proportion of Walmart sneaker purchasers would be interested in purchasing an accused shoe and 2) the rate at which these purchasers would purchase a Vans sneaker instead.[105]

### A. Shoe Substitution Survey Population

143.    The relevant population for this matter is comprised of U.S. consumers, ages 18 and older, who have purchased sneakers from Walmart.

### B. Sampling of the Relevant Population

144.    As with both of my previous surveys, potential survey respondents were contacted by Veridata Insights, an online panel and data collection services company.

145.    A total of 610 respondents qualified for and completed the survey. The survey invitation is included as **Exhibit G-1**, the complete questionnaire is provided in **Exhibit G-2**, screenshots of the survey as it appeared to respondents are included as **Exhibit G-3**, and survey stimuli are provided in **Exhibit G-4**.

146.    The data for the survey were collected between June 30, 2023 and July 10, 2023.[106]

### C. Quality Control Measures for the Survey

147.    To ensure that my data are of the highest quality, I implemented the same quality control measures listed above in paragraph 66.

### D. Shoe Substitution Screening Questionnaire

148.    To ensure that panel respondents were part of the relevant population, a series of screening questions were asked. Only respondents who met these qualifying conditions continued

---

[105] Based on conversation with counsel. I have not been asked to review and provide a response to Dr. Joachimsthaler's report. I understand other experts are addressing this report.

[106] An additional 49 interviews were collected in March 2023 to ensure the demographics of the survey sample were representative of the broader U.S. population.

with the main survey. Respondents had to live in the United States and be 18 years old or older to quality for the survey. Similar to my Point-of-Sale Survey, respondents also had to indicate they had purchased sneakers from Walmart in the past twelve months either for themselves, another adult, a teenager, or a toddler or child.

149.    Once qualified for the study, respondents were taken to the main questionnaire.

## E.  Shoe Substitution Main Questionnaire

150.    In the main portion of the questionnaire, all qualified respondents were provided with the following instruction:

> Imagine you were shopping for sneakers at Walmart, and you came across the following product. Please review this product as you normally would if you were considering purchasing it. For the remainder of the survey, this shoe will be referred to as **SHOE A.**

151.    All respondents were then shown the No Boundaries Low-Top sneaker priced at $14.97.

152.    After confirming that they could see the image clearly, respondents were asked how likely they would be to purchase the shoe. Specifically, the question read, "If you were considering purchasing sneakers, how likely would you be to purchase these shoes for $14.97?" Respondents were provided with a 7-point Likert scale, with options ranging from "Very likely" to "Very unlikely,"[107] and could also indicate "Don't know / unsure." Respondents who selected something other than don't know were asked a follow-up question about what made them say they would likely/unlikely to purchase these shoes.

153.    All respondents were next provided with the following set of instructions:

> Please now imagine **SHOE A**, the shoe you were just shown, is no longer available for purchase. Next, you will be shown several different shoe options for purchase instead. For each array, please

---

[107] The Likert scale was rotated so that half of respondents saw a scale ranging from "Very unlikely" to "Very likely."

select the shoe **you would be most likely to purchase** if **SHOE A** was not available. You may also indicate that you would not purchase any of the shoes shown.

154.    Respondents were then presented with six different sets of alternative sneakers, were asked, for each set, to select the shoe they would be most likely to purchase if "Shoe A" (the No Boundaries low top) was no longer available. Across 610 respondents, this yields a total of 3,660 observations. For each alternative selected, a follow up question was asked after each choice set as to whether they would actually be likely to purchase the shoe they selected. The specific question wording was as follows, "You indicated you would purchase the [INSERT BRAND] shoes for $[INSERT PRICE]. Considering other shoes available on the market and your budget, would you actually purchase the shoes you selected?" Response options were rotated and included "Yes," "No," or "Don't know / unsure."

155.    Each set shown provided respondents with alternatives that used generally similar coloring and styling:[108] 1) a No Boundaries brand non-accused shoe, 2) a Vans Old Skool shoe, 3) a lower-mid priced shoe (either a Payless brand Airwalk shoe or a Levi's brand shoe), 4) a mid-price shoe (either Adidas or Puma), and 5) a higher-price shoe (either Nike, or a Skechers brand shoe). Respondents could also indicate that they would not purchase any of the shoes shown.

156.    Following the choice sets, all respondents were asked an open-ended question about what features are most to them when purchasing sneakers. A follow-up question asked respondents whether there was anything else they would like to mention. Respondents who indicated they had previously purchased sneakers for children or toddlers, were also asked an open-ended question about what features are most important to them when purchasing sneakers for toddlers or children.

---

[108] As shown in **Exhibit G-4**, each of the alternative shoes shown was largely black and white with a flat, white rubberized sole.

157.    Respondents were asked one final question for quality control purposes.[109] After this question, the survey ended, and respondents were thanked for their time.

## F.  Shoe Substitution Stimuli

158.    Respondents were shown a random set of six groupings of alternative sneakers.[110] For each of the groupings shown, respondents were provided with an array of five shoe options. Every group included a Walmart No Boundaries brand non-accused shoe alternative, and a Vans Old Skool sneaker. Each group also included a middle-lower priced brand (Levi's or Airwalk), and mid-priced brand (Adidas or Puma) and a higher-priced brand (Nike or Skechers). These "distractor" shoes were included to ensure that survey respondents were not simply focused on comparing the accused shoe to Vans as such an isolated comparison would have created focalism bias.

159.    Each brand of shoe was also shown at varying price points to represent the types of prices consumers might see in the real world.[111] The alternative Walmart No Boundaries brand shoe was shown either at the actual price of the low-top sneaker ($14.97) or at the actual price of the high-top sneaker ($18.64). For all other brands, the shoes were shown at an advertised price (for example, $69.97 for Vans Old Skool), or at price 20 percent below or 20 percent above this advertised price. I included the additional price points (+/- 20 percent) to ensure that the substitution data I have is not dependent on any alternative brand only being offered at a single

---

[109] Respondents were presented with a list of response options and were asked in the question stem to type the word "survey" into the response for "Other." Only six respondents incorrectly answered this survey question and were excluded from the analyses reported here.

[110] The six sets were selected from a total of twelve different groupings, three from the groups labeled 1-6 and three from the groups labeled 7-12. The sets included options for the lower-mid, mid, and higher-priced "distractor" shoe brands. See **Exhibit G-2** for the twelve choice sets.

[111] For example, shoes on sale, or shoes offered in a more exclusive colorway or design.

price and to account for the fact that products can be discounted or be more expensive depending on the sneaker model. An example choice set is shown below in **Figure 14**.



**Figure 14. Example Choice Set Shown to Respondents**

## G. Shoe Substitution Survey Results[112]

160.     A total of 610 respondents qualified for and completed the survey. Respondents in my Shoe Substitution Survey were consumers who have purchased sneakers from Walmart in the past twelve months for themselves, another adult, a teenager, or for a toddler or child. As shown in **Table 16** below, this survey includes both men and women and the majority of the sample is between the ages of 18 and 54 years old. Respondents were geographically distributed across the U.S. (**Table 17** on next page).

---

[112] The data are included as **Exhibit G-5**.

**Table 16. Shoe Substitution Survey - Age and Gender Breakdown**

| Age Group | Male | | Female | | Overall | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 95 | 31.1% | 112 | 36.7% | 207 | 33.9% |
| 35-54 | 146 | 47.9% | 120 | 39.3% | 266 | 43.6% |
| 55+ | 64 | 21.0% | 73 | 23.9% | 137 | 22.5% |
| **Total Respondents** | **305** | **100.0%** | **305** | **100.0%** | **610** | **100.0%** |

Source: NERA Shoe Substitution Survey, June-July 2023

**Table 17. Shoe Substitution Survey - Regional Distribution**

| Response | Count | Percent |
|---|---|---|
| Northeast | 107 | 17.5% |
| Midwest | 130 | 21.3% |
| South | 247 | 40.5% |
| West | 126 | 20.7% |
| **Total Respondents** | **610** | **100.0%** |

Source: NERA Shoe Substitution Survey, June-July 2023

161.    After confirming that they could see the accused Walmart No Boundaries low-top sneaker clearly, I asked respondents how likely they would be to purchase the shoe for $14.97. A total of 82.5 percent of respondents indicated they would be at least somewhat likely to purchase the shoe. As detailed in **Table 18**, 31.1 percent of respondents said they would be very likely to purchase, 19.0 percent said they would be likely, and 32.3 percent said they would be somewhat likely to purchase the shoe. A total of 17.0 percent of consumers who have or would purchase sneakers at Walmart, did not indicated that they would be likely to purchase the accused shoe.[113]

---

[113] This includes the three respondents who indicated that they did not know.

**Table 18. Respondents Likelihood of Purchasing the Accused Shoe**

| Response | Count | Percent |
|---|---|---|
| Very likely | 190 | 31.1% |
| Likely | 116 | 19.0% |
| Somewhat likely | 197 | 32.3% |
| Neither likely or unlikely | 31 | 5.1% |
| Somewhat unlikely | 23 | 3.8% |
| Unlikely | 23 | 3.8% |
| Very unlikely | 27 | 4.4% |
| Don't know / unsure | 3 | 0.5% |
| **Total Respondents** | **610** | **100.0%** |

*Q2. If you were considering purchasing sneakers, how likely would you be to purchase these shoes for $14.97?*

Source: NERA Shoe Substitution Survey, June-July 2023

162.    Respondents were then presented with sets of alternatives and asked to select which shoe they would be most likely to purchase if the previous shoe was no longer available. Among those likely to purchase the accused shoe, more than half of all respondents, or 58.3 percent, *never* selected the Vans shoe as an alternative. Moreover, even of respondents who selected the Vans shoe, the selection was made infrequently. Of the 3,018 choices,[114] only 15.7 percent were made substituting the Vans shoe for the accused Walmart sneaker. Respondents were more than twice as likely to select an alternative Walmart sneaker (40.0 percent of choices made), compared to Vans, if the accused shoe was no longer available. These results are shown below in **Table 19**.

---

[114] This is less than the total number of possible choices because some respondents, when shown the accused shoe, indicated that they would not be likely or didn't know if they would purchase the shoe. The total of 3,018 selections represents the six possible selections among the 503 respondents who indicated they would be likely to purchase the accused shoe (503 x 6 = 3,018). These results do not change when I take into account the follow-up question about whether respondents would actually purchase the shoe they selected.

**Table 19. Shoes Respondents Would Select Otherwise Among Those Likely to Purchase the Accused Shoe[115]**

| Response | Count | Percent |
|---|---|---|
| Vans | 475 | 15.7% |
| No Boundaries (non-accused alternative) | 1208 | 40.0% |
| Low-mid | 560 | 18.6% |
| Middle | 371 | 12.3% |
| High | 329 | 10.9% |
| None of these | 75 | 2.5% |
| **Total Respondent Selections[1]** | **3018** | **100.0%** |

*Q4. Which of the following would you be **most likely to purchase** if SHOE A was no longer available?*

Note: [1] Represents the total number of selections made by each respondent.

Source: NERA Shoe Substitution Survey, June-July 2023

163.    All respondents were next asked what features are important to them when purchasing sneakers. Common themes included price, comfort, and style across both respondents who selected Vans in the choice sets and those who did not. No one indicated that a "stripe" was important to them, and only a single respondent (who did not select Vans) indicated that the stitching was important. Respondents were just as likely to mention the general "design" of the shoe as being important if they had not selected the Vans shoe as compared to those that did at least once select the Vans shoe. Some examples of respondent verbatims are shown below in **Table 20**.

---

[115] I also have the selection of Vans tabulated for the lower price point of $55.98. See additional Sensitivity Table in **Exhibit G-6**.

**Table 20. Respondent Verbatims of Important Features When Purchasing Sneakers**

**Never Selected Vans**

| ID | Response |
|----|----------|
| 319 | Price and comfort |
| 389 | The comfort is most important to me but I would also want something that looks appealing. |
| 486 | Quality and price |
| 548 | They have to be comfortable on the feet, attractive and reasonably priced. |
| 629 | I look for comfort style and price |
| 815 | Price is the most important, followed by comfort and support. |
| 1096 | Style and price. |
| 1164 | pricing, comfortability, style |
| 1283 | Softness and comfort are my top priorities |
| 1653 | Affordable price design is more simple and stylish |
| 1807 | Price and comfort |
| 2118 | Price and design are very important to me. |
| 2966 | Comfort and affordability. |

**Selected Vans At Least Once**

| ID | Response |
|----|----------|
| 124 | comfort then style |
| 946 | The price. Are they comfortable and look good. Quality. |
| 1012 | Price and confort |
| 1081 | the price, the color, the comfort and the style. |
| 1234 | The design and the price |
| 2842 | Comfort, style, and price |
| 3361 | The price and comfort |
| 3685 | comfort, style and price |
| 4043 | Comfortable price |
| 4082 | Just a style and comfort |
| 4108 | Price and style |
| 4222 | Style, and comfort as well as their price. |
| 4588 | Comfort. Price |

*Q16. When purchasing sneakers, what feature(s) is/are most important to you?*

Source: NERA Shoe Substitution Survey, June-July 2023

164.    These results demonstrate that not all consumers who would purchase sneakers at Walmart would purchase the accused shoes. Further, the results demonstrate that less than half of respondents would ever substitute the Vans sneaker for the accused sneaker and the rate of substitution is substantially lower. In fact, only 15.7 percent of respondents' alternative selections (if the accused shoe were unavailable) were for Vans.

# XI.  CONCLUSIONS

165.    Mr. Sowers conducted five surveys in total, all of which are rendered unreliable by demand effects (created by repeated references to and emphasis of "skate shoes") and the use of a running style Control sneaker which cannot account for respondents' general tendency to name Vans when asked to think about "skate shoes." Further, Mr. Sowers provides no evidence or justification for his out of context, close-up view of only a leg and the accused shoe in his post-sale survey. By presenting the stimulus in this manner, Mr. Sowers creates focalism bias and forces his respondents to attend more carefully to the design of the sneakers than they would otherwise.

166.    My post-sale survey demonstrates the extent to which focalism has inflated Mr. Sowers' estimate of confusion. By allowing respondents to view a whole person and asking whether any brands were noted, my survey generates rates that are less than half of those produced by Mr. Sowers. My results demonstrate that even when the exposure to the accused sneaker is conservative (*i.e.*, there are no other brands or persons as distractors) only between a net 10 and 11 percent of respondents believe the sneakers shown are or are associated with Vans.

167.    My point-of-sale survey confirms consumers are unlikely to be confused when making a purchase. Here, less than a net three percent of respondents indicate that the accused shoes are made by, associated with, or licensed by Vans. These results also demonstrate that

consumers who purchase sneakers at Walmart are largely interested in the accused shoe because of its price or because it looks comfortable and do not find the accused design elements to be particularly influential. Further, the distribution of consumers' interest in purchasing the shoe shown does not differ substantially whether the accused design elements are present or are not. Finally, my shoe substitution survey demonstrates that Vans is infrequently a substitute for an accused sneaker. In fact, my data show that Vans was only selected as an alternative to the accused sneaker in 15.7 percent of the selections and more than half of over 600 Walmart sneaker purchasers *never* selected the Vans sneaker in lieu of the accused shoe.

168.    My conclusions have been reached through the proper application of survey methods and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if I am provided with additional information. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Sarah Butler, Managing Director
July 14, 2023